## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CONFERENCE OF STATE BANK SUPERVISORS,<br>1129 20th Street, N.W.<br>Washington, D.C. 20036<br><br>           Plaintiff,<br><br>  v.<br><br>OFFICE OF THE COMPTROLLER<br>OF THE CURRENCY,<br>400 7th Street SW,<br>Washington, D.C. 20219<br><br>and<br><br>JOSEPH OTTING,<br>COMPTROLLER OF THE CURRENCY,<br>400 7th Street SW,<br>Washington, D.C. 20219<br><br>           Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)     Civil Action No. _____ |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff CONFERENCE OF STATE BANK SUPERVISORS ("CSBS") brings this Complaint for declaratory and injunctive relief against the OFFICE OF THE COMPTROLLER OF THE CURRENCY and JOSEPH OTTING, COMPTROLLER OF THE CURRENCY ("Comptroller Otting") (collectively, the "OCC"), alleging as follows:

### INTRODUCTION

1.      CSBS, the nationwide organization of state banking regulators in the United States, brings this action challenging the OCC's creation of a new special-purpose national bank charter for nonbank companies, including financial technology companies ("fintech") (the "Nonbank Charter Program").

2.      State authorities (including CSBS's members) have been successfully overseeing and regulating nonbank institutions—including those viewed as fintech in nature—for more than a century.  In addition to supervising state-chartered banks, most state banking departments regulate a variety of nonbank financial services providers, including money transmitters, mortgage lenders, consumer lenders, and debt collectors.

3.      Long before the OCC's interest in these companies manifested itself in the Nonbank Charter Program, nonbanks have unquestionably been subject to state regulatory authority and state law for many decades—including but not limited to licensing, examination and reporting requirements, usury laws, and a variety of other consumer protections, such as restrictions on product terms and unfair and deceptive practices, and requirements pertaining to disclosure, investments, and net worth.  Among other prudential requirements, states also impose upon these nonbank companies certain business-conduct requirements and ensure that these institutions conform to both state and federal consumer-protection and anti-money-laundering laws.

4.      More recently, however, the explosive growth of the nonbank financial services industry has drawn the OCC's attention, leading to the creation of its Nonbank Charter Program. The Nonbank Charter Program pulls nonbank fintech companies that receive the charter into the national banking regulatory system, thereby preempting and displacing the licensing, regulation, and supervision responsibilities of state authorities over these institutions.

5.      The OCC contends that the number of fintech companies in the United States and United Kingdom has reached more than 4,000, with investment in the sector growing from $1.8 billion to $24 billion worldwide in just the last five years.  It is therefore without question that the OCC's actions to remove these nonbank companies from state oversight will have significant

economic consequences—for example, the largest 10 money transmitters alone transferred more than $685 billion in 2017.

6.      The OCC formally announced its interest in nonbanks and the creation of a new national bank charter for nonbank companies in December 2016, under the leadership of then-Comptroller Thomas J. Curry ("Comptroller Curry").   In the ensuing months, the OCC went through several leadership changes and faced a previous lawsuit filed by CSBS challenging its authority under the National Bank Act ("NBA") to offer the nonbank charter.   In response, the OCC (at least ostensibly) reconsidered the creation of the new charter.

7.      But on July 31, 2018, the OCC clearly and unambiguously announced that it would pursue its originally announced intention to exercise its alleged power to charter nonbanks, stating that it has now begun accepting applications for nonbank charters.   OCC Press Release, *OCC Begins Accepting National Charter Applications for Financial Technology Companies*, OCC (July 31, 2018), https://www.occ.gov/news-issuances/news-releases/2018/nr-occ-2018-74.html (attached hereto as Exhibit A).

8.      On the same day, the OCC published a Policy Statement to "clarify its intent to exercise its existing chartering authority," as well as a supplement to its Licensing Manual explaining the policies and procedures governing its Nonbank Charter Program.   *See* OCC Policy Statement dated July 31, 2018 and *Comptroller's Licensing Manual Supplement: Considering Charter Applications from Financial Technology Companies* (attached hereto as Exhibits B and C).

9.      In announcing the commencement of the Nonbank Charter Program, the OCC made clear that the program is intended only for companies that do not take deposits and are not insured by the Federal Deposit Insurance Corporation ("FDIC").   *See* Licensing Manual

3

Supplement, Exhibit C at p. 2.  The OCC also made its official position regarding its authority to regulate these companies clear: the OCC's chartering authority does not require that the company take deposits.  *See* Press Release, Exhibit A.

10.     By creating a national bank charter for nonbank companies like fintech firms, the OCC has gone far beyond the limited authority granted to it by Congress under the NBA and other federal banking laws. Those laws cabin the OCC's authority to charter only those institutions that carry on either the "business of banking" or certain special purposes expressly authorized by Congress.  It is well settled by court precedent, federal banking laws, and historical chartering practice that carrying on the "business of banking" under the NBA requires, at a minimum, engaging in receiving deposits.  Yet the OCC has, through its latest effort, created without express statutory authorization a new type of charter for nonbank companies that would neither carry on the business of banking (because chartered companies would not be engaged in deposit-taking), nor any expressly authorized special purpose.

11.     Because creating a national bank charter for nondepository institutions, and the regulation upon which the OCC relies in doing so, are contrary to the NBA and inconsistent with other federal banking laws, the OCC has acted beyond its statutory authority and not in accordance with law.

12.     Further, because the OCC established the Nonbank Charter Program without adequately considering and addressing the myriad policy implications and concerns raised by the public or conducting an adequate cost-benefit analysis, and because the OCC has not offered a reasoned explanation for its decision, its actions should be deemed not only contrary to law, but also arbitrary, capricious, and an abuse of discretion.

13.     The OCC has also acted without observance of procedure required by law.  The OCC has created this sweeping new nonbank charter without following the notice and comment procedures applicable to preemption interpretations under the NBA, instead opting merely to publish a high-level white paper, policy statement, and a supplement to the Comptroller's Licensing Manual and seeking public "feedback" regarding the mechanics of its new charter. Notwithstanding the significance of the nondepository financial services industry to consumers and the consequences of this new charter, the OCC has declined to pursue publicly vetted interpretations.

14.     Finally, the OCC's Nonbank Charter Program allows chartered entities to operate outside the bounds of existing state regulation and preempts state law.  But the OCC through its Nonbank Charter Program cannot preempt state law without clear evidence of Congressional intent to authorize the OCC to do so.  Because Congress has not granted the OCC the requisite authority to charter these nonbank entities, much less expressed the intent that the OCC's nonbank charter program should preempt state law, the OCC's program violates the Supremacy Clause and the Tenth Amendment of the U.S. Constitution.

15.     Moreover, this challenge to the OCC's chartering authority is now ripe for review. On April 30, 2018, the Honorable Dabney L. Friedrich found that the issuance of a Nonbank Charter was too speculative to support standing or ripeness and dismissed CSBS's prior lawsuit without prejudice.  At that time, the OCC was in the midst of a leadership change and had publicly expressed uncertainty regarding whether it would move forward with the Nonbank Charter Program at all.  In fact, in seeking the dismissal of CSBS's lawsuit as premature, the OCC argued it was "incontrovertible that the OCC ha[d] not decided whether to accept applications" for the Nonbank Charter Program. *See* Reply in Support of Defendant's Motion to

Dismiss, filed in *Conference of State Bank Supervisors v. Office of the Comptroller of the Currency*, 1:17-cv-00763 at p. 14 (Doc. 15).  The Court relied on the OCC's statements that, for example, "even if a Fintech attempted to apply, the OCC may not accept the application" (*Id.*), and ultimately determined that there were not sufficient allegations that the "OCC will issue a charter *imminently*." Memorandum Opinion at p. 5 (Doc. 19) (emphasis added).

16.     Things have changed substantially since the Court's decision, however.  The issuance of a Nonbank Charter is now clearly imminent.  In fact, a mere three months after the Court's dismissal, the OCC publicly announced that it would move forward with the Nonbank Charter Program.  As recently as October 17, 2018, Comptroller Otting has publicly stated that the OCC has had in-depth discussions with, and is vetting, several companies and expects to receive applications by the end of 2018, with charter decisions made by mid-2019.  Thus, upon information and belief, multiple pre-qualified candidates have already decided to apply (and may have already applied).

17.     For all of these reasons, the Nonbank Charter Program is subject to review under the Administrative Procedure Act ("APA") and cannot stand.  CSBS brings this action seeking declaratory and injunctive relief declaring the OCC's Nonbank Charter Program unlawful and enjoining the OCC from continuing it.

## PARTIES

18.     Plaintiff CSBS is the nationwide organization of state banking and financial services regulators from all 50 U.S. states, the District of Columbia, Guam, Puerto Rico, the U.S. Virgin Islands, and American Samoa.  CSBS is a 501(c)(3) corporation incorporated and headquartered in Washington, DC.

19.     For more than a century, CSBS has given state bank and financial services regulators a national forum to coordinate bank and nondepository supervision and to develop regulatory policy.  As the chartering and supervisory authorities for more than 75% of the banks in the United States, and the licensing and regulatory authorities for more than 20,000 nondepository financial services providers, CSBS's state regulator members are charged with protecting consumers, ensuring safety and soundness of the institutions under their authority, and encouraging economic prosperity in their states.

20.     Plaintiff CSBS has standing to bring this action because (1) its members would otherwise have standing to sue in their own right; (2) the interests CSBS seeks to protect are germane to its purpose; and (3) neither the claims asserted nor the relief sought requires the participation of individual members in this lawsuit.  *See Friends of the Earth, Inc. v. Laidlaw Environmental Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000).  Indeed, courts have previously recognized CSBS's associational standing to challenge actions of the OCC.  *See Conference of State Bank Supervisors v. Lord*, 532 F.Supp. 694, 695 (D. D.C. 1982); *aff'd sub nom. Conference of State Bank Supervisors v. Conover*, 710 F.2d 878 (D.C. Cir. 1983).

21.     Defendant Office of the Comptroller of the Currency is a bureau of the United States Department of the Treasury and functions as the primary supervisor of federally chartered national banks.  Its offices are located at 400 7th Street S.W., Washington, DC 20219.

22.     Defendant Joseph Otting is the current Comptroller of the Currency and is named in his official capacity.

## JURISDICTION AND VENUE

23.     This action arises under the Administrative Procedure Act, 5 U.S.C. §§ 500-596,

701 *et seq.*, the National Bank Act, 12 U.S.C. § 1, *et seq.* and 12 U.S.C. § 21, *et seq.*, and the

United States Constitution.  This Court has jurisdiction pursuant to 28 U.S.C. § 1331.

24.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(e)(1).

## BACKGROUND

**I.      Depository Institutions and Nondepository Institutions ("Nonbanks") are Distinct Types of Institutions Subject to Distinct Systems of Regulation.**

25.     In the United States, depository institutions and nondepository institutions are

different types of institutions and are subject to distinct systems of financial regulation

administered by different regulatory authorities.

26.     Depository institutions are entities chartered under special federal or state

incorporation laws for the formation of commercial banks and savings associations that, pursuant

to their corporate powers, engage in receiving deposits in addition to engaging in nondepository

financial activities, including lending money and paying checks.

27.     Nondepository institutions, on the other hand, are not banks.  These nonbank

entities are natural persons or entities organized under general incorporation laws that engage in

nondepository financial activities, such as lending and transmitting money, but they do not

engage in receiving deposits and are prohibited from doing so by federal and state laws.

28.     In fact, the laws of every state prohibit the use of the term "bank" in naming a

nondepository institution, prohibit nondepository institutions from creating the impression that

they are banks, and prohibit the formation of general business corporations for the purpose of

carrying on the business of banking.

29.     Nondepository institutions are not subject to federal and state banking laws because they are not required to obtain a bank or other depository institution charter to simply lend or transmit money.  Since the creation of the system of federal deposit insurance in 1933, federal law has prohibited institutions from taking deposits unless they obtain a depository institution charter and thereby become subject to depository institution regulation. 12 U.S.C. § 378(a)(2).  Unauthorized banking laws in every state likewise treat deposit-taking as the exclusive privilege of banks and other depository institutions (like savings associations and credit unions).  By restricting the activity of deposit taking to depository institutions, federal and state laws ensure that banking is subject to bank regulation, while still preserving the rights of individuals and entities to engage in nondepository financial activities.

30.     Thus, the only reason that an institution seeking to engage financial activities is required to obtain a bank charter is to engage in receiving deposits, and, conversely, it is unnecessary for nonbanks to obtain a national or state bank charter simply to conduct financial activities other than deposit-taking.  For this reason, a separate and distinct system of regulation has been established to regulate the financial activities of nonbanks.

31.     And because depository institutions are subject to a distinct and comprehensive regulatory scheme, they are generally not bound by state licensing and regulatory requirements applicable to nonbank financial institutions.  This includes the crucial state system of licensure and regulation of nonbank financial institutions providing consumer financial services.

    **A.**      **Both the OCC and the States Charter and Regulate Depository Institutions Concurrently, as Part of the U.S. Dual-Banking System.**

32.     The federal government and state governments exercise concurrent authority over depository institutions under their respective special incorporation laws, which enable them to charter and regulate commercial banks and savings associations.

33.     This allocation of chartering and regulatory authority is referred to as a "dual banking system" because depository institutions can choose to apply for a state charter issued by one of CSBS's members, or for a federal charter issued by the OCC.

34.     National banks are commercial banks chartered and regulated primarily by the OCC, while state banks are commercial banks chartered and regulated primarily by their state chartering authority in conjunction with either the Federal Deposit Insurance Corporation ("FDIC") or the Federal Reserve System ("FRS").

35.     National banks are required to become members of the FRS, while, for state banks, Federal Reserve membership is optional. 12 U.S.C. §§ 222 (national banks) and 321 (state banks). State banks that become members of the FRS are regulated by the FRS, while state banks that do not become members are regulated by the FDIC.

36.     As a condition of Federal Reserve membership, national banks are required to apply for, obtain, and maintain deposit insurance from the FDIC. 12 U.S.C. § 222.  Thus, full-service national banks chartered by the OCC must be FDIC-insured banks. Accordingly, all of the 842 full-service national banks active as of September 30, 2018 are FDIC-insured.

37.     The Federal Reserve Act ("FRA"), Federal Deposit Insurance Act ("FDIA"), and other federal banking laws impose uniform prudential and safety and soundness requirements on national and state-chartered banks, including, but not limited to, generally applicable capital requirements, community reinvestment requirements, regular examination, uniform supervisory ratings, lending limits, and restrictions on unsafe and unsound banking practices. These prudential rules and requirements generally apply to "insured depository institutions" and thus become applicable upon obtaining deposit insurance from the FDIC.

38.     Federal banking laws also impose restrictions on the organizational structure, control, affiliation, merger and acquisition, and conversion of national and state banks.  For instance, any parent company that controls a bank is deemed a "bank holding company" pursuant to the Bank Holding Company Act ("BHCA"), and is subject to regulation and supervision by the FRS and restricted to conducting only those activities that are deemed by the FRS to be "closely related to banking." 12 U.S.C. § 1843(c)(8).

39.     Lastly, in the event of insolvency, depository institutions are subject to a special resolution regime outside of bankruptcy that involves seizure of insolvent or unsound banks and resolution through an FDIC receivership.   Unlike other commercial enterprises and nondepository financial institutions licensed by the states, banks are ineligible for bankruptcy. *See* 11 U.S.C. § 109(b), (d).

40.     These extensive regulations applicable to depository institutions—including the prudential regulations, structural restrictions, and special resolution mechanisms mentioned above—have developed over time and in recognition that the special deposit-taking power of banks poses a special hazard to the public that necessitates the application of "cradle-to-grave" regulation to the entirety of bank operations, in order to reduce the likelihood and severity of bank failure.

41.     Moreover, as recompense for the unparalleled stringency and intrusiveness of depository institution regulation, depository institutions are given certain regulatory privileges not afforded other institutions.  One of the most significant privileges afforded depository institutions is federal preemption of state law and regulation.

**B.  CSBS's Member States (Not the OCC) Have Always Had Primary Responsibility For Licensing and Regulating Nondepository Financial Institutions ("Nonbanks").**

42.  For more than a century, states have regulated nonbank financial activities by requiring all persons and corporations to obtain a state license to engage in such activities in a business capacity.

43.  These state laws impose licensing and other regulatory requirements on nondepository financial institutions providing certain consumer financial services and delegate the authority to regulate and supervise such institutions to the state banking and financial agencies that are CSBS's members. Generally, nondepository institutions must obtain a license in every state in which they seek to engage in activities subject to licensure.

44.  The nondepository financial activities subject to licensing and regulation by the states generally include mortgage lending and servicing, consumer lending and servicing, money-services businesses and money transmission, debt collection, credit-service businesses, credit bureaus, payday lending, title lending, auto lending and auto loan servicing, and student lending and student-loan servicing.

45.  State laws impose product restrictions on these nondepository institutions, such as restrictions on interest rates and finance charges.  State laws also impose business conduct requirements—such as prohibitions on unfair, abusive, or deceptive acts and practices; restrictions on predatory lending; customer communication restrictions; disclosure requirements; permissible investment requirements; and net worth requirements.

46.  Every state regulates certain nondepository financial activities, such as mortgage lending.  And 49 of the 50 states regulate other nondepository financial activities, such as consumer lending and money transmission.

47.     For instance, the 49 states that heavily regulate consumer lending require the licensure and regulation of institutions engaging in the business of lending money to persons on an unsecured basis below a certain amount and/or above a certain percentage rate.  Some, but not all, of these laws apply to commercial lending in addition to lending for household, family, and personal purposes.  *See* Survey of State Licensing and Regulatory Laws for Nonbank Mortgage Lending, Consumer Lending, and Money Transmission ("State Licensing/Regulatory Law Survey") (attached hereto as Exhibit D).

48.     Additionally, 49 states license and regulate institutions performing money transmission and other money-transfer services.  *See* State Licensing/Regulatory Law Survey, Exhibit D. Such laws generally apply to businesses that provide check cashing, currency exchange, or money transmitting or remittance services, or issue or redeem money orders, traveler's checks, and other similar instruments.

49.     All 50 states require any person or company that negotiates, makes, or offers to make mortgage loans to obtain a mortgage lending license.  *See* State Licensing/Regulatory Law Survey, Exhibit D.  Under these licensing laws, nonbank mortgage lenders are subject to restrictions on product terms and business conduct, as well as pre-licensure and continuing education standards and character and fitness requirements. These requirements conform to the Secure and Fair Enforcement for Mortgage Licensing Act of 2008 ("SAFE Act"), which set minimum standards for state licensure of nonbank mortgage lenders and called for the states to establish the Nationwide Mortgage Licensing System ("NMLS"), administered by CSBS. Today, NMLS serves as the system of record for state licensure of nonbank money transmitters, consumer lenders, and other licensed nonbank financial institutions.

50.     Thus, CSBS's members license and regulate the activities of lending money and transmitting money (the functional equivalent of paying checks, per the OCC's interpretation) when performed by nondepository institutions.  These are merely some of the state laws that have long governed nonbanks, as part of the states' century-old oversight of these companies.

II.     **The National Bank Act Allows National Banks to Escape the  Application of State Law Under Certain Circumstances.**

51.     The NBA and the OCC's implementing regulations preempt a number of state laws, including but not limited to state laws authorizing state regulation of national banks, state laws that conflict with a national bank's exercise of its powers, and state usury laws.

52.     Under the NBA, national banks are subject exclusively to the regulatory authority of the OCC and, thus, state laws authorizing state bank regulators to apply state regulation to national banks and otherwise supervise and examine national banks are expressly preempted. 12 U.S.C. § 484; 12 C.F.R. § 7.4000 (2018).

53.     Furthermore, under the NBA, "state consumer financial laws" that "prevent or significantly interfere" with a national bank's exercise of its powers are preempted. *See* 12 U.S.C. § 25b.  In its regulations, the OCC has listed certain categories of state laws that are said to be preempted under this standard—such as state laws governing loan terms, interest rates, advertising, and disclosure. 12 C.F.R. §§ 7.4007, 7.4008; 34.4 (2018).

54.     These regulations also provide that any state licensing laws that require national banks to obtain a license or to register with the state before exercising a federally-granted authority—including the activities of lending and transmitting money—are preempted because they interfere with a national bank's exercise of its powers and conflict with the OCC's exclusive visitorial authority over national banks.  12 C.F.R. §§, 7.4008(d)(1); 7.5002(c); 34.4(a)(1) (2018).

55.     Moreover, Section 85 of the NBA expressly preempts state usury laws in certain circumstances.  For example, under the "most favored lender" reading of Section 85, the maximum rate permitted to be charged on loans extended by national banks is the rate of interest allowed by the laws of the state where the bank is located, even if that rate is higher than the rate permitted by state law for state banks. 12 U.S.C. § 85; 12 C.F.R. §§ 7.4001(b).

56.     Additionally, Section 85 permits the interstate "exportation" of interest rates— allowing the bank to apply the maximum permissible rate in the state in which the bank is located to loans to customers residing in a different state, even if the rate exceeds the highest permissible rate in that state. 12 USC § 85.  Further, "interest" under Section 85 has been interpreted to include a wide variety of finance charges and fees and preempts conflicting state law definitions of interest. 12 U.S.C. § 85; 12 C.F.R. § 7.4001(c).

57.     As the OCC has stated, this extensive preemption is the primary reason nonbank financial institutions, including "fintech" companies, are interested in applying for the Nonbank Charter.

   **A.     Allowing Nondepository Institutions (Nonbanks) to Escape the Application of State Law is Not Good Policy and is the Type of Preemption Congress Has Acted to Restrict.**

58.     As recent history has shown, given the broad nature of NBA preemption, its extension to nondepository institutions is not good public policy.  Indeed, it is widely accepted that by extending NBA preemption to nondepository mortgage company subsidiaries of national banks, and by asserting preemption of state anti-predatory lending laws from the mid-1990s to the early 2000s, the OCC played a pivotal role in laying the legal foundation for the subprime lending abuses that bore out during the financial crisis in the years that followed. *See* Arthur E.

Wilmarth Jr., *The Dodd Frank Act's Expansion of State Authority to Protect Consumers of Financial Services*, 36 J. Corp. L. 893, 897-918 (2011).

59.     To correct the OCC's regulatory overreach, Congress enacted the Dodd-Frank Act in 2010, amending the NBA to rescind the OCC's extension of NBA preemption to nondepository subsidiaries of national banks, making those subsidiaries subject to state consumer financial laws. *See* 12 U.S.C. § 25b(b)(2), (e), (h). Congress also took significant steps to limit the OCC's authority to preempt state consumer financial laws, including through the imposition of new procedural and evidentiary requirements and heightened standards of review. *See* 12 U.S.C. § 25b(b), (c), (d), (g).

60.     State government officials have unique expertise in the banking practices and market conditions in their communities, which makes them uniquely situated to recognize and act upon consumer financial protection issues.  Due to their proximity to the consumers and communities they are charged with protecting, and their accountability to state legislatures that promulgate state consumer financial law, state regulators are best positioned to apply, interpret, and enforce state consumer financial laws, as compared to centralized federal agencies.

61.     Additionally, for more than a century, state banking regulators have led the way in promoting and enabling financial innovation, being the first to allow such new ideas as interest-bearing checking accounts, home equity loans, and automated teller machines—innovations that were subsequently adopted in the national banking system.

62.     Importantly, regulators in the dual-banking system have enabled the emergence of these innovations by embracing and building upon the essential attributes that make a bank what it is, not by denying those attributes and deconstructing banking simply to enable the circumvention of existing regulatory systems.

63.     Ultimately, the dual-banking system thrives as intended—not when bank regulators enable arbitrage by seeking to exploit purported ambiguity in foundational statutory terms with well-settled meanings (as OCC has done here)—rather, when bank regulators embrace the dynamic of competitive federalism to encourage banks to deliver innovative solutions that further the purpose for which they are chartered; namely, to carry on the business of banking.

### III.     The OCC's Statutory Power is Limited to Chartering National Banking Associations for "Carrying on the Business of Banking."

64.     The NBA, enacted in 1863 and substantially revised in 1864, created the national banking system and established the OCC as a bureau within the Treasury Department with responsibility for supervising these federally chartered banks. *See* 12 U.S.C. § 1, *et seq.*; 12 U.S.C. § 21, *et seq.* (Title LXII of the Revised Statutes).

65.     The OCC is responsible for ensuring federally chartered banks' safety and soundness, compliance with federal banking laws, and compliance with federal laws regarding fair access to financial services and fair treatment of customers. 12 U.S.C. § 1(a). The OCC is authorized to "prescribe rules and regulations to carry out the responsibilities of the office." 12 U.S.C. § 93a.

66.     The NBA is a bank incorporation law enabling the chartering of national banks. Under the NBA, national banks are formed for "carrying on the business of banking," 12 U.S.C. § 21, and are granted the powers necessary to pursue this purpose. 12 U.S.C. § 24. To organize a national bank, the NBA requires incorporators to file articles of association and an organization certificate with the OCC. 12 U.S.C. § 21-22. For the OCC to be authorized to grant the charter, the association must be "lawfully entitled to commence the business of banking" and formed for the "legitimate objects" contemplated by the NBA. 12 U.S.C. § 26-27.

A.     **The Essential, Unambiguous Meaning of the "Business of Banking" Necessarily Includes the Receiving of Deposits.**

67.     The NBA, both on its own and when read together with other federal banking laws, specifies the minimum, essential meaning of the "business of banking."  Indeed, the text of the Act, judicial interpretations of the Act, and subsequently enacted federal banking laws interrelated with the Act—including the FRA, Banking Act of 1933, FDIA, and BHCA—all indicate that engaging in receiving deposits is a necessary condition of carrying on the banking business under the NBA.

68.     First, the plain language of the NBA chartering provisions require incorporators to identify in the organization certificate the place where the national bank's "operations of discount and deposit are to be carried on" and refers to such operations elsewhere as "the general business of each national bank association." 12 U.S.C. §§ 22, 81. This provision of the NBA, unmodified since the Act's passage in the 1860s, gives a clear indication that, in enacting the NBA, Congress identified deposit taking as an indispensable function necessary to carry on the business of banking.

69.     Additionally, in interpreting the meaning of the business of banking under the NBA, the OCC has stated that "the National Bank Act essentially reduces the business of banking, in perhaps its simplest form, to accepting deposits, making loans, *and* paying checks." *See* 1985 OCC QJ LEXIS 812, *21-22 (emphasis added), *cited with approval in Dep't of Banking & Consumer Fin. v. Clarke*, 809 F.2d 266, 270 (5th Cir. 1987) ("Congress has defined the business of banking, stripped to its essentials, as accepting deposits, paying checks, *and* making loans"), *cert denied* 483 U.S. 1010 (1987) (emphasis added). Thus, the OCC and the courts have previously interpreted and defined the business of banking as requiring engaging in all three core banking functions, including the function of receiving deposits.

70.     More generally, courts that have interpreted the term "business of banking" as used in the NBA have taken note of the essential nature of deposit taking.  *See*, *e.g.*, *United States v. Philadelphia National Bank*, 374 U.S. 321, 326 (1963)("[c]ommercial banks are unique among financial institutions in that they alone are permitted by law *to accept demand deposits*.") (emphasis added).  Indeed, as put by the Ninth Circuit, "the deposit and withdrawal of funds 'are services provided by banks since the days of their creation. Indeed, such activities define the business of banking.'" *See Gutierrez v. Wells Fargo Bank*, 704 F.3d 712, 723 (9th Cir. 2012) (quoting *Bank of Am. v. City & Cty. of S.F.*, 309 F.3d 551, 563 (9th Cir. 2002)).

71.     Additionally, other federal banking laws that have a practical interrelation with the NBA confirm that receiving deposits is required to carry on the business of banking.

72.     For example, in order to comply with the NBA requirement that the applicant be "lawfully entitled to commence" the business of banking (12 U.S.C. §§ 26-27), the FRA requires that an applicant be capable of becoming a member of the FRS and an insured bank under the FDIA upon "commencing business." 12 U.S.C. § 222. A national bank that fails to become (or cannot become) an FRS member and obtain deposit insurance from the FDIC forfeits "all of the rights, privileges, and franchises" granted to it under the NBA. 12 U.S.C. § 501a.

73.     However, a national bank cannot obtain deposit insurance unless it takes deposits, because the FDIA expressly requires that a national bank be "engaged in the business of receiving deposits, other than trust funds" to be eligible to be an "insured bank." 12 U.S.C. § 1815(a)(1). Therefore, absent specific congressional authorization, a national bank must, *at a minimum*, be "engaged in the business of receiving deposits" in order to comply with obligations imposed under the FRA and FDIA and thereby be "lawfully entitled to commence the business of banking" under the NBA.

74.     Additionally, through the definition of "bank" in the BHCA, 12 U.S.C. § 1841, *et seq.,* Congress likewise has recognized that receiving deposits is a required function in order to be engaged in the "business of banking." The BHCA definition of "bank" and the NBA term "business of banking" should be interpreted together in a coherent fashion because they serve a similar purpose of restricting entry into the banking system. *See Whitney Nat'l Bank v. Bank of New Orleans & Tr. Co.*, 379 U.S. 411, 417-26 (1965).

75.     Section 2(c)(1) of the BHCA defines a "bank" to include an institution that, at a minimum, engages in the business of receiving deposits. *See* 12 U.S.C. §§ 1841(c)((1)(A) and (B).  Congress purposely crafted this definition to ensure that it covers all institutions chartered to carry on the business of banking, and thus its focus on deposit-taking represents a recognition by Congress that receiving deposits is necessary to carry on the banking business. Accordingly, any definition of the "business of banking" in the NBA that does not require receiving deposits is plainly in conflict with the BHCA and undermines the intent of Congress in restricting entry into the banking system.

76.     Lastly, in prohibiting receiving deposits without obtaining a bank charter, the federal and state unauthorized banking laws and the extensive body of precedent interpreting these laws indicate that deposit-taking is a function indispensable to engaging in the business of banking. *See*, *e.g.*, 12 U.S.C. § 378(a)(2); *Davis v. W.J. West & Co.*, 127 Ga. 407 (1907).

77.     The fundamental proposition underlying these laws is that institutions may conduct all manner of financial activities (some of which, such as lending and transmitting money, may even be core to the banking business), but it is only when financial activities are conducted in concert with the function of receiving deposits that those activities take on the character of banking activities.

78.     In sum, read together and in a manner consistent with other banking laws, the

NBA must be interpreted to reflect the consistent, settled understanding of Congress and the

courts that engaging in receiving deposits is indispensable to "carrying on the business of

banking."

IV.     **The OCC's Authorization to Issue Special-Purpose Charters Is Limited to Specific Categories of Special Purpose National Banks.**

79.     The Nonbank Charter Program is not the first time OCC has exceeded the limits

of its chartering authority.  Each time the OCC has created charters for entities that would not be

engaged in the business of banking, the courts struck down those efforts, concluding that OCC is

not empowered by the NBA to charter such institutions unless specifically authorized by

Congress.

80.     For example, in 1977 a federal district court rejected the OCC's efforts to charter

a national bank whose activities would be limited to the fiduciary services provided by a trust

company—holding that the OCC lacked authority to charter an institution that would not engage

in the business of banking, including receiving deposits. *National State Bank v. Smith*, No. 76-

1479 (D. N.J. Sept. 16, 1977), *rev'd on other grounds*, 591 F.2d 223 (3d Cir. 1979).

81.     In response to this defeat, the OCC asked Congress to expand its authority.  It

requested from Congress an amendment to the NBA that would specifically authorize the

Comptroller to charter national trust banks. Congress adopted the requested amendment in 1978

as part of the Financial Institutions Regulatory and Interest Rate Control Act ("FIRIRCA"), 12

U.S.C. § 27(a). Congress thereby gave the OCC specific authorization to create national trust

banks, the first type of special-purpose chartering authority conferred upon the OCC.

82.     In the following decade, a federal district court once again blocked the OCC's

efforts to issue special-purpose charters beyond its authority, granting an injunction prohibiting

the OCC from issuing special-purpose charters to "nonbank banks" —that is, institutions

chartered by the OCC that escaped regulation under the BHCA because they either did not

accept demand deposits or make commercial loans and thus did not qualify as "banks."

*Independent Bankers Assn. of America v. Conover*, No. 84-1403-CIV-J-12, 1985 U.S. Dist.

LEXIS 22529, Fed. Banking L. Rep. (CCH) P86, 178 (M.D. Fla. Feb. 15, 1985). The court held

that the activities included in the definition of "bank" under the BHCA constitute the minimum,

essential elements of the "business of banking" under the NBA and, accordingly, "a financial

institution that is legally unable to engage in both activities cannot engage in the 'business of

banking' within the meaning of the NBA." *Id*.

83.     Following the OCC's defeat in *Conover*, Congress declined to adopt legislation

extending to the OCC the special-purpose chartering authority it had attempted to assert with

respect to "nonbank banks." To the contrary, Congress took steps to codify the *Conover* ruling

by amending the BHCA, through the Competitive Equality Banking Act ("CEBA"), to make it

clear that financial institutions that do not accept deposits are not "banks." *See* 12 U.S.C. §

1841(c); *see also* S. Rep. No. 100-19, at 7 (1987).

84.     Ultimately, the OCC is permitted to charter a national bank only: (1) where the

institution is organized to carry on "the business of banking," which, under current law, includes

(at a minimum) taking deposits—and thus is a "full-service national bank"—or (2) where

Congress has taken specific legislative action to allow the OCC to charter an entity to carry on a

special purpose other than the business of banking—and thus is a "special purpose national bank."

85.     Currently, Congressional authorization exists to charter only two categories of

special purpose national banks: trust banks and banker's banks. 12 U.S.C. § 27(a)(last sentence)

and (b). Specific legislative authorization was required for trust banks and banker's banks

because solely providing fiduciary services or correspondent banking services did not, under existing law, qualify as carrying on the business of banking. This would not have been necessary if OCC already possessed the broad authority it now claims.

## THE OCC'S NONBANK CHARTER PROGRAM

### I.     The OCC's Announcement of the Nonbank Charter Program in 2016 Meets with Objections and Concern.

86.     In March 2016, the OCC issued a "white paper" announcing that it had begun an initiative to study innovation in the federal banking system, to include, among other things, evaluation of the opportunities and risks presented by rapid advances in financial technology. *See* "Supporting Responsible Innovation in the Federal Banking System: An OCC Perspective," dated March 2016 (available at https://www.occ.gov/publications/publications-by-type/other-publications-reports/pub-responsible-innovation-banking-system-occ-perspective.pdf).

87.     In September 2016, the OCC communicated to the public that it was considering as part of its innovation initiative the creation of a special-purpose bank charter for nonbanks. *See* Proposed Rulemaking, *Receiverships for Uninsured National Banks*, 81 Fed. Reg. 62,835 (Sept. 13, 2016) (to be codified at 12 C.F.R. pt. 51).  The proposed rulemaking noted that the OCC was "considering how best to implement a regulatory framework that is receptive to responsible innovation, such as advances in financial technology," as well as "considering whether a special-purpose charter could be an appropriate entity for the delivery of banking services in new ways." *Id*. at p. 62,837.

88.     Although this proposed rulemaking did not itself authorize a special-purpose charter for nonbanks, the connection to a potential special-purpose charter was clear, and it triggered significant public concern.  This included a letter from CSBS noting that state banking regulators were opposed to a potential national charter for nonbank companies for a variety of

reasons.  CSBS made clear its view that the OCC lacked statutory authority to issue these

nonbank charters and that such charters "would distort the marketplace for financial services and

undermine State laws and regulations governing financial services."  *See* Letter from CSBS to

Comptroller Curry dated November 14, 2016 (attached hereto as Exhibit E).

89.     Also in September 2016, the OCC issued substantial revisions to its existing

"Charter" booklet of the Comptroller's Licensing Manual, which further paved the way for the

issuance of future nonbank charters.  *See* OCC Bulletin 2016-29 regarding Revised

Comptroller's Licensing Manual Booklet (available at https://www.occ.treas.gov/news-

issuances/bulletins/2016/bulletin-2016-29.html).

90.     Notwithstanding public concern raised in response to the September 2016

proposed rulemaking, the OCC finalized the *Receivership for Uninsured National Banks* rule

without change and with no meaningful response to the public feedback it received.

91.     The OCC's consideration of the issue led to then-Comptroller Curry's

announcement on December 2, 2016, that the OCC had decided to create a new special-purpose

charter for nonbank companies, stating that "the OCC *will* move forward with chartering

financial technology companies that offer bank products and services . . . .".  *See* "Remarks by

Thomas J. Curry, Comptroller of the Currency, Regarding Special-purpose National Bank

Charters for Fintech Companies," at Georgetown Law Center dated Dec. 2, 2016 at p. 3

(emphasis in original) (available at https://occ.gov/news-issuances/speeches/2016/pub-speech-

2016-152.pdf).

92.     When addressing the basis for the OCC's newfound chartering authority,

Comptroller Curry asserted that the OCC "has the authority to grant special-purpose national

bank charters to fintech firms that conduct *at least one* of three core banking activities—receiving deposits, paying checks *or* lending money." *Id*. at p. 5 (emphasis added).

93.     It was clear that in his statement of authority Comptroller Curry was not referencing any provision of the NBA or other statute but, instead, a regulation promulgated by the OCC itself in 2003, 12 C.F.R. § 5.20(e)(1) (stating that the OCC may charter a special-purpose bank that limits its activities to "any other activities within the business of banking," provided that the special-purpose bank conducts "*at least one of* the following three core banking functions: Receiving deposits; paying checks; *or* lending money.") (emphasis added).

94.     The Comptroller stated that the OCC would be developing a "formal agency policy" for evaluating applications for nonbank charters and that the OCC had published on the same day a white paper discussing the issue and seeking stakeholder feedback to help inform the development of the forthcoming policy. *See* Comptroller Remarks at pp. 3, 5.

95.     The OCC's Nonbank Charter Decision and white paper met with significant public concern and criticism.

96.     Notably, U.S. Senators Sherrod Brown (Ranking Member, Senate Committee on Banking, Housing, and Urban Affairs) and Jeffrey A. Merkley issued a letter to Comptroller Curry expressing concern that "[o]ffering a new charter to non-bank companies seems at odds with the goals of financial stability, financial inclusion, consumer protection, and separation of banking and commerce that the OCC has upheld under your tenure."

97.     The Senators also questioned whether the OCC had the ability to issue charters to nondepository institutions, noting that that Congress has given the OCC "a very narrowly-defined authority" to charter entities that are not engaged in the business of banking, limited to bankers' banks, credit card banks, and trust banks. The Senators urged the OCC to refrain from

issuing special-purpose charters because "[i]t is up to Congress to take action on these important matters."

98.     A diverse group of more than 25 entities expressed opposition to the nonbank charter—including consumer groups, banking and financial industry trade associations, state government officials and others.  Several questioned the OCC's statutory authority to issue national bank charters to nonbank companies.  Many urged the OCC to seek Congressional approval for the charter and, if the charter were to be pursued, to develop generally applicable regulations pursuant to the APA that would clarify such important questions as the OCC's expectations for capital, liquidity, financial inclusion, supervision and examination, and whether the new charter holders would have direct access to the Federal Reserve's payment system and its discount window.

99.     Still others expressed concern about potential consumer harm, preemption of state laws, and competitive advantage available to nonbank charter holders if they are not held to the same supervision and regulation as other banks.  Concerns were also raised that the nonbank charter could jeopardize the longstanding U.S. policy of limiting affiliations or combinations between banks and commercial enterprises.

100.    Many critics noted that the OCC had not adequately explained which nonbank companies would be eligible for a charter, how "fintech" is defined, and how those companies would be supervised and regulated.

101.    CSBS itself submitted a 27-page explanation of its opposition to the Nonbank Charter Decision, expressing its views that the OCC lacked statutory authority to issue the charters; such charters would distort the marketplace for financial services and create tremendous uncertainty and risks pertaining to access to critical government resources, including the

payments system and the federal safety net; and the preemptive effect of the charter nullifies the states' ability to protect customers. *See* Letter from CSBS to Comptroller Curry dated January 13, 2017 (attached hereto as Exhibit F).

102.     On March 10, 2017, members of the U.S. House of Representatives Committee on Financial Services sent a letter to Comptroller Curry likewise expressing concern regarding a rushed decision, urging the Comptroller not to take further action, and vowing to examine any further action taken by the OCC and, if appropriate, to overturn that action.

II.     **Despite Public Concern, the OCC Begins Implementing the Nonbank Charter Program in 2017.**

103.     Notwithstanding these numerous and significant concerns and the questions raised about its statutory authority, the OCC continued to move forward with the implementation of the Nonbank Charter Program.  On March 15, 2017, the OCC published a "draft" supplement to the Comptroller's Licensing Manual (entitled "Evaluating Charter Applications From Financial Technology Companies").  The draft supplement made explicit that the new nonbank charter was intended for companies that do not take deposits.

104.     As in the prior white paper and other public pronouncements by the OCC, the agency reiterated its reliance upon its own regulation (12 C.F.R. § 5.20(e)(1)) as authority for its ability to charter companies that do not take deposits, so long as they either pay checks or lend money.

105.     Separately on March 15, 2017, the OCC published a "Summary of Comments and Explanatory Statement," apparently in an attempt to respond to the significant volume of concerns expressed in response to its December 2016 white paper.  *See* "OCC Summary of Comments and Explanatory Statement: Special Purpose National Bank Charters for Financial Technology Companies" dated March 2017 (available at https://www.occ.treas.gov/topics/bank-

operations/innovation/summary-explanatory-statement-fintech-charters.pdf ) (attached hereto as

Exhibit G).

106.    This "Summary of Comments and Explanatory Statement" fell far short of

addressing the numerous criticisms of the Nonbank Charter Decision, however.  In particular, the

OCC's response to questions about its chartering authority is limited to two short paragraphs that,

once again, rely solely upon the OCC's own regulation (12 C.F.R. § 5.20(e)(1)) in support of its

ability to issue national bank charters to nondepository companies.  *See* Summary of Comments

and Explanatory Statement at pp. 14-15.

107.    The OCC invited feedback on its Manual Supplement.  As with its prior white

paper, the Manual Supplement drew sharp criticism and elicited significant concerns.  Many

commenters, recognizing that the OCC had not adequately addressed the concerns previously

raised in response to the OCC white paper, re-submitted their prior letters.

108.    Similarly, CSBS reiterated its previously articulated concerns in response to the

Manual Supplement, as well as a number of new concerns.  Among other things, CSBS criticized

the *ad hoc* regulatory treatment of charter holders which, contrary to the OCC's contentions,

would not be subject to most federal banking laws, which cover only insured banks.  CSBS also

emphasized the unfair advantages to the nonbank charter holders, as compared to traditional, full

service banks; the threatened erosion of the separation of banking and commerce; and the

potential for significant consumer harm.  *See* Letter from CSBS to Comptroller Curry dated

April 13, 2017 (attached hereto as Exhibit H).

## III.    The OCC Has Begun Taking Nonbank Charter Applications.

109.    Recognizing that the OCC had not responded to the numerous concerns raised

regarding the Nonbank Charter Program and intended to move forward with its plan to issue

nonbank charters, CSBS initiated a legal action against the OCC and Comptroller Curry in this

Court in April 2017, seeking declaratory and injunctive relief.

110.    Subsequently, and while the lawsuit was pending, Comptroller Curry was

succeeded by Acting Comptroller Keith Norieka, who was then succeeded by the current Senate-

confirmed Comptroller Otting.

111.    In August 2017 the OCC moved to dismiss CSBS's lawsuit, arguing that the suit

was premature because the agency was still deciding whether it would actually exercise its newly

claimed power.  Relying upon OCC's representations that it had not yet decided to move forward

with the Nonbank Chartering Program, the Court dismissed CSBS's complaint without prejudice

on April 30, 2018.  *See generally Conference of State Bank Supervisors v. Office of the*

*Comptroller of the Currency*, 17-cv-763-DLF, Doc. No. 19 (D.D.C., Apr. 30, 2018).

112.    Within a mere three months of the dismissal of CSBS's suit, however, the OCC on

July 31, 2018 announced it had begun accepting applications for nonbank charters.  *See* Press

Release, *OCC Begins Accepting National Charter Applications from Financial Technology*

*Companies* (July 31, 2018) (available at https://www.occ.gov/news-issuances/news-

releases/2018/nr-occ-2018-74.html (Exhibit A)

113.    As before, the OCC stated that its authority to grant nonbank charters was derived

from 12 CFR 5.20(e), and that its authority "does not require the bank to take deposits within the

meaning of the Federal Deposit Insurance Act and therefore would not require insurance from

the Federal Deposit Insurance Corporation."  *Id.*

114.    On the same day, the Comptroller also issued a Policy Statement, which echoed

the OCC's position that Section 5.20 permits it to issue a special purpose national bank charter to

an entity that performs any one of the OCC-described "core banking functions"—receiving

29

deposits, paying checks *or* lending money.  *See* Policy Statement on Financial Technology Companies' Eligibility to Apply for National Bank Charters dated July 31, 2018 at p. 3 (available at https://www.occ.treas.gov/publications/publications-by-type/other-publications-reports/pub-other-occ-policy-statement-fintech.pdf) (attached hereto as Exhibit B).  The Policy Statement also made it clear that the OCC "is open and receptive to charter applications from qualified fintech companies."  *Id.*

115.    That day the OCC also published a final Comptroller's Licensing Manual Supplement.  *See* Comptroller's Licensing Manual Supplement, *Considering Charter Applications from Financial Technology Companies* dated July 2018 (available at https://www.occ.treas.gov/publications/publications-by-type/licensing-manuals/file-pub-lm-considering-charter-applications-fintech.pdf)  (attached hereto as Exhibit C)

116.    The Manual Supplement outlines the process for applying for a nonbank charter, the OCC's considerations when evaluating applicants, the requirements for the charter holder, and the OCC's approach to supervising chartered entities.

117.    Based upon public statements by Comptroller Otting himself, applications for nonbank charters are imminent, if not already received.  In an article he authored for the *American Banker* in September 2018, Comptroller Otting explained that "interest in the charter remains robust, and we expect multiple applications by the end of the year."  *See American Banker,* "Why do state regulators want to limit consumer choice?" by Joseph Otting, dated September 18, 2018 (available at https://www.americanbanker.com/opinion/occs-otting-why-do-state-regulators-want-to-limit-consumer-choice) (attached hereto as Exhibit I).

118.    Comptroller Otting made even more clear that a nonbank charter is imminent in another article he authored, published on October 17, 2018.  *See Politico*, "Otting Sees OCC

Ready for Fintech Decisions by Mid-2019" by Joseph Otting dated October 18, 2018 (available at [https://subscriber.politicopro.com/financial-services/whiteboard/2018/10/otting-sees-occ-ready-for-fintech-decisions-by-mid-2019-2088074](https://subscriber.politicopro.com/financial-services/whiteboard/2018/10/otting-sees-occ-ready-for-fintech-decisions-by-mid-2019-2088074)) (attached hereto as Exhibit J).  He reiterated that the OCC is in active discussions with "a number of highly interested institutions" and that OCC will receive applications by the end of the year, with charter decisions expected shortly thereafter (no later than mid-year 2019). *Id*.

119.   Thus, upon information and belief, the OCC has already met with several companies who have decided to pursue a nonbank charter.  But it is not known to CSBS whether any company has yet applied for a nonbank charter, and CSBS does not have an effective means of receiving prompt notice of any such applications.

120.   There is no statutory requirement under the NBA that charter applicants publish a notice of the submission or approval of their charter application.  Although the OCC's regulations and Licensing Manual do impose such a requirement, these guidelines only require that the applicant publish a notice of its charter application in a general circulation newspaper in the community in which the bank will be located. 12 C.F.R. 5.8(a). Although the OCC's Licensing Manual indicates that the OCC will publish notice of charter applications in its Weekly Bulletin, publication in this report is purely at the discretion of the OCC and is frequently delayed.  Applications are routinely omitted from the Weekly Bulletin, and these notices often contain insufficient information to determine whether the application at issue involves a nonbank charter.

121.   Thus, to determine whether a charter application has simply been filed, let alone approved, CSBS members must monitor local newspapers across the country or simply hope that the OCC has not omitted the charter application from its weekly report and has provided

sufficient detail to make the application identifiable. In such a scenario, it is very likely that the first notice of a charter application or approval that state regulators receive will be in the form of a consumer complaint or while monitoring for unlicensed activity in their state.

## THE NONBANK CHARTER PROGRAM CANNOT STAND

**I.**      **The OCC Lacks Statutory Authority to Charter Nondepository Companies and, Thus, to Implement the Nonbank Charter Program.**

122.     The OCC's Nonbank Charter Program exceeds the OCC's authority under the NBA.  Congress has never conferred upon the OCC the broad power to redefine the business of banking to exclude deposit taking, so as to enable the OCC to create new categories of charters for companies that do not engage in the business of banking.  In fact, each time the OCC has attempted to issue such charters, the federal courts have struck down its efforts.

123.     As previously noted, it is only upon specific authorization by Congress that the OCC has been allowed to issue special-purpose bank charters to institutions that do not, under existing law, engage in the business of banking.  Applying fundamental principles of statutory construction, the existence of these specific grants of Congressional authority necessarily demonstrates that the OCC does not have any authority to charter special-purpose national banks other than those expressly authorized by statute.  These specific statutory grants of special-purpose chartering authority would never have been necessary if the OCC possessed general authority to issue special-purpose charters.  In addition, to adopt a broad view of the OCC's chartering authority would render the specific grants of statutory chartering authority for bankers' banks and trust banks redundant and mere surplusage, contrary to established canons of statutory construction.

124.     In asserting that it has the power to issue nonbank charters, the OCC relies solely upon one of its own regulations, 12 C.F.R. § 5.20(e)(1), which states that the OCC may charter a

special-purpose bank that engages in any activity within the business of banking, provided that it conducts "*one of* the following three core banking functions: Receiving deposits; paying checks; *or* lending money" (emphasis added).  But an agency cannot expand the nature or scope of its own authority—only Congress can do that.

125.    Because Section 5.20(e)(1)—never before used by the OCC to support a chartering decision—would allow a bank charter to be issued to an organization that does not take deposits and is therefore not engaged in the business of banking, it is patently inconsistent with the NBA, BHCA, FDIA and FRA, as well as established court precedent and long-standing OCC interpretations.   Indeed, the OCC has crafted Section 5.20(e)(1) so expansively that the agency could create an immeasurable variety of special-purpose nonbank charters under the purported reach of the regulation.  There is no Congressional authority for this far-reaching power, and Section 5.20(e)(1) cannot serve as a valid basis for the OCC's Nonbank Charter Program.

126.    The OCC interprets Section 5.20(e)(1) in a manner unsupported by any statutory language or Congressional instruction.  Through this interpretation, the OCC purports to have the power to define the scope of its own regulatory authority.  As such, this interpretation is not entitled to any deference.   Nor is the OCC entitled to deference where its decision making relates in part to the interpretation of banking statutes it is not charged with implementing and purports to reconcile conflicting statutory regimes.

## II.    **The OCC Engaged in Improper Rulemaking by Failing to Undertake a Preemption Determination Submitted for Public Notice and Comment.**

127.    Despite the unprecedented nature of the Nonbank Charter Program, the OCC did not follow the required notice and comment procedures imposed by the NBA with respect to

preemption interpretations. *See* 12 U.S.C. §§ 25b, 43.  Instead, the OCC relied solely upon its white paper and Manual Supplement and invitations for informal feedback.

128.    When the OCC concludes that the NBA preempts state consumer protection laws, the NBA requires the OCC to publish in the Federal Register a notice of the preemption interpretation the OCC is considering and provide interested parties an opportunity to comment. 12 U.S.C. § 43. Additionally, the OCC is required to periodically publish a notice containing a list of its preemption determinations with respect to state consumer financial laws. 12 U.S.C. §§ 25b(d), (g). Although the OCC has repeatedly asserted in establishing the Nonbank Charter Program that state consumer protection laws are preempted and would not apply to fintech companies that receive a nonbank charter, the OCC has not complied with any of the notice and comment requirements imposed by the NBA on these preemption interpretations.

129.    It is improper and unlawful for the OCC to handle this matter of fundamental importance to the U.S. banking and financial systems outside the notice and comment process mandated by the NBA.  The OCC has opted instead to approve nonbank charters pursuant to broadly worded policy statements and sparse legal analysis, which is contrary to the transparency requirements imposed on OCC preemption interpretations by Congress.

130.    The process the OCC has pursued is no substitute for, and in fact violates, the notice and comment procedures required by the NBA.

III.    **The OCC's Actions in Implementing the Nonbank Charter Program are Arbitrary and Capricious.**

131.   The OCC's Nonbank Charter Program also is arbitrary, capricious, and an abuse of discretion because it has failed to consider the many significant implications of the Nonbank Charter Program, nor has it offered a reasoned explanation for its actions.

132.   Among other things, the OCC wholly failed to respond adequately to the many relevant and significant public comments received in response to its Nonbank Charter Program. This includes the many significant policy considerations that weigh strongly against the creation of this new special charter.

133.   As articulated in CSBS's letters in response to the white paper and Manual Supplement, as well in the public feedback of many others, the Nonbank Charter Program has raised numerous concerns that remain unaddressed:

- Many significant federal banking laws do not apply to Nonbank Charter Program charter holders;

- The use of individualized, *ad hoc*, private agreements between the OCC and charter holders creates an uneven playing field among regulated entities;

- The lack of transparency regarding specific regulatory requirements nullifies any promise of a level playing field among regulated banks;

- The uncertain scope of the incidental powers conferred through the special-purpose charter raises significant safety and soundness concerns;

- The OCC has not explained how special-purpose charter holders comply with the requirement that national banks become members of the Federal Reserve System, how they will be regulated by the Federal Reserve, and whether they will have access to the federal safety net and critical public resources;

- The nonbank charter is structured to evade the coverage of the BHCA and enables the commingling of banking and commerce;

- Nonbank charter holders likely will be exempt from the enforcement authority of the Securities and Exchange Commission, and the OCC itself lacks the authority to enforce the federal securities laws with respect to nondepository institutions;

- Special-purpose charter holders are not subject to federal consumer protection laws to the same extent as full-service banks; and

- The special-purpose charter undermines and preempts existing state regulation of financial services providers; charter holders are entitled to preemption of some state laws, to the detriment of consumers.

134.   The OCC  failed to acknowledge, much less analyze and address, most of these myriad concerns before implementing the final Nonbank Charter Program.

## IV.   **The Nonbank Charter Program is Unconstitutional.**

135.   Under the Supremacy Clause and Tenth Amendment of the U.S. Constitution, an invasion of state sovereign interests is permitted only if it is the clear and manifest purpose of Congress to supplant state law.

136.   Here, as noted above, Congress has not authorized the OCC to issue national bank charters to institutions engaged in lending money and paying checks, but not engaged in receiving deposits. Absent a clear expression of Congressional authority and intent to preempt state law, the states retain the power to regulate and supervise nondepository institutions, and the Nonbank Charter Program represents an unlawful and unconstitutional assertion of preemptive authority by the OCC.

## V.   **The Nonbank Charter Program Harms CSBS's Member Regulators.**

137.   The Nonbank Charter Program has created regulatory interference with traditional areas of state concern; namely, the enforcement of state laws, including consumer protections

36

such as state usury laws and state licensing laws applicable to nondepository financial

institutions providing consumer financial services. These state laws are of vital importance to the

states and their economies, communities, and citizens, and reflect the unique policy priorities and

commitments of the residents of each state.

138.    As outlined above, the NBA and the OCC's implementing regulations assert

preemption of state consumer financial laws, including, among others, state licensing laws and

state usury laws. The OCC's Policy Statement, Licensing Manual Supplement and related public

issuances repeatedly state that recipients of a Nonbank Charter are subject to the same laws and

regulations that apply to national banks, including the federal laws affording preemption and

rendering state consumer financial laws inapplicable.

139.    In announcing its final decision to establish the Nonbank Charter Program, the

OCC made clear that the Nonbank Charter is an option that would vitiate the necessity of

pursuing state licensure.  Further, as indicated in the OCC's subsequent statements as well as the

Treasury Department's July 31, 2018 recommendation to finalize the Nonbank Charter Program,

the primary motivation for a nondepository financial institution to seek the Charter is to avoid

compliance with existing state law. The preemptive effect of the Nonbank Charter Program

occurs regardless of the nature, size or location of the charter holder's business.

140.    Thus, the scope of the harm to CSBS's members is significant.  Although the

OCC has not formally defined "fintech," or what constitutes a "fintech" company, the term is

generally understood to encompass any of a very broad array of technology-driven financial

services providers.  Fintech companies range from start-up ventures to well-established

conglomerates.  The term covers a wide variety of services, from the traditional (*e.g.*, payment

processing) to the more cutting edge (*e.g.*, crowd funding and digital currencies, such as bitcoin).

And although the Nonbank Charter Program primarily focuses on fintech companies, it extends to any nonbank financial services providers, regardless of the extent to which they are technology-driven. Regardless of the label applied, interference with state regulatory authority is inevitable because an institution must engage in lending or transmitting money to be eligible for the Nonbank Charter, all states license and regulate the activities of lending and transmitting money, and the OCC has asserted that the application of state regulatory authority to Nonbank Charter holders is preempted.

141.   The states' enforcement of their own laws has been undermined by the Nonbank Charter Program and the purported applicability of federal preemption to charter holders. This injury to state enforcement creates a judicially cognizable interest because it impedes the states' exercise of their sovereign power to create and enforce a legal code and diminishes that sovereignty.

142.   The OCC's actions impede the states' ability to continue their existing regulation of financial services companies within their borders and to enforce state laws designed to protect the consuming public and ensure the safety and soundness of nondepository companies.  This also creates difficulties for the states in detecting unlicensed activity within their borders. Similarly, companies facing or at risk of state enforcement actions escape state enforcement authority by obtaining a national charter.

143.   Indeed, even without accepting an application, interference with the regulatory operations of CSBS's members has already begun to materialize in several forms. For instance, since the OCC has begun its campaign to redefine what it means to be a bank under federal law, confusion has arisen as to the meaning of banking under state regulatory and criminal laws prohibiting persons from referring to themselves as or implying that they are "banks" without a

bank charter. Additionally, the establishment of the Nonbank Charter Program poses challenges for CSBS's members in allocating resources for examination and enforcement as state regulators worry that significant resources may be devoted to such efforts, only to have the relevant institution seek to escape their jurisdiction by obtaining a Nonbank Charter from the OCC.

144.    The states have a legitimate, sovereign interest in the continued enforceability of their state consumer financial laws.  Examples of the state licensing laws that are directly affected by the Nonbank Charter Program are identified in the accompanying State Licensing/Regulatory Law Survey, Exhibit D.

145.    Requirements imposed under these affected state laws include, but are certainly not limited to, restrictions on mortgage lending, such as restrictions on loan flipping, negative amortization, abnormal prepayment penalties, and loan packing practices, *e.g.*, N.M. Stat. Ann. §§ 58-21A-1 *et seq*.

146.    Affected laws also include restrictions on consumer lending, such as mandating consideration of a borrower's ability to repay, *e.g.*, Mo. Rev. Stat. § 367.185(4); and the imposition of requirements on money transmitters to preserve customer funds from misappropriation, data breaches and insolvency, *e.g.*, Cal. Fin. Code §§ 2037, 2081. Compliance with these requirements is ensured through regular examination by the appropriate state regulatory agency, and violation of these prohibitions and restrictions triggers several possible government actions, from investigation and inspection to enforcement actions and criminal referral.  *See, e.g.*, Wash. Rev. Code Ann. §§ 19.146.100, 110, 220.

147.    By way of another example, many states effectively ban high-cost, short-term small-dollar lending, often referred to as "payday lending," by setting interest rate caps or usury limits at levels at which this type of lending would not be profitable.  *See, e.g.*, Ark. Const.

amend. 89, § 3. However, the OCC has asserted that recipients of the nonbank charter are permitted under the NBA to "export" the interest rates permitted in one state into another state, as explained above.  Thus, according to the OCC, a nonbank is, for the first time, permitted to override these state laws and engage in what would otherwise be usurious lending.

## CLAIMS FOR RELIEF

### COUNT I

### The OCC's Nonbank Charter Program Exceeds its Statutory Authority

148.   CSBS incorporates by reference the allegations of the preceding paragraphs.

149.   The NBA only allows the OCC to charter entities to (1) carry on the "business of banking," which requires, at a minimum, receiving deposits, or (2) carry on a special purpose expressly authorized by Congress.

150.   As a result, the OCC lacks the authority to charter nondepository entities without the express authorization of Congress.  The OCC's own regulations (specifically, 12 C.F.R. 5.20(e)(1)) are insufficient to expand the scope of the OCC's chartering authority beyond that delegated to the OCC by statute.

151.   Moreover, the OCC's interpretation of the scope of its own authority is not entitled to deference, particularly where the OCC is attempting to interpret conflicting federal statutes, including statutes the OCC is not charged with implementing.

152.   CSBS is entitled to relief pursuant to 5 U.S.C. §§ 702 and 706(2)(A) and (C).  The OCC's Nonbank Charter Program exceeds the OCC's statutory authority and is otherwise not in accordance with law, and this Court should declare the Nonbank Charter Program unlawful and set it aside, as well as enjoin the OCC from taking further action toward the creation or issuance of any of these nonbank special-purpose charters.

## COUNT II

**The OCC's Promulgation of 12 C.F.R. § 5.20(e)(1) Exceeds its Statutory Authority**

153.    CSBS incorporates by reference the allegations of the preceding paragraphs.

154.    As previously noted, the NBA only allows the OCC to charter entities (1) to carry on the "business of banking," which requires, at a minimum, engaging in receiving deposits, or (2) to carry on a special purpose expressly authorized by Congress.

155.    In promulgating 12 C.F.R. § 5.20(e)(1), the OCC endeavored to unilaterally extend its authority to charter entities that do not carry on the "business of banking," such as nondepository entities, without the requisite Congressional authorization.  The OCC cannot through the promulgation of regulations expand the scope of its own chartering authority beyond that delegated to the OCC by statute.

156.    Moreover, the OCC's interpretation of the scope of its own authority is not entitled to deference, particularly where the OCC is attempting to interpret conflicting federal statutes, including statutes the OCC is not charged with implementing.

157.    CSBS is entitled to relief pursuant to 5 U.S.C. §§ 702 and 706(2)(A) and (C). Because Section 5.20(e)(1) improperly exceeds the OCC's statutory authority and is otherwise not in accordance with law, this Court should declare that regulation unlawful and set it aside, as well as enjoin the OCC from taking further action toward the creation or issuance of any charter pursuant to this invalid regulation.

## COUNT III

**Failure to Follow Rulemaking Procedures Required by Law**

158.    CSBS incorporates by reference the allegations of the preceding paragraphs.

159.   The OCC's Nonbank Charter Program is a "preemption determination" and an "opinion letter or interpretive rule" within the meaning of 12 U.S.C. §§ 25b and 43, respectively.

160.   The OCC did not comply with the requirements of the NBA in issuing this rule and making this determination.  12 U.S.C. §§ 25b(g), 43(a).

161.   CSBS is entitled to relief pursuant to 5 U.S.C. §§ 702 and 706(2)(D).  Because OCC's Nonbank Charter Program was reached without observance of the procedure required by law, this Court must declare the Nonbank Charter Program unlawful and set it aside.

## COUNT IV

## Arbitrary and Capricious Action

162.   CSBS incorporates by reference the allegations of the preceding paragraphs.

163.   In making and implementing the Nonbank Charter Program, the OCC not only acted beyond its statutory authority but also failed to consider the effect of its actions on the states' authority to regulate traditional areas of state concern.  The OCC likewise failed to consider the many significant concerns arising from the Nonbank Charter Program, or to conduct an adequate cost-benefit analysis, and it did not offer a reasoned explanation for its decision.

164.   Under the APA, an agency cannot act in a manner that is arbitrary or capricious and is required to engage in "reasoned decision making" when adopting new rules.  5 U.S.C. § 706(2)(A).

165.   Moreover, the OCC's actions are not entitled to deference, particularly where the OCC is attempting to define the scope of its own authority and interpret conflicting federal statutes, including statutes the OCC is not charged with implementing.

166.    The OCC's Nonbank Charter Program is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), and this Court must declare the Nonbank Charter Program unlawful and set it aside.

## COUNT V

**Preemption—Article VI, clause 2 (Supremacy Clause) and the Tenth Amendment of the U.S. Constitution**

167.    CSBS incorporates by reference the allegations of the preceding paragraphs.

168.    Pursuant to the Tenth Amendment of the U.S. Constitution, the states retain the powers not delegated to the federal government—which include the police powers necessary to regulate financial services and protect consumers and the public interest from unsound and abusive financial practices.  Among other things, the states possess the power to regulate nonbank companies, like those that are purportedly eligible for the OCC's new nonbank charter.

169.    The OCC's nonbank charter program creates conflicts with state laws to the extent it purports to enable nonbank charter holders to disregard state laws previously applicable to them.

170.    Under the Supremacy Clause of the U.S. Constitution, federal law represents the supreme law of the land when it conflicts with state law, but only to the extent that Congress has clearly manifested its intent to preempt state law.

171.    Because Congress did not intend to extend the OCC's national bank chartering authority to include the nondepository entities described in the OCC's Nonbank Charter Program, Congress has not clearly and manifestly expressed an intent that the OCC's new nonbank charter program should preempt state law.

172.    Indeed, there is nothing in the NBA authorizing the OCC to create a charter for these nonbank entities, much less clearly and manifestly reflecting Congressional intent that the charter preempt state laws.

173.    For this reason, Plaintiff is entitled to relief pursuant to 28 U.S.C. § 2201, 2202 and 5 U.S.C. §§ 702, 706(2)(A) and (B), and this Court should declare the Nonbank Charter Program unlawful and unconstitutional.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff CSBS prays for a judgment and order:

1.    Declaring that the Office of Comptroller of the Currency lacks statutory authority under the National Bank Act to create and issue special-purpose national bank charters to nonbank companies that do not carry on the "business of banking," which includes, at a minimum, receiving deposits;

2.    Declaring that the Office of Comptroller of the Currency lacked statutory authority under the National Bank Act to promulgate 12 C.F.R. § 5.20(e)(1);

3.    Declaring that the OCC's Nonbank Charter Program was improperly reached without following proper notice and comment procedures required by the Administrative Procedure Act and the NBA;

4.    Declaring that the OCC's Nonbank Charter Program is arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law;

5.    Declaring that the Nonbank Charter Program is an unconstitutional attempt to preempt otherwise applicable state law, in violation of the Supremacy Clause and Tenth Amendment to the U.S. Constitution;

6.    Declaring the Nonbank Charter Program unlawful and setting it aside;

7.    Declaring the OCC's promulgation of 12 C.F.R. § 5.20(e)(1) unlawful and setting that regulation aside;

8.    Awarding injunctive relief prohibiting the OCC from continuing the Nonbank Charter Program or creating or issuing any nonbank charter pursuant to 12 C.F.R. § 5.20(e)(1);

9.    Awarding Plaintiff its reasonable costs, including attorneys' fees, incurred in bringing this action; and

10.    Awarding any such other relief as the Court deems just and equitable.

Date:  October 25, 2018

Respectfully submitted,

*/s/ Jennifer Ancona Semko*
Jennifer Ancona Semko (Bar No. 481119)
Steven M. Chasin (Bar No. 495853)
Graham Cronogue (Bar. No. 1044036)
BAKER & McKENZIE LLP
815 Connecticut Avenue NW
Washington, DC 20006
Tel: +1 202 835-4250
Fax: +1 202 416-7055
jennifer.semko@bakermckenzie.com
steven.chasin@bakermckenzie.com
graham.cronogue@bakermckenzie.com

and

John Gorman
Margaret Liu
Michael Townsley
CONFERENCE OF STATE BANK
SUPERVISORS
1129 20th Street, NW
Washington, DC 20036
Tel: +1 202 296-2840
bgorman@csbs.org
mliu@csbs.org
mtownsley@csbs.org