# EXHIBIT C


Office of the
Comptroller of the Currency

**COMPTROLLER'S LICENSING MANUAL SUPPLEMENT**

# Considering Charter Applications From Financial Technology Companies

July 2018

# Contents

**Introduction** .................................................................................................................. 1
   What Is a Special Purpose National Bank? ...................................................... 2
   Application Process: Overview ........................................................................ 3

**Prefiling Communications** ............................................................................................ 4

**Filing a Charter Application** ........................................................................................ 5

**OCC Review of the Application** ................................................................................... 5
   Key Considerations ......................................................................................... 5
      Organizers, Management, and Directors ..................................................... 6
      Business Plan ............................................................................................... 6
      Capital and Liquidity .................................................................................. 8
      Financial Inclusion ................................................................................... 10
      Contingency Planning ............................................................................... 10
   Other Important Considerations ..................................................................... 11
      Coordination With Other Regulators ......................................................... 11
      Continuation of Remedies ......................................................................... 11

**The Chartering Decision** ............................................................................................ 12

**Supervision of Approved SPNBs** ............................................................................... 13

**Appendixes** ................................................................................................................. 14
   Appendix A: Supervisory Considerations ..................................................... 14
   Appendix B: Financial Inclusion Commitment Guidance .............................. 17

# Introduction

Technological innovations have revolutionized the way financial products and services are delivered and have enabled the development of new products and services. Today, many financial products and services are more accessible, easier to use, and more tailored to the needs of customers than ever before. The Office of the Comptroller of the Currency (OCC) has determined that companies that offer innovative technology-driven products and services may be eligible for a national bank charter, provided they meet the chartering requirements and standards applicable to all national banks.[1] Those requirements and standards are established by statute at 12 USC 21, 26, and 27, and by the OCC's regulations at 12 CFR 5. Comprehensive, publicly available OCC guidance explains how the OCC applies these requirements and standards.

The requirements and standards that govern applications for a national bank charter do not change if the applicant's business model incorporates new delivery channels or mechanisms using new technology to meet evolving customer needs. Financial technology —or fintech— companies may seek to comply with those requirements and standards in ways tailored to their business models, their delivery channels, and the products and services they offer. This document describes the key factors the OCC will consider in evaluating charter applications from fintech companies that have nontraditional or limited business models, do not take deposits, and rely on funding sources different from those relied on by insured banks.

This Supplement to the *Comptroller's Licensing Manual* provides detail on how the OCC would evaluate applications for a special purpose national bank charter from fintech companies and clarifies the OCC's expectations that companies with a fintech business model demonstrate a commitment to financial inclusion. It also explains the contingency planning each bank will be expected to undertake. Finally, the document describes the OCC's approach to supervising newly chartered special purpose national banks.

This Supplement augments, and does not replace, the OCC's existing chartering guidance. *The Comptroller's Licensing Manual* comprises a series of booklets that set out the OCC's policies on bank charters and step-by-step procedures for potential applicants for all charter types, including special purpose national banks.[2] The *Comptroller's Licensing Manual* includes the "Charters" booklet, which is a key resource for those seeking a national bank charter. The "Charters" booklet

- describes OCC policies and procedures used in the charter application process and provides detailed guidance and instructions.
- discusses the factors that the OCC considers in deciding whether to grant a charter.

---

[1] The requirements and standards discussed in this supplement would also apply to a group of individuals (organizing group) or an unincorporated entity. The reference to "companies" reflects the interest in and inquiries made to the OCC from established fintech companies for a special purpose national bank charter.

[2] See the "Charters" and "Background Investigations" booklets of the *Comptroller's Licensing Manual*.

- describes the application process, including the prefiling process, filing, OCC review of the application, the decision, and the organization phase of the new bank.
- provides information about the ongoing supervision of a federally chartered bank.
- discusses issues specific to special purpose national banks.

All potential applicants for a special purpose charter should carefully read this Supplement in conjunction with the OCC chartering regulation (12 CFR 5) and the "Charters" booklet.[3]

As with all potential charter applicants, OCC staff stands ready to answer questions, explain the application process, and provide guidance to potential applicants. The OCC invites those contemplating a special purpose national bank charter to contact the OCC's Office of Innovation to begin a dialogue about what it takes to become a special purpose national bank.

## What Is a Special Purpose National Bank?

A special purpose national bank is a national bank that engages in a limited range of banking or fiduciary activities, targets a limited customer base, incorporates nontraditional elements, or has a narrowly targeted business plan. Special purpose national banks include those banks whose operations are limited to certain activities, such as credit card operations, fiduciary activities, community development, or cash management activities. Special purpose national banks also include national banks that engage in limited banking activities, including one or more of the core banking functions of taking deposits, paying checks, or lending money.[4]

This Supplement applies specifically to the OCC's consideration of applications from fintech companies to charter a special purpose national bank that would engage in one or more of the core banking activities of paying checks or lending money, but would not take deposits and would not be insured by the Federal Deposit Insurance Corporation (FDIC).[5] We refer to these banks in this Supplement as SPNBs.[6] Fintech companies that seek a national bank

---

[3] The OCC's regulation, 12 CFR 5, sets forth the OCC's rules, policies, and procedures for the corporate activities of a national bank and a federal savings association. The specific rules that apply to organizing a national bank are set forth in 12 CFR 5.20.

[4] Under 12 CFR 5.20(e)(1), a special purpose bank that conducts activities other than fiduciary activities must conduct at least one of the following three core banking activities: taking deposits, paying checks, or lending money. Beyond those core activities, the activities of an SPNB are limited to those that are permissible for national banks under a statute, regulation, or federal judicial precedent, or that the OCC has determined to be permissible. See e.g. 12 USC 24(Seventh); 12 CFR 7.5002; *NationsBank of North Carolina, N.A. v. Variable Annuity Life Ins. Co.*, 513 U.S. 251 (1995).

[5] The OCC views the National Bank Act as sufficiently adaptable to permit national banks to engage in traditional activities like paying checks and lending money in new ways. For example, facilitating payments electronically may be considered the modern equivalent of paying checks. Applicants proposing to engage in activities not already addressed in statute, regulation, or OCC precedent should consult the OCC with respect to the permissibility of those activities.

[6] This Supplement does not apply to other types of special purpose banks. For example, this Supplement would not apply to a fintech company that intends to engage in fiduciary activities and otherwise meets the requirements of a trust bank.

---

charter and plan to take insured deposits would be required to obtain FDIC insurance and should apply for a full-service national bank charter.

As a national bank, an SPNB will be subject to the laws, rules, regulations, and federal supervision that apply to all national banks. In addition, all SPNBs will be subject to the same high standards of safety and soundness and fairness that all federally chartered banks must meet. As it does for all banks under its supervision, the OCC will tailor these standards based on the bank's business model, size, complexity, and risks, consistent with applicable law. For example, to approve a charter as an SPNB, the OCC may need to account for differences in business models and activities, risks, and the inapplicability of certain laws resulting from the uninsured status of the bank.

To address some of these differences, companies seeking a charter as an SPNB will be expected to make a commitment to financial inclusion and develop and adhere to a contingency plan that includes options to sell, wind down, or merge with a nonbank affiliate, if necessary.

## Application Process: Overview

The OCC charters national banks under the authority of the National Bank Act of 1864, as amended.[7] In evaluating whether to approve an application to establish a national bank, the OCC must determine whether the proposed bank has complied with all statutory and regulatory requirements and has met the OCC's chartering standards.[8] The OCC uses its established chartering standards and procedures as the basis for processing applications for all national banks, including SPNBs.[9]

The OCC's application process for a national bank consists of four phases:

1. A prefiling phase, in which potential applicants engage with the OCC in formal and informal meetings to discuss the proposal, the chartering process, and application requirements.
2. The filing phase, in which the organizers submit a complete application.
3. The review phase, in which the OCC reviews and analyzes the application to assess whether the proposed bank has a reasonable chance of success, will be operated in a safe and sound manner, will provide fair access to financial services, will promote fair

---

[7] See 12 USC 21, 26, and 27.

[8] See 12 CFR 5.20 (describing the OCC's statutory chartering authority and the procedures and requirements governing the OCC's review and approval of an application to establish a national bank, including a bank with a special purpose). Special purpose bank charter applicants generally must provide the information required by the OCC's standard review process. Applicants, however, should tailor the contents of the application to be consistent with the business model of the proposed special purpose bank.

[9] See 12 CFR 5.20(l)(1) (directing applicants for a special purpose charter to adhere to established charter procedures with modifications appropriate for the circumstances as determined by the OCC). See also the "Charters" booklet of the *Comptroller's Licensing Manual*.

treatment of customers, will ensure compliance with laws and regulations, and will foster healthy competition.[10]

4. The decision phase, in which the OCC decides whether to approve a charter application. The decision phase includes the preliminary conditional approval stage, in which the OCC imposes requirements and conditions for receiving a charter; the organization stage, in which the bank raises capital and prepares for opening; and the final approval stage.

The Supplement highlights key aspects of each phase of the application process. The "Charters" booklet of the *Comptroller's Licensing Manual* includes an in-depth discussion of each of these phases. Potential applicants are encouraged to familiarize themselves with the "Charters" booklet and the requirements for a national bank charter before initiating the application process.

# Prefiling Communications

The OCC finds it mutually beneficial for the applicant and the OCC to maintain an open dialogue throughout the application process. The OCC strongly encourages potential applicants to engage with the OCC well in advance of filing a charter application to better understand the application process and the OCC's requirements and expectations.

A fintech company interested in an SPNB charter should contact the Office of Innovation, innovation@occ.treas.gov. After the initial dialogue, the Office of Innovation may arrange further discussions with appropriate OCC staff, including the Licensing Department (Licensing), to give the company an opportunity to understand the application process, explain its proposal and reasons for seeking a charter, and become acquainted with the bank regulatory environment.

If the company decides to pursue a charter, one or more additional meetings will be scheduled, as determined by Licensing. For these additional meetings, organizers should be prepared to discuss the proposed bank's business plan, including a description of the proposed activities, the underlying marketing analysis supporting the business plan, the capital and liquidity needed to support the business plan, as well as a contingency plan to remain viable under significant financial stress. The company also should be prepared to address how it proposes to demonstrate a commitment to financial inclusion. These meetings will enable early identification of issues related to the proposed business plan, management, capital, and other requirements for a charter. The meetings will also give the OCC an opportunity to provide feedback on the proposal and discuss any legal, policy, or supervisory issues that may be relevant to the proposal and that would need to be resolved in connection with the final application. Licensing also will determine whether the organizers should submit a draft application before filing a formal application.[11]

---

[10] See 12 CFR 5.20(f).

[11] The OCC employs the draft application process to better understand the potential challenges inherent in unusual or complex filings and the major obstacles from a policy or risk perspective. Filing a draft application does not guarantee that the OCC will approve a formal application.

# Filing a Charter Application

After the prefiling phase, organizers would file a charter application. The filing procedures for an SPNB will be substantially the same as those that would apply to any other national bank. For example, the application must be published[12] and made available to the public for comment.[13] For details on filing and publishing notice of an application, see 12 CFR 5 and the "Charters" booklet of the *Comptroller's Licensing Manual*.

# OCC Review of the Application

## Key Considerations

The OCC begins the process of reviewing the application as soon as it is filed.[14] In its review, the OCC will consider whether the proposed bank has a reasonable chance of success, will be operated in a safe and sound manner, will provide fair access to financial services, will promote fair treatment of customers, and will ensure compliance with laws and regulations.[15] The OCC's regulations set forth additional considerations, including whether the proposed bank can reasonably be expected to achieve and maintain profitability and whether approving its charter will foster healthy competition.[16]

In evaluating whether the applicant has met these standards, the OCC will consider an applicant's business model and proposed risk profile. It will also consider, among other factors, whether the proposed bank has a business plan that articulates a clear path and timeline to profitability, has adequate capital and liquidity to support the projected volume, and has organizers and management with appropriate skills and experience.[17]

---

[12] The applicant must publish notice of its charter application in the community in which the proposed bank will be located as soon as practicable before or after the date of the filing. See 12 CFR 5.8. Because many SPNBs will operate online and nationally, the OCC will consider and discuss with the applicant alternative locations or methods where publication of this notice would be appropriate.

[13] The public comment period runs for 30 days after publication of the public notice. See 12 CFR 5.10. The OCC maintains a public file of the application and makes it available to any person requesting it; the public file is also available on the OCC's website, and the OCC publishes notice of the application in its Weekly Bulletin. Applicants may request that confidential treatment be afforded to certain parts of the application, for example, those containing proprietary information. See 12 CFR 5.9.

[14] See *Comptroller's Licensing Manual*, "Charters" booklet. The OCC seeks to make a decision on a complete and accurate application within 120 days after receipt or as soon as possible thereafter. The OCC's review of a special purpose charter application, however, may require additional time and scrutiny.

[15] See 12 USC 1(a) and 12 CFR 5.20(f)(1). See also *Comptroller's Licensing Manual*, "Charters" booklet.

[16] See 12 CFR 5.20(f)(2) and *Comptroller's Licensing Manual*, "Charters" booklet.

[17] The "Charters" booklet provides detailed information on each of these factors.

The charter review process is comprehensive and takes into account all aspects of the applicant's individual business model, governance structure, and risk profile. Highlighted below are some of the key considerations the OCC will assess in determining whether to grant an SPNB charter to a fintech company.[18]

### Organizers, Management, and Directors

The organizers, managers, and directors are critical to the success of an SPNB, as they are for all banks. The OCC expects them to be well qualified, with diverse experience in relevant areas.[19] Although the OCC would expect some members of the organizing group, the proposed board of directors, and management to have experience in banking or broader financial services, other relevant experience will depend on the specific products or services offered by the proposed bank. In addition, the OCC will consider whether the organizers, managers, and directors have other financial and business expertise and experience in highly regulated industries, including relevant experience needed to implement the proposed bank's business plan. Since fintech companies are technology-driven, having sufficient technical knowledge, skills, and experience will be as necessary as having sufficient banking and financial experience.

OCC regulations and licensing policies, including those outlined in the "Charters" booklet of the *Comptroller's Licensing Manual*, provide additional guidance regarding the qualifications of organizers, managers, and directors, as well as the respective roles of each. These criteria and qualifications are generally applicable to SPNBs, although the OCC may tailor certain criteria as appropriate.

### Business Plan

All applicants for a national bank charter must submit a comprehensive business plan to the OCC.[20] Having a comprehensive plan is critical to the OCC's decision on whether to approve a national bank charter. The OCC expects a company seeking any type of national bank charter to articulate why it is seeking a national bank charter and to provide significant detail about the proposed bank's activities. Proposals from companies without an established business record will be subject to a higher degree of scrutiny to evaluate whether the proposed bank has a reasonable likelihood of long-term success.

The business plan is an integral part of the management and oversight of a newly chartered or de novo bank and should establish the bank's written goals and objectives. The plan also

---

[18] The key considerations contained in this Supplement are based on the OCC's extensive internal review and analysis of whether to entertain SPNB applications, as well as the comments it has received from the public and stakeholders including fintech companies, banks, community and consumer groups, and trade associations.

[19] OCC regulations and licensing policy provide guidance regarding the qualifications of organizers, managers, and directors, as well as the respective roles of each. See 12 CFR 5; the "Charters" and "Background Investigations" booklets of the *Comptroller's Licensing Manual*; and *The Director's Book*.

[20] See 12 CFR 5.20(h). This regulation details specific items that should be addressed in a business plan, including earnings prospects, management, capital, community service, and safety and soundness.

summarizes and explains how the bank will organize its resources to meet its goals and measure its progress.

The business plan also should describe the bank's proposed activities. Questions about the permissibility of the applicant's proposed activities should be raised by the applicant (and may also be raised by the OCC) early in the discussion of the applicant's proposal. In a case in which the permissibility of an activity has not previously been established, OCC staff may advise the applicant to request a legal opinion from the OCC's Chief Counsel's Office.

In addition, the business plan should clearly define the market that the proposed bank plans to serve and the products and services it will offer. It should identify the proposed bank's customer base and contain realistic forecasts regarding market demand, economic conditions, competition, and financial projections, under normal and stressed conditions. The basis for the applicant's forecasts should also be included.

A key element of the applicant's business plan is a description of the proposed bank's risk management framework to identify, measure, monitor, and control risks. This description should include a discussion of how the board will monitor adherence to the business plan and adjust or amend the plan as appropriate to accommodate significant or material changes.

The business plan should also describe the bank's proposed internal system of controls to monitor and mitigate risk, including management information systems. The discussion of internal controls should include a general description of the controls for ensuring customer transaction and data integrity, security, and auditability, as well as overviews of the operational architecture, security framework, and resiliency structures.[21] Independent testing of the business activities, systems and controls, and compliance management systems should also be addressed.[22] Further, the business plan should address any functions or services that will be outsourced to a third party and the third-party risk management processes that are commensurate with the level of risk and complexity of those third-party relationships.

The applicant should also provide a risk assessment with the business plan. The risk assessment should demonstrate a realistic understanding of risk and describe management's assessment of all risks inherent in the proposed business model and products and services, including risks relating to third-party service providers, cybersecurity, Bank Secrecy Act (BSA) and anti-money laundering (AML) requirements, Office of Foreign Assets Control economic sanctions obligations, consumer protection, and fair lending. The risk assessment should set out the degree of risk the bank intends to assume (its risk appetite) and how it would manage the identified risks. The risk assessment should factor in the target markets'

---

[21] Applicants should review 12 CFR 30, appendix B, "Interagency Guidelines Establishing Information Security Standards." These guidelines address standards for developing and implementing administrative, technical, and physical safeguards to protect the security, confidentiality, and integrity of customer information and for disposing of consumer information.

[22] Such independent testing may be performed internally or may be outsourced but should be performed by someone independent of the day-to-day functions of the business activities, systems, and controls and who has the requisite skills to identify program or control weaknesses.

economic and competitive conditions, including the proposed products, services, and customers; the targeted geography (e.g., regional, nationwide); and any regulatory considerations regarding serving those markets.[23]

Detailed guidance regarding the business plan is available in the "Charters" booklet of the *Comptroller's Licensing Manual*.[24] Additional information on the OCC's expectations regarding a bank's risk management and corporate governance framework may be found in appendix A to this Supplement, "Supervisory Considerations."

### *Capital and Liquidity*

The OCC's evaluation of a bank's capital is important not only to assess the strength of an individual bank but also to maintain the safety and soundness of the entire banking system. Bank capital also helps to ensure public confidence in the stability of individual banks and the banking system; supports the volume, type, and character of the business conducted; and provides for the possibilities of loss.

For an SPNB, minimum and ongoing capital levels should be commensurate with the risk and complexity of the proposed activities. An SPNB will be subject to the minimum leverage and risk-based capital requirements in 12 CFR 3 that apply to all national banks. These requirements, however, which measure regulatory capital levels relative to an entity's assets and off-balance-sheet exposures, set a floor and may not be sufficient for measuring capital adequacy for some SPNBs.

For example, the risks posed by an SPNB with limited on-balance-sheet assets or nontraditional strategies may not be fully captured in its reported assets and off-balance-sheet exposures. To account for this gap, organizers will be expected to propose a minimum level of capital that the bank will meet or exceed at all times. Organizers will determine this minimum level of capital through a capital adequacy assessment that considers quantitative and qualitative factors, such as the volume of off-balance-sheet activity conducted and the risks associated with the applicant's business plan. The OCC will evaluate the applicant's capital adequacy assessment.

Capital adequacy should be addressed in the business plan. Organizers should analyze and support the minimum capital levels the bank will adhere to until it can achieve and sustain

---

[23] For any SPNB that provides retail bank services, the applicant should describe a BSA/AML compliance program (12 CFR 21.21) reasonably designed to assure and monitor compliance with BSA recordkeeping and reporting requirements, and a consumer compliance program designed to ensure fair treatment of customers and to promote fair access to financial services as well as compliance with section 5 of the Federal Trade Commission Act, the Unfair, Deceptive, and Abusive Acts or Practices prohibitions of the Dodd–Frank Consumer Protection and Wall Street Reform Act of 2010, and all other applicable consumer financial protection laws and regulations.

[24] The "Charters" booklet of the *Comptroller's Licensing Manual* includes a link to the OCC's Business Plan Guidelines. The Business Plan Guidelines provide information on the general elements of a business plan, including a description of the business; marketing plan; management plan; compliance management; the financial management plan; records, systems, and controls; and financial projections.

profitable operations. In addition, organizers should propose minimum capital levels the bank will adhere to after profitability that would be appropriate for its ongoing operations. Organizers also should discuss how the bank would address adverse market conditions that could deplete capital, such as broad market volatility or volatility specific to a business line. Additional factors that organizers should consider include the following:

- On- and off-balance-sheet composition, including credit risk, concentration risk, and market risk.
- Operational risk, including third-party relationships, and compliance risk associated with nontraditional products, services, or operating characteristics.
- Proposed activities and anticipated volume (new accounts, transactions) and impact on capital.
- Plans and prospects for growth, including any material action necessary to address business activity that is either below or above expectations and management's past experience in managing growth.
- Stability or volatility of sources of funds and access to capital.[25]

If the OCC grants preliminary conditional approval for an SPNB charter, that approval will include a condition specifying a minimum capital level the bank must maintain or exceed at all times.[26] This amount would be based on the analysis of quantitative and qualitative factors, including those described above. The OCC expects that capital in an SPNB would increase beyond the initial minimum amount as the size, complexity, and corresponding risks of the bank evolve.

In addition to capital, the organizers should address liquidity and funds management. Liquidity is a bank's capacity to readily meet its cash and collateral obligations at a reasonable cost without adversely affecting either daily operations or the bank's financial condition.[27] Since SPNBs are uninsured and likely to rely on funding that is potentially more volatile in certain environments, organizers should describe how the SPNB can be funded and maintain sufficient liquidity under stressed conditions. The OCC will consider the proposed bank's specific business model when evaluating the bank's liquidity profile and

---

[25] For additional guidance on capital considerations, please see the "Capital and Dividends" booklet of the *Comptroller's Licensing Manual*.

[26] The OCC tailors capital requirements for other special purpose banks. For example, the OCC typically imposes capital requirements on trust banks in addition to the minimum requirements calculated according to 12 CFR 3. Because trust banks do not make loans or rely on deposit funding, the OCC typically requires them to hold a specific minimum amount of capital, which often exceeds the capital requirements for other types of banks.

[27] For additional details regarding liquidity, applicants may refer to the "Liquidity" booklet of the *Comptroller's Handbook*.

processes for monitoring and mitigating liquidity risk.[28] Based on an analysis of the proposed SPNB's business model, the OCC may impose requirements tailored to the bank's funding model, structure, and risks to ensure it maintains adequate liquidity at all times and in all economic environments. Such requirements could include entering into a liquidity maintenance agreement with a parent company or maintaining a certain amount of high-quality liquid assets.

### Financial Inclusion

Consistent with the agency's mission to ensure fair treatment of customers and fair access to financial services, the OCC expects any entity seeking an SPNB charter to demonstrate a commitment to financial inclusion that includes providing or supporting fair access to financial services and fair treatment of customers.[29] The nature of that commitment will depend on the proposed bank's business model, and the types of products, services, or activities it intends to provide.

An SPNB applicant should describe the proposed bank's commitment to financial inclusion in its application. The description should include the proposed goals, approaches, activities, milestones, commitment measures, and metrics for serving the anticipated market and community consistent with the bank's activities, business model, and product and service offerings. For more information on the OCC's expectations regarding financial inclusion, see appendix B to this Supplement, "Financial Inclusion Commitment Guidance."

### Contingency Planning

Before receiving final approval for a charter, an SPNB will be required to develop a contingency plan to address significant financial stress that could threaten the viability of the bank. The contingency plan should outline strategies for restoring the bank's financial strength and options for selling, merging, or liquidating the bank in the event the recovery strategies are not effective.[30] The format and content of the plan are flexible and should be tailored to the bank's specific business and reviewed and updated as the bank's business evolves.

As a condition for preliminary approval of a charter, an SPNB will be required to develop the contingency plan during the bank's organization phase. The OCC's final approval will require the bank to implement and adhere to the plan. The bank will be expected to review the contingency plan annually and update it as needed. Any significant changes to the contingency plan will require the non-objection of the appropriate supervisory office.

---

[28] National banks, including SPNBs, that meet certain asset thresholds are automatically subject to additional liquidity requirements under 12 CFR 50, including banks with total consolidated assets equal to $250 billion or more, and banks with total consolidated on-balance-sheet foreign exposure equal to $10 billion or more.

[29] See 12 USC 1(a).

[30] "OCC's Guidelines Establishing Standards for Recovery Planning for Certain Large Insured National Banks, Insured Federal Savings Associations and Insured Federal Branches," in 12 CFR 30, appendix E may be a useful resource for SPNBs developing strategies to restore the bank to financial viability.

# Other Important Considerations

### *Coordination With Other Regulators*

Depending on the structure of the proposed SPNB, regulators in addition to the OCC may have oversight and supervisory roles over the bank. In considering applications for SPNB charters, the OCC will coordinate as appropriate with other regulators to facilitate consideration of any applications or approvals that may be required by those regulators.

### *Continuation of Remedies*

The OCC does not permit companies that are the subject of a corrective program or enforcement action by another regulator to avoid the consequences of that corrective program or enforcement action. A pending enforcement action with respect to a significant supervisory matter may be grounds for denial of a charter application. Otherwise, after consultation with the other regulator, the OCC will ensure that a company's obligation to remediate or pay penalties for any violations or deficiencies cited or identified by another regulator is carried forward and enforced through conditions imposed on an approval of an SPNB charter.

# The Chartering Decision

The OCC grants approval of a charter application in two steps: preliminary conditional approval and final approval.[31] The period between the preliminary conditional approval and final approval is referred to as the organization phase.[32] The OCC will issue a final approval once it determines that all key phases of organizing the bank have been completed, all requirements and conditions for final approval have been met, and the organizers have received any other necessary regulatory approvals.

The OCC imposes certain conditions in connection with the approval of all new national bank charters, including special purpose national banks.[33] The conditions may address a variety of issues, such as guaranteeing maintenance of minimum capital levels commensurate with the prospective risk of the bank's business plan. Other conditions include ensuring that the bank does not significantly deviate from the business model proposed in its application without obtaining the OCC's prior non-objection.[34]

The OCC also will impose conditions that are specific to SPNBs or unique to an individual SPNB. For example, because SPNBs are uninsured, the OCC will require the bank to develop a contingency plan that includes options to sell itself, wind down, or merge with a nonbank affiliate, if necessary. In addition, the OCC may impose conditions similar to requirements in statutes that apply by their terms only to insured banks, for instance a condition requiring the bank to demonstrate a commitment to financial inclusion.[35]

---

[31] Following review of the application, the OCC determines whether to grant preliminary conditional approval or deny the application. A preliminary conditional approval determination indicates the OCC's permission to proceed with the organization of the bank according to the business plan set forth in the application and specifies the conditions for approval. Granting preliminary conditional approval provides the organizers of the bank with assurances that the application has passed the first phase of OCC review before the organizers expend additional funds to raise capital, hire officers and employees, and fully develop policies and procedures. It is not an assurance that the OCC will grant final approval for a new bank charter.

[32] For additional information on the organization phase, see the "Charters" booklet of the *Comptroller's Licensing Manual*.

[33] The OCC also imposes a number of requirements on a bank when it grants preliminary conditional approval. Examples of such requirements include establishing appropriate policies and procedures and adopting an internal audit system appropriate to the size, nature, and scope of the bank's activities. The organizers must satisfy these requirements before the OCC grants final approval. These requirements are discussed in the "Charters" booklet of the *Comptroller's Licensing Manual*.

[34] See the "Charters" booklet of the *Comptroller's Licensing Manual* for a discussion of conditions that may be imposed in connection with a charter application. The condition regarding a significant deviation from the business plan is discussed in appendix F, "Significant Deviations After Opening."

[35] Certain provisions in the Federal Deposit Insurance Act, such as section 1831p-1 (safety and soundness standards) and section 1829b (retention of records), only apply to insured depository institutions. When a law does not apply directly, the OCC may, through a charter condition, work with the bank to achieve the goals of a particular statute or regulation, taking into account relevant differences between a full-service bank and a special purpose bank.

In addition, the OCC will impose assessments on an SPNB as a condition of approval. The OCC is funded through assessments and fees charged to the banks it supervises, and SPNBs will be subject to periodic assessments, just as other national banks are.[36] The OCC has modified the assessments it charges to other special purpose national banks to account for the banks' activities and the assets they hold.[37] The OCC would determine assessments for an SPNB based on similar factors tailored to the business model of the SPNB.

These charter conditions are enforceable and generally will remain in place until removed or modified by the OCC.[38] Compliance with these conditions will be reviewed by the OCC during the examination process.[39]

# Supervision of Approved SPNBs

After the OCC issues final approval and the bank opens for business, the OCC will supervise the SPNB, as it does all other national banks, under a scheduled supervisory cycle, including on-site examination and periodic off-site monitoring. The OCC sets high expectations for the entities it supervises. Like all de novo institutions, newly chartered SPNBs will be subject to rigorous ongoing oversight to ensure that the bank's management and the board of directors are properly executing their business strategy and the bank is meeting its performance goals.

Key supervisory considerations for SPNBs are highlighted in appendix A to this Supplement. For additional information on specific areas of bank supervision such as internal controls and corporate and risk governance, applicants should refer to the booklets of the *Comptroller's Handbook*.

---

[36] See 12 USC 16 and 481; and 12 CFR 8.

[37] Additional assessments are required of certain national banks. See, e.g., 12 CFR 8.2(c) and 8.6(c) (additional assessments imposed on independent credit card banks and independent trust banks). As it gains experience, the OCC may amend its rules to address assessments for SPNBs.

[38] Conditions imposed in connection with a charter are considered "conditions imposed in writing" and are enforceable under 12 USC 1818.

[39] These conditions may be imposed in the preliminary approval letter and the final approval letter (together, conditional approval letters). The OCC also may require that the applicant enter into an operating agreement with the OCC. The OCC publishes all conditional approval letters on its website on a monthly basis. The OCC does not generally publish operating agreements. A conditional approval letter, however, will disclose the existence of an operating agreement. The special purpose charters section of the "Charters" booklet of the *Comptroller's Licensing Manual* has additional information on operating agreements and other documents used for some special purpose national trust banks.

# Appendixes

## Appendix A: Supervisory Considerations

### OCC Supervisory Framework

The supervisory framework for SPNBs will incorporate core elements already in place for all national banks. These elements include an assigned supervisory office, an assigned portfolio manager, a supervisory strategy tailored to the bank's business model, and a blend of on-site and off-site supervisory activities conducted by an experienced, knowledgeable examination team. In addition to the statutory examination requirements[40] and consistent with longstanding OCC de novo supervision policy, newly chartered SPNBs will be subject to more frequent and intensive supervision in their early years of operation. The scope of supervision activities will follow a risk-based approach commensurate with the size and complexity of the institution, focusing on any elevated risks and unique supervisory challenges presented by a given SPNB. SPNB examination and supervision activities will also include frequent contact with the board of directors and bank management.

OCC executive management will assess the OCC's ability and willingness to supervise an eligible SPNB based on the OCC's risk appetite, resources, and skill sets needed. The executives will collaborate with the Office of Innovation, Legal, and Licensing staff in making their decisions on proposed SPNB charters. Similar to the OCC's supervision framework for existing special purpose banks, the OCC will identify the appropriate supervisory office for ongoing supervision. In addition, each bank will have an assigned portfolio manager who will serve as the primary point of contact and examiner-in-charge for the institution. The portfolio manager and the examination team will have subject matter expertise appropriate for the bank's business model. In addition, licensing and risk specialists, legal staff, and other subject matter experts will be assigned to each bank, as appropriate.

### Rating Framework

SPNBs will be subject to the same ratings framework, including applicable specialty ratings, as other national banks. As outlined in the "Bank Supervision Process" booklet of the *Comptroller's Handbook,* national banks are assessed in accordance with the Uniform Financial Institutions Rating System. Composite ratings are based on an evaluation of an institution's managerial, operational, financial, risk management, and compliance performance.

Under this uniform rating system, the OCC ensures that all national banks are evaluated in a comprehensive and uniform manner and that supervisory attention is focused appropriately on those banks that exhibit financial and operational weaknesses or adverse trends. The rating system, commonly referred to as CAMELS, assesses components of a bank's

---

[40] As national banks, SPNBs will be subject to the statutory examination cycle prescribed by 12 USC 1820(d).

performance including capital adequacy, asset quality, management, earnings, liquidity, and sensitivity to market risk, as well as specialty areas such as information technology, trust (if applicable), and consumer compliance.

## Risk Management Framework

The OCC expects every national bank to have an appropriate risk management framework to address all relevant risks to the bank.[41] The structure, sophistication, and oversight of these systems should be commensurate with the complexity and amount of risk a bank assumes. Regardless of the bank's size or complexity, a sound risk management framework should do the following:

- **Identify risk:** Banks must recognize and understand existing risks and risks that may arise from new business initiatives, including risks posed by third-party relationships, by external market forces, or by regulatory or statutory changes. Risk identification should be a continuing process and occur at both the transaction and portfolio levels.
- **Measure risk:** Banks must have effective risk management systems that measure risks accurately and in a timely manner. A bank that does not have an effective risk measurement system has limited ability to control or monitor risk levels.
- **Monitor risk:** Banks must monitor risk levels to ensure timely review of risk positions and exceptions to risk limits. Monitoring reports must be timely, accurate, and relevant, and should be distributed to appropriate individuals to ensure action, when needed.
- **Control risk:** Banks must establish and communicate risk limits through policies, standards, and procedures that define responsibilities and authority. These limits serve as a means to control exposures to the various risks associated with the bank's activities.

The OCC employs a risk-based supervisory philosophy focused on evaluating risk, identifying material and emerging problems, and ensuring that individual banks take corrective action before problems compromise their safety and soundness or result in the unfair treatment of customers. This supervision-by-risk approach provides a consistent definition of risk and a system for assessing risks (known as the Risk Assessment System or RAS), and it integrates risk assessment into the supervisory process. The RAS is applicable to all risks identified across a bank and can include (although it is not limited to) credit risk, information technology systems and controls, operational risk, cybersecurity risk, liquidity and funds management, compliance risk, and strategic and reputation risks. Following risk evaluations, the supervisory office tailors and conducts supervisory activities based on the risks identified, and periodic testing is completed in order to validate a bank's risk assessment.

---

[41] For additional information on the risk management framework, see the "Corporate and Risk Governance" booklet of the *Comptroller's Handbook*.

## Corporate Governance Framework

As with all national banks, the OCC expects the governance structure for any proposed SPNB to be commensurate with the risk and complexity of its proposed products, services, and activities. The OCC expects national banks to have expertise, financial acumen, and a risk management framework that includes governance and well-defined roles among the bank's business units, support functions, and the internal audit function.[42]

The board of directors must have a prominent role in the overall governance structure by participating on key committees and guiding the bank's overall strategy and risk management framework. Board members also must actively oversee management, provide credible challenge, and exercise independent judgment.

## Ongoing Communication

The OCC is committed to ongoing communication with the banks it supervises and with other banking regulators. This includes formal and informal conversations, meetings, examination reports, and other written communications. At a minimum, the OCC must provide a bank's board of directors a report of examination (ROE) at least once each supervisory cycle. The ROE conveys the bank's overall condition, ratings, and risk assessment summary. It also summarizes examination activities and findings identified during the supervisory cycle.[43]

---

[42] Internal audit (including co-sourcing and outsourced arrangements) must be an independent function and report directly to the audit committee of the board of directors. For additional information on the audit function, see the "Internal and External Audits" booklet of the *Comptroller's Handbook*.

[43] Additional information about communications can be found in the "Bank Supervision Process" booklet of the *Comptroller's Handbook*.

# Appendix B: Financial Inclusion Commitment Guidance

## Financial Inclusion Commitment

Consistent with the agency's mission to ensure fair treatment of customers and fair access to financial services, the OCC expects any entity seeking an SPNB charter to demonstrate a commitment to financial inclusion that includes providing or supporting fair access to financial services and fair treatment of customers. The nature of that commitment will depend on the proposed bank's business model, and the types of products, services, or activities it intends to provide.

## Considerations

### Initial Description

In completing the charter application, each SPNB applicant should identify the financial services needs of underserved markets that could be met by the SPNB's products, services, and activities. An applicant should include a description of its financial inclusion commitment that addresses the proposed bank's

- products, services, and activities.
- anticipated markets and communities, including underserved populations or communities, including low- and moderate-income customers.
- goals, milestones, commitment measures (e.g., the applicant's loan origination volumes for lenders, average pooled account balances and transaction volumes for payment entities), and metrics (e.g., the measure as a percentage of activity in anticipated markets and communities, such as the share of lending to low- and moderate-income borrowers).

### Policies and Procedures

During the organization phase, following preliminary conditional approval, the SPNB will develop policies and procedures that address the SPNB's implementation of its financial inclusion commitment.

Before final approval, the OCC will review and evaluate the SPNB's policies and procedures related to the financial inclusion commitment and will consider the following:

- The SPNB's ability, efforts, and commitment to meet various community credit and other financial service needs, including those of underserved populations or communities, based on the applicant's projected financial condition and size, economic conditions in the anticipated markets and communities, and other factors.
- Investments, partnerships, ongoing outreach, and collaboration strategies, or expected participation in governmentally insured, guaranteed, or subsidized loan programs that the SPNB will use to achieve its financial inclusion objectives.

- Other factors that reasonably bear upon the extent to which the SPNB will help meet the credit and other financial services needs of the anticipated market and community, including underserved populations or communities.
- The SPNB's process to meet the needs of the anticipated market and community on a continual basis, including its process to update or modify its financial inclusion commitment in appropriate circumstances, and material changes to the products or services offered or the markets and communities served.

The SPNB's commitment to financial inclusion is ongoing through the life of the charter. Financial inclusion commitment-related conditions imposed as part of any final approval will remain in place and will be reviewed for compliance during the examination process.