# EXHIBIT E



November 14, 2016

Office of the Comptroller of the Currency (OCC)
Legislative and Regulatory Activities Division
400 7th Street SW, Suite 3E-218
Mail Stop 9W-11
Washington, DC 20219

Re:   *Receiverships for Uninsured National Banks*, Proposed Rule; Docket ID OCC-2016-0017

Dear Comptroller Curry,

The Conference of State Bank Supervisors (CSBS) appreciates the opportunity to comment on the notice of proposed rulemaking, entitled *Receiverships for Uninsured National Banks*, addressing how the Office of the Comptroller of the Currency (OCC) would conduct the receivership of an uninsured national bank and placing the receivership proposal within the OCC's responsible innovation initiative. State bank supervisors appreciate the OCC's desire to clarify the receivership framework applicable to uninsured national banks for the benefit of the broader regulatory community and financial market participants. We also appreciate the efforts of the OCC and other financial regulatory agencies to focus on the benefits and risks that technological innovation has and will continue to bring to financial services. However, as set out in this comment letter, State banking regulators oppose a potential national charter for certain financial technology companies because it would distort the marketplace for financial services and undermine State laws and regulations governing financial services.

CSBS and its members recognize the value flowing from the intersection of innovation and financial services—value that enables existing and new companies to potentially better serve their customers. This convergence also presents risks—risks for customers and for the larger marketplace. State regulators have and continue to charter, license, and supervise a variety of entities involved in developing innovative financial services solutions and products. As supervisors of over three-quarters of this nation's banks and a very broad range of non-depository financial services companies, State regulators are committed to fostering innovation that promotes economic development and improves the ability of regulated financial services companies to serve their customers and operate in a safe and sound manner.

I.   **SPECIAL PURPOSE CHARTERS**

The rulemaking indicates that the proposed receivership framework falls within the OCC's initiative on responsible innovation and that the OCC is considering whether "a special purpose charter could be an appropriate entity for the delivery of banking services in new ways" by financial technology (fintech) companies.

In this section, State regulators share our perspective on the Comptroller's chartering authority as well as the supervisory and regulatory issues that would be created by an unprecedented, overreaching use of such authority.

### A. Statutory Limits of the OCC's Chartering Authority

The proposed rule begins with a discussion of the OCC's authority to issue special purpose charters. The proposal cites Section 5.20(e)(1)(i) of the OCC's chartering regulations in stating that "[t]he OCC has the authority to charter and supervise special purpose banks with operations limited solely to providing fiduciary services. . . . In addition to national trust banks, the OCC also may charter other special purpose banks with business models that are within the business of banking. The OCC's rules provide that a special purpose bank must conduct *at least one of the three core banking functions*, namely receiving deposits, paying checks, or lending money" (emphasis added).[1]

As CSBS indicated when the OCC's chartering regulations were revised in 2003,[2] State regulators are firmly opposed to any expansion of the Comptroller's chartering authority that would enable wholesale preemption of State oversight and consumer protection laws for a group of entities conducting activities that are only loosely related to banking. State regulators believe that Section 5.20(e)(1)(i) of the OCC's chartering regulations exceeds the statutory limits of the OCC's chartering authority by authorizing the OCC to charter an institution that engages exclusively in non-depository core banking functions—whether lending money and/or paying checks.

The Comptroller's Licensing Manual indicates that new national banks may be organized for "full-service operations" under a general purpose charter or that new national banks may be organized for "special purpose operations" under a special purpose charter. As discussed below, the National Bank Act (NBA) and other federal banking laws do not support the assertion that an institution that engages exclusively in non-depository core banking functions may be chartered by the Comptroller as a national bank under either a general or special purpose charter.

As courts have held,[3] and as the OCC itself has acknowledged,[4] the NBA does not authorize the Comptroller to issue a general purpose charter to an institution that engages exclusively in non-depository core banking functions, because such an institution would not be engaged in the "business of banking". While an institution operating under a general purpose charter need not exercise all of the powers inherent in the

---

[1] *See* 81 Fed. Reg. 62835, 62837 (citing 12 C.F.R. § 5.20(e)(1)(i)).

[2] In our 2003 comment letter we stated: "the OCC's proposal to allow limited purpose national banks to conduct fiduciary activities or 'any other activities within the business of banking' raises important questions. . . . CSBS is concerned that expansion of the limited purpose national bank charter creates a safe harbor - enabling wholesale preemption of State oversight and consumer protection laws for a group of entities conducting activities only loosely related to banking . . . additional clarification on the OCC's plans for expanding limited purpose national bank powers is needed to avoid a perception that the OCC is availing the national bank charter to a group of entities not conducting core banking activities. CSBS questions what authority the OCC has to undertake such a sweeping measure."

[3] *See Independent Bankers Ass'n of America v. Conover*, 1985 U.S. Dist. LEXIS 22529, at *34 -*36 (M.D. Fla. Feb. 15, 1985) (*IBAA v. Conover*) (holding that an institution which does not engage in both accepting deposits and making loans cannot be chartered as a national bank because it would not be engaged in the "business of banking" within the meaning of the NBA). *See also National State Bank of Elizabeth v. Smith*, No. 76-1479 (D.N.J. September 16, 1977) (holding that the Comptroller lacked the authority to charter a trust company which did not also engage in the "business of banking") *rev'd on other grounds*, 591 F.2d 223 (3d Cir. 1979).

[4] *See* Office of the Comptroller of the Currency Interpretations - Corporate Decision #96-41. Although the OCC dealt with the issue in a perfunctory manner in this interpretive letter, by conditioning the approval of the charter application on the applicant's commitment that it would eventually perform a deposit-taking function, the OCC implicitly acknowledged that a general purpose charter cannot be granted to an institution which does not perform the core banking function of deposit-taking.

business of banking, applicable legal precedent,[5] the OCC's chartering history,[6] federal banking law,[7] and other federal laws[8] plainly indicate that engaging exclusively in non-depository core banking functions does not, in itself, constitute engaging in the "business of banking" under the NBA. As several provisions of the NBA (12 U.S.C. §§ 21, 24(Seventh), 26 & 27) make clear, the OCC may not issue a general purpose national bank charter to an institution unless that institution intends to engage in the "business of banking," including deposit-taking.

With respect to special purpose charters, although Congress has given the Comptroller specific grants of authority to charter special purpose institutions engaged in fiduciary activities[9] or a narrowly drawn set of specialized activities,[10] those narrowly drawn grants of authority clearly do not allow the Comptroller to issue other types of special purpose charters to institutions that are engaged exclusively in non-depository core banking functions. Based on the foregoing, the chartering regulation upon which the OCC appears to rely (Section 5.20(e)(1)(i)) clearly exceeds the statutory limits of the Comptroller's chartering authority.

In addition to the NBA, the Bank Holding Company Act (BHCA) has been held to limit the scope of the Comptroller's chartering authority. Specifically, by defining "bank" as an institution which accepts deposits and makes loans,[11] the BHCA has been held to bar the Comptroller from conditioning the approval of a charter application on the institution agreeing to voluntarily refrain from engaging in either of these core banking functions, particularly deposit-taking.[12] The subsequent revision of the BHCA with the passage of the Competitive Equality in Banking Act of 1987 (CEBA) would not have altered the governing rationale of court's ruling in *IBAA v. Conover*. To the contrary, CEBA's classification of an "insured bank" as a "bank" under the BHCA represents a congressional acknowledgment that performing the function of deposit-taking is a necessary condition to be engaged in the business of banking, as the court held in *IBAA v. Conover*.

---

[5] *See IBAA v. Conover*, supra note 2; *National State Bank of Elizabeth v. Smith*, supra note 2.

[6] It is noteworthy that, since the adoption of Section 5.20(e)(1)(i) of the OCC's chartering regulations in 2003, the Comptroller has not, to our knowledge, granted a general purpose charter to an institution engaged exclusively in non-depository core banking functions.

[7] Other provisions of the NBA also support the conclusion that an institution engaged exclusively in non-depository core banking functions cannot be engaged in the business of banking without also engaging in deposit-taking. *See e.g.,* 12 U.S.C. § 22 (requiring that the organization certificate (i.e. charter) specify the place where the institutions operations of discount and deposit are to be carried on). Other federal banking laws likewise recognize that deposit-taking is the essential function of and necessary condition to engage in the business of banking. *See* 12 U.S.C. § 378 (prohibiting deposit-taking without a bank charter); 12 U.S.C. § 1841(c)(1) (definition of "bank" under the Bank Holding Company Act).

[8] Numerous federal laws treat the function of deposit-taking as a necessary condition for qualifying as a bank. See *In re Republic Trust & Sav. Co.*, 59 B.R. 606 (Bankr. N.D. Okla. 1986) (interpreting bankruptcy code definition of "banking institution" in 11 U.S.C. § 109(b) as inapplicable to an institution which does not have the power to or actually engage in deposit-taking). See also 26 U.S.C. § 581 (defining a "bank" under federal tax law as an institution "a substantial part of the business of which consists of receiving deposits and making loans and discounts").

[9] *See* 12 U.S.C. § 27(a) (national trust companies).

[10] *See* 12 U.S.C. § 24(Eleventh) (community development banks); 12 U.S.C. § 27(a) (cash management banks); 12 U.S.C. § 27(b) (bankers' banks). For certain special purpose charters, the OCC's chartering authority stems from other federal banking laws, *see* 12 U.S.C. § 1841(c)(2)(F) (credit card banks).

[11] *See* 12 U.S.C. § 1841(c)(1).

[12] *See IBAA v. Conover*, 1985 U.S. Dist. LEXIS 22529, at *36-*38 (holding that "nonbank banks" did not act "voluntarily" when they chose to refrain either from accepting demand deposits or from making commercial loans in order to avoid being treated as "banks" under the BHC Act). In the court's view, "the Comptroller will issue . . . charters [for nonbank banks] with the knowledge that they cannot exercise one of the powers that is essential to the business of banking. The substantive effect is the same as if the charters contained terms limiting them." *Id.* at *38.

Given the OCC's chartering history, the applicable case law, and the lack of any statutory authority for the expansive interpretation underlying Section 5.20(e)(1)(i), State regulators request that the OCC identify the statutory source for their purported authority to charter a national bank that engages exclusively in non-depository core banking functions.[13] Additionally, State regulators request that the OCC clarify the source and limits of the Comptroller's authority to grant a general purpose charter to an institution that voluntarily limits its activities to the exercise of non-depository core banking functions. Stakeholders, whether prospective charter applicants or fellow chartering and supervisory authorities, deserve clarity as to the legal foundations for a charter to engage exclusively in non-depository core banking functions—a type of charter without precedent in the national banking system.

### B. Supervisory and Regulatory Issues

Aside from the legal issues pertaining to the limits of the Comptroller's chartering authority, State supervisors believe significant policy considerations counsel against the reshaping of the national charter for an institution which engages exclusively in non-depository core banking functions. Such policy considerations include concerns regarding the traditional state-federal balance of authority in licensing and regulation, the preemption of State consumer protection laws, the separation of banking and commerce, and potential risks posed to payments systems.

### i.  *Traditional Role of the States in Chartering and Licensing*

With the exception of the dual banking system, the acts of chartering and licensing—although a routine function of the States—is a power that the federal government has exercised sparingly. In contrast to banking, where the exercise of regulation begins with the charter grant, the federal government has almost always regulated nonbanking activities by imposing rules on firms that have already acquired the right to engage in a nonbanking business under a State charter or license. The licensing of financial services activities takes place primarily at the State level, because, as a function of the inherent police power of the States, the protection of the public welfare is primarily a matter of local concern.[14] Indeed, as Justice Brandeis explained over 70 years ago: "[i]t is one of the happy incidents of the federal system that a single courageous State may, if its citizens choose, serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country."[15]

State regulators believe that Congress has deliberately preserved this cooperative federal-state regulatory framework for the vast majority of nonbanking financial services activities for the benefit of consumers and providers of financial services alike. Consumers benefit because the proximity of the State regulatory framework has proven to be more accountable to local concerns and enables the public to conduct their own assessment as to whether the degree of consumer protections afforded by a particular State accords with their personal preferences. Additionally, a State-based licensing structure benefits financial services

---

[13] In the 2003 final rule revising Section 5.20(e)(1)(i) the OCC stated the core banking functions requirement is based on 12 U.S.C. § 36(j), the statutory provision identifying the activities which cause a facility to be considered a bank branch. Given the clear distinction between the definition of a bank "branch" in Section 36(j), which does not refer to the "business of banking" and the statutes governing the OCC's chartering authority (12 U.S.C. §§ 21, 24(Seventh), 26 & 27), which expressly describe a national bank as an institution that is authorized to engage in and shall commence the "business of banking", State regulators reject the assertion that the statutory definition of "branch" can provide any support for a legitimate expansion of the OCC's special-purpose chartering authority.

[14] *Lewis v. BT Inv. Managers*, 447 U.S. 27, 38 (1980) ("both as a matter of history and as a matter of present commercial reality, banking and related financial activities are of profound local concern. . . . [S]ound financial institutions and honest financial practices are essential to the health of any State's economy and to the well-being of its people. Thus, it is not surprising that ever since the early days of our Republic, the States have chartered banks and have actively regulated their activities.")

[15] *See e.g., New State Ice Co. v. Liebmann*, 285 U.S. 262, 311 (1932) (Brandeis, J., dissenting).

providers by precluding large, entrenched incumbents from capturing the licensing process so as to exclude new, innovative entrants.

Where Congress has seen fit to provide for the concurrent licensing or regulation of financial services activities at the federal and State level—for instance, in banking, securities, or certain, limited specialized financial services activities—it has done so expressly and clearly through specific legislation. To date, Congress has not authorized the creation of a federal charter or license for the vast majority of nonbank financial service providers, deferring to State authority and the actions of duly elected State legislatures.[16]

By offering a degree of preemption historically unavailable to non-depository institutions, an unprecedented national bank charter for fintech companies would potentially result in the total centralization of non-depository licensing in a single federal agency and thereby nullify the greater competition and innovation enabled through reliance upon multiple State chartering and licensing authorities. State regulators believe that this effective nullification of State authority would result in multiple negative consequences for financial services providers and consumers.

In such a scenario, the OCC could easily become a means for entrenched institutions to exclude new, innovative entrants in order to preserve market structure and competitive dynamics under the status quo. Similarly, incumbent chartered institutions could pressure the OCC to raise the barriers to entry for other fintech companies in order to prevent innovative institutions from obtaining federal charters, either because they lack the significant resources required or because their business models differ slightly from the fintech business models already sanctioned by the OCC. Put simply, the creation of a federal charter for fintech or other nonbanking companies would put the OCC in the position of picking winners and losers among providers of fintech services, to the general detriment of customers and innovative financial services providers. State regulators believe that preserving the preeminent role of the States in the chartering and licensing of non-depository providers of financial services provides the best national strategy for encouraging fintech companies to develop and offer innovative products and solutions, while promoting consumer protection and a diverse and stable financial services market.

In addition to hindering innovation in the financial services industry, the creation of a new special purpose bank charter for fintech and other non-depository institutions would threaten significant harm to consumers both by preempting State consumer protection laws as well as by triggering a "race to the bottom". State regulators believe that, by selectively displacing State consumer protection laws, the issuance of a federal charter would make it increasingly difficult for State legislatures to expand or revise consumer protection laws in response to local concerns. State regulators urge the Comptroller to avoid triggering such a competition in laxity as it would undermine the overriding national public interest in maintaining a safe and sound financial system that protects the interests of consumers while encouraging innovation, growth and vibrancy in the U.S. financial services industry.

In sum, State regulators are opposed to the unprecedented expansion of the Comptroller's chartering authority because, in acting without express authority from Congress, the OCC would drastically alter the traditional state-federal balance of authority in the licensing and regulation of non-depository financial services. We urge the OCC to refrain from upsetting the current equilibrium that has been deliberately

---

[16] On several occasions, legislation has been proposed which would provide the OCC with the authority to charter special purpose non-depository institutions, but such legislation has never been enacted by Congress. See FFSCC Charter Act of 2011, H.R. 1909, 112th Cong. (2011); Consumer Credit Access, Innovation, and Modernization Act, H.R. 6139, 112th Cong. (2012). Nevertheless, the fact that proposed legislation was introduced in order to authorize the OCC to charter a non-depository institution underscores the need for Congressional authorization with respect to the non-depository charter currently under consideration.

preserved by Congress, for such a unilateral maneuver would seriously undermine the protections afforded to consumers under State law and would potentially trigger unilateral action by other chartering authorities seeking to grant benefits similar to those afforded under a federal charter.

### ii. *Preemption of State Consumer Protection and Licensing Laws*

In addition to altering the traditional state-federal balance of authority in the regulation of financial services, the creation of a new charter type for an institution engaged exclusively in lending money or paying checks would massively preempt otherwise applicable State licensing and consumer protection laws. Unfortunately, the preemption of State consumer protection laws by the OCC is not an experience with which State regulators are unfamiliar.

For instance, leading up to the 2008 financial crisis, many States adopted laws and brought enforcement actions to stop predatory lending. Such anti-predatory lending laws were enacted because the unique insight of State regulators into local conditions allowed them to identify abusive practices within their jurisdictions. Nevertheless, the OCC promptly preempted the application of State anti-predatory lending laws to national banks and their affiliates, thereby permitting unsafe and abusive lending practices to flourish in the lead up to the financial crisis.[17] With respect to the possible creation of new types of special purpose national bank charters currently being contemplated by the Comptroller, State regulators believe that a similar pattern of overriding State consumer protection laws—and the invaluable, local perspective of State officials underlying such laws—would be highly likely to recur.

At least one consumer-oriented interest group has indicated that they may support the creation of a new special purpose national bank charter for fintech companies provided the charter were to serve as a floor, and not a ceiling, for State fair lending and consumer protection laws. It should be abundantly clear that, even if the OCC were willing to declare that a fintech charter would be subject to stricter State consumer protection laws than those applicable at the federal level, such an arrangement would still depend on the OCC's willingness to rigorously supervise federally chartered institutions for compliance with State laws. To rely on the OCC to exercise its visitorial authority to ensure compliance with State consumer protection laws is to reassign the enforcement of State consumer protection laws from those State officials who are sworn, and legally bound, to enforce them, to federal officials for whom compliance with State law has proven to be, at best, a secondary concern.

In sum, State regulators firmly oppose the creation of new special purpose national bank charters for fintech companies and other non-depository providers of financial services, because such charters will either (1) preempt stricter State consumer protection laws than applicable at the federal level, or (2) reduce State regulators to mere bystanders who are reliant on the discretion of the OCC to enforce State consumer protection laws that apply to federally-chartered fintech companies.

### iii. *The Separation of Banking and Commerce*

The OCC seems to interpret its authority to issue a general purpose charter to engage in the business of banking as implicitly providing the OCC with authority to issue a special purpose charter to engage exclusively in any core banking function within the business of banking. If this interpretation were sound, State regulators believe that such an implicit authority would irreconcilably conflict with a fundamental principle of federal banking law, namely, the separation of banking and commerce.

---

[17] *See, e.g.,* Arthur E. Wilmarth, Jr., *The Dodd-Frank Act's Expansion of State Authority to Protect Consumers of Financial Services*, 36 Iowa J. Corp. L. 893, 909-919 (2011).

In originally establishing a wall between banking and commerce, Congress explicitly relied on the business of banking concept,[18] precisely because economic neutrality ought to be required in the exercise of banking powers. If the OCC charters an institution which engages exclusively in non-depository core banking functions, the fact that the institution is characterized as, in itself, conducting the business of banking, warrants the separation of its credit granting operations from general commercial enterprises. However, because the novel charter type would be exempt from coverage under the BHCA, there would be no federal mechanism to ensure that its activities remain divorced from ownership or control by commercial enterprises.

Accordingly, if an institution that engages exclusively in non-depository core banking functions thereby engages in the business of banking under the NBA, then, State regulators believe, the fundamental principle mandating the separation of banking and commerce is in jeopardy. Thus, State regulators urge the Comptroller to avoid relying upon an expansive interpretation of its chartering authority to create novel, unprecedented charter types that dilute the very meaning of the business of banking and thereby undermine the wall established by Congress between banking and commerce.

    *iv.*    *Payments System Risk*

Despite their membership in the Federal Reserve System, special purpose national banks have limited access to the Federal Reserve payment systems. Pursuant to the Competitive Equality in Banking Act (CEBA) of 1987, special purpose national banks are prohibited from incurring daylight overdrafts in their Federal Reserve Accounts on behalf of affiliates.[19] State regulators have significant concerns and request clarity regarding the OCC's understanding as to whether and on what terms a special purpose national bank would be granted access to Federal Reserve payment systems. Under 12 U.S.C. § 222, any new special purpose national bank must become a member of the Federal Reserve System. However, the Federal Reserve Board has not yet issued any regulations or policy statements governing the future membership of fintech national banks, including fintech payments processors.

Providing nonbank payment processors with direct access to the Federal Reserve payments system would create significant new challenges in measuring and controlling settlement risk. Special purpose national banks typically have been involved only indirectly in making settlement arrangements through Fedwire and ACH.[20] This indirect approach is consistent with the intent of Congress reflected in CEBA, which exempted a number of special purpose institutions from treatment as a bank provided they do not obtain payment related services from any Federal Reserve Bank.[21]

Beyond settlement risk, the provisions of CEBA also point to significant legal and operational risks which would stem from creating a special purpose national bank charter for an institution whose functions are limited to payment processing activities. Those hazards would include the risk that a poorly articulated legal and regulatory framework would result in significant financial exposures or losses to payments system participants. Finally, given the virtual business models pursued by many nonbank fintech companies, those companies generally face greater inherent cyber-related risks that could easily flow through to the Fed's payment systems if such companies are allowed direct access.[22]

---

[18] *See* 12 U.S.C. § 1843(c)(8).
[19] *See* 12 C.F.R. § 225.52.
[20] *See Nonbanks in the Payment System*, Payments System Research, Federal Reserve Bank of Kansas City (2003), available here: https://www.kansascityfed.org/~/media/files/publicat/psr/bksjournarticles/nonbankpaper.pdf.
[21] *See* 12 U.S.C. § 1841(c)(2). *See also* 12 CFR 225.145.
[22] Kristin Broughton, *Apple Pay A Systemic Risk? Banker Warns About Nonbank Players*, American Banker (Nov. 21, 2014).

In light of the many risks that such a novel federal charter would pose to the payment systems, State regulators request that the OCC provide greater clarity as to whether and on what terms a fintech company with a special purpose national bank charter would be granted direct access to Federal Reserve payments systems. We urge the OCC to refrain from authorizing or issuing any new type of special purpose national bank charter until the Federal Reserve Board has clearly explained how it intends to regulate the membership of such institutions in the Federal Reserve System.

## II. PROPOSED RECEIVERSHIP FRAMEWORK

As the main purpose of the proposed rule is to articulate a framework to govern the receivership of uninsured national banks, this section discusses issues prompted by the proposed receivership framework. State regulators are concerned about several aspects of the proposed framework, including issues related to the conflicts between the proposal and OCC policy, federal law, and other State laws, as well as the costs stemming from administering the receivership of an uninsured institution.

### A. Conflict with OCC Policy

Since Congress authorized the chartering of national trust companies in 1978, the OCC generally has not required a national trust bank to obtain deposit insurance as a prerequisite to granting it a charter. However, in 2013, the OCC established a new chartering policy that required that national trust banks obtain deposit insurance in order to be chartered by the OCC, unless an adequate resolution mechanism were in place to resolve the uninsured institution.[23] The OCC's stated rationale for the policy change in 2013 was that the agency is not structured to act as a receiver and that it is ill-equipped to resolve a failed non-depository institution that lacks deposit insurance.

State regulators believe that the OCC's policy conclusion in 2013 is supported by a strong rationale, as receiverships for uninsured institutions can be devastating to creditors of the institution and for that reason must rest on a sound resolution mechanism that is administered by an agency with extensive institutional experience in serving as a receiver. In sharp contrast to its policy position set forth only three years ago, the OCC's proposed rule seems to indicate (without any supporting evidence) that the OCC's ability to administer receiverships has significantly improved. State regulators request that the OCC explain in detail how the structure and experience of the OCC has changed over the past three years in such a manner as would enable it to overcome its previously-stated concerns regarding its limited capacity to function as a receiver.

### B. Conflict with Federal Law

Just as the OCC is responsible for appointing the FDIC as receiver for insured national banks, State regulators are responsible for appointment with respect to insured state banks. Furthermore, State banking regulators charter and license a number of uninsured institutions and are charged with appointing receivers and overseeing receiverships for such institutions. Based on this experience overseeing receiverships for uninsured institutions, State regulators wish to emphasize that conflicts with certain generally applicable federal laws, particularly bankruptcy law, can be pervasive.

For instance, the U.S. Bankruptcy Code excludes "banking institutions" from being a debtor in liquidation proceedings under Chapter 7 and reorganization proceedings under Chapter 11.[24] The definition of banking institution is such that an institution will not qualify as a bank if it lacks the power to receive deposits, since

---

[23] *See* Joe Adler, *OCC Quietly Ends Exemptions for Trust Banks*, American Banker (Apr. 19, 2013). *See also* Michael H. Krimminger, *Moving Towards a Fintech National Banking Charter?*, Harvard Law School Forum on Corporate Governance and Financial Regulation (Oct. 22, 2016).
[24] *See* 11 U.S.C. § 109(b), (d).

this is the essential function and distinguishing attribute of banks.[25] On this basis, it has been held that a mortgage and trust company[26] and a currency exchange[27] were not banking institutions under bankruptcy law and were therefore eligible to file for bankruptcy. To determine whether an institution is precluded from being a debtor by the banking institution exception, bankruptcy courts predominantly rely upon the state classification test, which involves an examination of the person's status under the law of the State of incorporation.[28]

Under these provisions of the bankruptcy code, uninsured trust banks covered by the proposal as well as prospective special purpose charters contemplated by the proposal would remain eligible to file for bankruptcy in a liquidation or reorganization proceeding. Given the relative novelty of the proposed receivership structure, State regulators request clarity as to how the proposed framework would interact with conflicting bankruptcy law and the rights accorded debtors and creditors under such law.

### C. Conflict with State Law

State regulators are concerned that the OCC's legal authority to serve as a receiver is untested and undeveloped in many areas critical to the operation of a receivership. For instance, the authorities cited in the proposed rule for many of the proposed powers, duties, and responsibilities of receivers for uninsured national banks rely on either precedents involving challenges to the authority of the FDIC or on the notion of a common law of receivers.

State regulators caution the OCC that the common law of receivers to which it makes frequent reference, was not and cannot be developed overnight. For example, the common law of receiverships governing the marshalling of assets, set-off, priorities, and the segregation of fiduciary accounts have been developed by State courts and agencies over the past two centuries as rules have been crafted and revised through experience in an untold number of receiverships. Furthermore, any available case law pertaining to the receivership of an uninsured national bank was developed prior to the creation of the deposit insurance system in 1933, when the legal system functioned quite differently given the then prevalent distinction between suits at law and equity,[29] the fact that shareholders of national banks were subject to double liability,[30] and the fact that most modern federal banking laws had yet to be promulgated.

State regulators believe that the absence of recent, historically relevant case law governing the conduct of a receivership administered by the OCC underscores the need for the OCC to avoid hastily creating new resolution frameworks for and new types of special purpose charters for untested financial service business models.

### D. Costs of Receivership

As the OCC acknowledges, the proposed receivership framework raises numerous cost implications. The major cost implication, according to the OCC, stems from the possibility that the receiver may not be able to recoup its expenses in performing liquidation functions if they exceed the liquidation value of the failed institution's assets. State regulators urge the OCC to also consider the tremendous costs to the creditors of

---

[25] *See In re Republic Trust & Sav. Co.*, 59 B.R. 606 (Bankr. N.D. Okla. 1986); *In re Republic Financial Corp.*, 77 B.R. 282 (N.D. Okla. 1987).
[26] *See In re Central Mortg. & Trust, Inc.*, 50 B.R. 1010 (S.D. Tex. 1985).
[27] *See Matter of Cash Currency Exchange, Inc.*, 762 F.2d 542, (7th Cir. 1985)
[28] *See In re Southern Indus. Banking Corp.*, 59 B.R. 978 (E.D. Tenn. 1986).
[29] *See generally* Charles T. McCormick, *The Fusion of Law and Equity in United States Courts*, 6 N.C.L.Rev. 283 (1928).
[30] James Fraser Gluck & August Baker, THE LAW OF RECEIVERS OF CORPORATIONS INCLUDING NATIONAL BANKS, 434 (Banks & Brothers 1891).

a failed institution in the event that administrative expenses exceed the resources available after liquidation. The total losses to creditors from the resolution of an uninsured non-depository institution are likely to be significantly greater than losses associated with the failure of an insured bank.

The unique funding structure of insured banks, with their access to core deposits, bolsters their franchise value, increases the likelihood of a sale of their assets and a transfer of their liabilities to an acquiring bank, and thereby reduces the magnitude of losses to creditors in resolution. In contrast, non-depository institutions have much less resilient liability structures heavily dependent on higher cost, volatile, short-term funding provided by sophisticated, institutional investors, who are likely to withdraw their funds at the earliest indication of potential problems.

State regulators believe that it is highly unlikely that the funding structures of non-depository institutions could mitigate the losses to their creditors in resolution to the same degree that the core deposit base of a bank reduces the losses suffered by creditors as a result of its failure. As the OCC considers the possible creation of a new special purpose national bank charter for fintech firms, State regulators urge the Comptroller to consider the cost implications of placing such firms in receivership, given the relatively low franchise value of and the lack of resiliency in their funding structures.

### III.  CONCLUSION

State bank regulators appreciate the opportunity to comment on the OCC's proposed rule to establish a framework to govern the receiverships of uninsured national banks. As discussed above, State regulators have several significant concerns with and request clarity as to how the OCC's existing statutory chartering authority could provide any valid basis for the OCC to approve new types of special purpose national bank charters for institutions engaged exclusively in non-depository core banking functions. Additionally, State bank supervisors believe significant risks and costs are likely to result from an expansive, unprecedented use of the OCC's chartering authority. With respect to the proposed receivership framework, we have further concerns as to how such a receivership would interact with conflicting State and federal laws. We look forward to receiving a detailed analysis and discussion by the OCC of all of the issues that we have raised in this comment letter.

As fellow chartering and regulatory authorities, the members of CSBS take great pride in our long-history of promoting the strength and vitality of the dual banking system. As State regulators continue to work to foster a regulatory and supervisory environment which promotes innovative practices in the delivery of financial services, we encourage the Comptroller to respect the balance of federal and State authority in the regulation of financial services so as not to undermine the effectiveness and impair the vitality of the dual banking system itself—a hallmark of cooperative federalism.


Sincerely,

John W. Ryan
President & CEO