# EXHIBIT G



# OCC Summary of Comments and Explanatory Statement: Special Purpose National Bank Charters for Financial Technology Companies

Office of the Comptroller of the Currency
Washington, D.C.

March 2017

OCC Summary of Comments and Explanatory Statement:
Special Purpose National Bank Charters for Financial Technology Companies

## Introduction

The Office of the Comptroller of the Currency (OCC) has considered whether it is in the public interest to entertain applications for a special purpose national bank (SPNB) charter from financial technology (fintech) companies that engage in banking activities and meet the standards applicable to national banks. The OCC has carefully considered the issues outlined in and the comments received on the OCC's paper *Exploring Special Purpose National Bank Charters for Fintech Companies* (SPNB Paper). This summary of comments and explanatory statement addresses key issues raised by commenters and explains the OCC's decision to issue for public comment a draft supplement to the *Comptroller's Licensing Manual* (Supplement) providing guidance to any fintech company that may wish to file a charter application.

The OCC will accept comments on the Supplement through close of business April 14, 2017. Comments should be submitted to specialpurposecharter@occ.treas.gov.

## OCC Support for Responsible Innovation

The OCC has long supported innovation in the national banking system. Federally chartered institutions have continually sought new approaches to meet the needs of customers and an evolving marketplace. It has been and remains the OCC's role to encourage and support institutions' efforts to engage in responsible innovation to meet the needs of consumers, businesses, and communities. The OCC's decision to issue the draft Supplement is consistent with that support. It is also one component of an initiative that began in 2015, when Comptroller of the Currency Thomas J. Curry announced[1] the agency's efforts to better understand innovation occurring in the financial services industry and to develop a framework to support responsible innovation in the federal banking system. To gain a broad perspective, the OCC conducted extensive research and held numerous discussions with fintech companies, banks, community and consumer groups, academics, and other regulators. This work led to the publication of a paper, *Supporting Responsible Innovation in the Federal Banking System: An OCC Perspective,*[2] outlining principles to guide the OCC's development of a responsible innovation framework. A wide range of stakeholders provided comments on that paper, including some who suggested the OCC consider issuing federal charters to fintech companies. Charter discussions continued at the OCC's June 2016 Forum on Responsible Innovation. Since then, there has been significant and growing interest in federal bank charters for fintech companies.

Work also has continued on the development of the OCC's framework to support responsible innovation. In October 2016, the OCC established a stand-alone Office of Innovation (Office) to serve as a clearinghouse for innovation-related matters and a central point of contact for OCC staff, banks, and nonbanks. The Office conducts outreach to a variety of financial services stakeholders and provides technical assistance and other resources for banks and nonbanks on

---

[1] Remarks by Thomas J. Curry, Comptroller of the Currency, Before the Federal Home Loan Bank of Chicago, August 7, 2015.

[2] OCC, *Supporting Responsible Innovation in the Federal Banking System: An OCC Perspective*, March 2016.

1

Case 1:18-cv-02449-DLF   Document 1-7   Filed 10/25/18   Page 4 of 17

OCC Summary of Comments and Explanatory Statement:
Special Purpose National Bank Charters for Financial Technology Companies

the OCC's expectations and guiding principles regarding responsible innovation. The Office also promotes awareness of industry developments among OCC staff and other regulators.

## SPNB Paper and SPNB Licensing Manual Draft Supplement

In December 2016, Comptroller Curry announced that the OCC would move forward with considering applications from fintech companies to become SPNBs. The OCC published and requested public comment on the SPNB Paper describing the issues associated with offering national bank charters to fintech companies.[3] The paper described the OCC's legal authority to grant a national bank charter to companies with limited purposes and articulated what the OCC considers the requirements for obtaining a charter. In particular, the paper made clear that if the OCC grants a national charter to a particular fintech company, the agency will hold that institution to the same high standards of safety and soundness, fair access, and fair treatment of customers that all federally chartered institutions must meet.

The Comptroller also asked staff to develop the draft Supplement to provide guidance for evaluating fintech charter applications and to ensure that the agency considers safety and soundness, risk management, financial inclusion, and compliance with applicable consumer protection and other laws and regulations were it to entertain applications from fintech companies. The draft Supplement, informed by the comments received on the SPNB Paper, explains how the OCC would evaluate applications from fintech companies and the conditions for approving such charters. The OCC welcomes additional comments on the draft Supplement.

While the term "special purpose national bank" is used elsewhere in the OCC's rules and policies to refer to a number of types of special purpose national banks, for purposes of the draft Supplement and this statement, "SPNB" means a national bank that engages in a limited range of banking activities, including one of the core banking functions, but does not take deposits and is not insured by the Federal Deposit Insurance Corporation (FDIC). The draft Supplement applies specifically to the OCC's consideration of applications from fintech companies to charter an SPNB and does not apply to other types of special purpose banks described in the current *Comptroller's Licensing Manual*.[4]

## OCC Responses to Comments on SPNB Paper

The OCC received more than 100 comment letters on the SPNB Paper. After considering those comments, the OCC states that in evaluating applications from fintech companies for an SPNB charter, the agency would be guided by certain threshold principles that inform the draft Supplement:

- The OCC will not allow the inappropriate commingling of banking and commerce.

---

[3] OCC, *Exploring Special Purpose National Bank Charters for Fintech Companies* (PDF), December 2, 2016.

[4] For example, the draft Supplement would not apply to a fintech company that intends to engage in fiduciary activities and otherwise meets the requirements of a trust bank.

2

Case 1:18-cv-02449-DLF   Document 1-7   Filed 10/25/18   Page 5 of 17

OCC Summary of Comments and Explanatory Statement:
Special Purpose National Bank Charters for Financial Technology Companies

- The OCC will not allow products with predatory features nor will it allow unfair or deceptive acts or practices.

- There will be no "light-touch" supervision of companies that have an SPNB charter. Any fintech companies granted such charters will be held to the same high standards that all federally chartered banks must meet.

Aligned with those principles, the OCC believes that making SPNB charters available to qualified fintech companies would be in the public interest. An SPNB charter provides a framework of uniform standards and robust supervision for companies that qualify. Applying this framework to fintech companies would help ensure that they operate in a safe and sound manner and fairly serve the needs of consumers, businesses, and communities. In addition, the OCC believes supervision by a federal regulator would promote consistency in the application of federal laws and regulations across the country.

Further, making charters available to qualifying fintech companies supports a robust dual banking system by providing these companies the option of offering banking products and services under a federal charter and operating under federal law, while ensuring essential consumer protections. This is the same choice Congress has made available to companies that deliver banking products and services in traditional ways.

Moreover, providing a path for fintech companies to become national banks can make the financial system stronger by promoting growth, modernization, and competition. The OCC believes that denying fintech companies this option could make the federal banking system less capable of adapting to evolving business and consumer needs. Additionally, the OCC's supervision of fintech companies chartered as SPNBs would deepen the agency's expertise in the emerging technologies that will be crucial to delivering banking products and services in the future.

Finally, the OCC believes innovation has the potential to broaden access to financial services. Many fintech companies state that they offer products and services that reach consumers who have had limited access to banks in the past. Chartering fintech companies increases the potential to reach consumers and thereby promote financial inclusion.

**General Comments**

Many commenters supported the OCC's decision to consider charter applications from fintech companies and noted many of the same public benefits cited by the OCC. For example, many agreed that a national charter would provide fintech companies with uniform, clear, and consistent supervision and regulation. Numerous commenters also viewed the national bank charter as a means to empower consumers and provide greater access to credit in underserved communities. Others said the availability of a national charter would spur innovation and encourage competition. One commenter pointed out that a federal charter would give the OCC a better-informed, direct view of innovations that are reshaping the financial system. Several commenters also noted that having a national bank charter would eliminate the need for state-by-state licenses, thereby reducing regulatory burdens and costs and facilitating growth.

Case 1:18-cv-02449-DLF   Document 1-7   Filed 10/25/18   Page 6 of 17

OCC Summary of Comments and Explanatory Statement:
Special Purpose National Bank Charters for Financial Technology Companies

Other commenters warned of possible risks of permitting fintech companies to operate as national banks. Some expressed concern about the potential for consumer harm, noting that a fintech company chartered as an SPNB could avoid consumer protections granted by state laws or federal laws that only apply to deposit-taking banks. Other commenters warned that the OCC has not limited SPNB charters to fintech companies, and thus the charters could be used by payday lenders.

In addition, several commenters expressed concern that the OCC's supervision of fintech companies chartered as national banks would be less stringent than the supervision fintech companies receive from state regulators today. Others were concerned SPNBs might receive less rigorous supervision than full-service national banks.

In contrast, some commenters were concerned that a rigid regulatory framework could stifle innovation and urged the OCC to provide flexible regulation tailored to the fintech company's business model and risks. Moreover, some argued that imposing standards that only the largest fintech companies could meet could lead to industry consolidation and ultimately less innovation.

Certain commenters opposed to the charter challenged the OCC's chartering authority and suggested that a national bank charter for fintech companies could undermine the separation of banking and commerce.

Charter proponents and critics alike urged the OCC to establish clear supervisory standards in advance and to make the charter approval process transparent. Many commenters supported requiring fintech banks to demonstrate a commitment to financial inclusion.

The following sections of this statement address these and other key issues raised by commenters.

**Consumer Protection**

Several commenters expressed concern that granting a national bank charter to a fintech company would allow such a company to avoid state laws designed to protect consumers. Other commenters argued that federal preemption of state law could encourage charter shopping. In particular, some commenters expressed concern that SPNBs would not be subject to state laws prohibiting unfair or deceptive acts or practices. Further, some commenters stated that granting a national bank charter to fintech companies would weaken states' ability to enforce consumer protection laws by removing their visitorial oversight, thereby making it more difficult to investigate and prosecute potential violations of law.

The OCC disagrees. Consumer protection laws and enforcement activities vary from state to state. A fintech company that is approved for a national bank charter would be subject to consistent federal consumer protection standards and federal supervision and regulation.

Case 1:18-cv-02449-DLF   Document 1-7   Filed 10/25/18   Page 7 of 17

OCC Summary of Comments and Explanatory Statement:
Special Purpose National Bank Charters for Financial Technology Companies

With the passage of the Dodd–Frank Wall Street Reform and Consumer Protection Act of 2010 (Dodd–Frank Act), Congress expanded federal protections for consumers through the Consumer Financial Protection Act and the establishment of the Consumer Financial Protection Bureau (CFPB).[5] Other federal laws also contain extensive protections for consumers. The Federal Trade Commission Act (FTC Act) provides that "unfair or deceptive acts or practices in or affecting commerce" are unlawful.[6] The OCC enforces the FTC Act with respect to both insured and uninsured national banks[7] and has taken a number of public enforcement actions against national banks for unfair or deceptive acts or practices.[8] Many state laws prohibiting unfair or deceptive acts or practices borrow FTC Act language and explicitly reference FTC standards and related judicial precedents. Consequently, OCC enforcement actions under the FTC Act often address the same conduct as is covered under the state "mini-FTC Acts."[9]

Congress has also carefully considered the OCC's use of federal preemption, and the Dodd-Frank Act clarified the standards and scope of the OCC's application of federal preemption for national banks and federal savings associations. The OCC acts in accordance with those provisions, which would also apply to the OCC's regulation of SPNBs. Thus, state law applies to an SPNB in the same way and to the same extent as it applies to other national banks. For example, state laws that address anti-discrimination, fair lending, debt collection, taxation, zoning, crime, and torts, generally apply to national banks and would also apply to SPNBs. In contrast to commenters' assertions, state laws that prohibit unfair or deceptive acts or practices, for example, business conduct laws that address consumer protection concerns such as material

---

[5] For example, in addition to prohibiting unfair or deceptive acts or practices, the Dodd–Frank Act prohibits "abusive" acts or practices as well. Dodd–Frank, section 1031, codified at 12 USC 5531. The Dodd-Frank Act also generally preserves any state law that affords consumers greater protection than Title X of the Act, including with respect to unfair, deceptive, or abusive acts or practices. The Dodd–Frank Act, section 1041(a)(2), codified at 12 USC 5551(a)(2). Title X, section 1011(a), codified at 12 USC 5491(a), created the CFPB.

[6] See 15 USC 45(a)(1) and 15 USC 45(n). See also "FTC Policy Statement on Unfairness," Federal Trade Commission (December 17, 1980); "FTC Policy Statement on Deception," Federal Trade Commission (October 14, 1983).

[7] See 12 USC 1818(b). OCC regulations regarding non-real estate and real estate lending, as well as the OCC's enforceable "Guidelines for Residential Mortgage Lending Practices," expressly reference the FTC Act standards. See 12 CFR 7.4008(c); 12 CFR 34.3(c); 12 CFR 30, appendix C. Further, OCC guidance also directly addresses unfair or deceptive acts or practices with respect to national banks. See OCC Advisory Letter 2002-3, "Guidance on Unfair or Deceptive Acts or Practices" (March 22, 2002); OCC Advisory Letter 2003-2, "Guidelines for National Banks to Guard Against Predatory and Abusive Lending Practices" (February 21, 2003) (OCC Advisory Letter 2003-2); OCC Advisory Letter 2003-3, "Avoiding Predatory and Abusive Lending Practices in Brokered and Purchased Loans" (February 21, 2003) (OCC Advisory Letter 2003-3); OCC Bulletin 2013-40, "Deposit Advance Products: Final Supervisory Guidance" (December 26, 2013) (OCC Bulletin 2013-40); OCC Bulletin 2014-37, "Risk Management Guidance: Consumer Debt Sales" (August 4, 2014) (OCC Bulletin 2014-37); and "Interagency Guidance Regarding Unfair or Deceptive Credit Practices" (August 22, 2014).

[8] For example, OCC actions have addressed national banks' failure to: provide sufficient information to allow consumers to understand the terms of the product or service being offered; adequately disclose when significant fees or similar material prerequisites are imposed in order to obtain the particular product or service being offered; and adequately disclose material limitations affecting the product or service being offered.

[9] Moreover, as explained in this statement, generally state laws prohibiting unfair or deceptive acts or practices are not preempted by either the FTC Act or the National Bank Act.

Case 1:18-cv-02449-DLF   Document 1-7   Filed 10/25/18   Page 8 of 17

OCC Summary of Comments and Explanatory Statement:
Special Purpose National Bank Charters for Financial Technology Companies

misrepresentations and omissions about products and services in billing, disclosure, and marketing materials, generally would apply to national banks, including SPNBs. The OCC understands that this would be the result even when the language of the state statute does not specifically refer to banks. Moreover, to the extent that a state law prohibiting unfair or deceptive acts or practices applies to a national bank and provides consumers with the right to bring a lawsuit against the bank, that remedy would be available against an SPNB. In addition, to the extent that a state law prohibiting unfair or deceptive acts or practices applies to a national bank and authorizes the state attorney general to enforce the law through judicial action, the state attorney general could bring an action in court against an SPNB for violation of the law.[10]

In addition to concerns regarding consumer protection laws, certain commenters expressed concerns that state laws establishing interest rate caps would be preempted for federally chartered banks. In particular, commenters warned that preemption and the availability of a fintech national bank charter could open the door for predatory lenders.

The OCC shares commenters' concerns about predatory lending and has taken significant steps to eliminate predatory, unfair, or deceptive practices in the federal banking system. For example, the OCC requires national banks engaged in lending to take into account the borrower's ability to repay the loan according to its terms.[11] Additionally, the OCC has cautioned national banks about lending activities that may be considered predatory, unfair, or deceptive, and notes that many of these lending practices already are unlawful under existing federal laws and regulations, including the FTC Act, and otherwise present significant safety and soundness and other risks. The highlighted practices include those that target prospective borrowers who cannot afford credit on the terms being offered, provide inadequate disclosures of the true costs and risks of transactions, involve loans with high fees and frequent renewals, or constitute loan "flipping" (frequent refinancings that result in little or no economic benefit to the borrower that are undertaken with the primary or sole objective of generating additional fees).[12] The OCC's policies establish that such practices conflict with the high standards expected of national banks and also present significant safety and soundness, reputation, and other risks.

The OCC does not approve charter applications from any company that plans to offer financial products and services with predatory, unfair, or deceptive features and so would not approve any such application from a fintech company. Further, the OCC takes appropriate supervisory action

---

[10] See *Cuomo v. Clearing House Assn., LLC,* 557 U.S. 519 (2009).

[11] See, e.g., 12 CFR 7.4008(b) (secured consumer lending); 12 CFR 34.3(b) (secured consumer real estate lending). In addition, insured depository institutions must consider, as part of prudent credit underwriting practices, "the borrower's overall financial condition and resources . . . and the borrower's character and willingness to repay as agreed." See 12 CFR 30, appendix A, "Safety and Soundness Standards." As described in the draft Supplement, the OCC could impose special conditions on SPNBs that are similar to certain laws that apply by statute to only insured banks, to the extent appropriate given the business model and risk profile of the applicant.

[12] See OCC Advisory Letter 2000-7, "Abusive Lending Practices" (July 25, 2000); OCC Advisory Letter 2000-10, "Payday Lending" (November 27, 2000); OCC Advisory Letter 2003-2; OCC Advisory Letter 2003-3; OCC Bulletin 2013-40; OCC Bulletin 2014-37.

Case 1:18-cv-02449-DLF   Document 1-7   Filed 10/25/18   Page 9 of 17

OCC Summary of Comments and Explanatory Statement:
Special Purpose National Bank Charters for Financial Technology Companies

to ensure compliance with applicable laws, address unsafe or unsound banking practices, and prevent practices that harm consumers.[13]

Finally, it is important to remember that although a national bank can export the usury laws of the state in which it is located,[14] Congress provided this same benefit to state-chartered banks in 1980, by giving insured state banks the same ability as national banks to extend credit under their home state usury rules.

**Small Business Protections**

In addition to consumer protections, many commenters urged the OCC to address gaps in protection for small business customers. Some commenters suggested that the OCC look to the Small Business Borrowers' Bill of Rights, an agreement by certain online lenders to provide certain disclosures to small business borrowers. Others suggested that the OCC impose consumer protections whenever an individual may be held personally liable for the loan.

Some commenters argued against the OCC's imposition of small business borrower protections, however, noting that Congress has not extended consumer borrower protections to small businesses. They noted that Congress has repeatedly recognized important distinctions between individuals and small businesses, such as their level of sophistication. Some commenters warned that imposing any such requirements could impede the flow of capital to more sophisticated borrowers.

Other commenters argued that small business lending is regulated sufficiently by such laws as the Fair Credit Reporting Act, the Equal Credit Opportunity Act, and the FTC Act, and, thus, additional protections are not required. Some commenters urged the OCC to rely on industry developed standards and not impose standards of its own.

The OCC would take appropriate supervisory action to ensure compliance with all applicable laws,[15] including laws that address unfair or deceptive practices[16] that affect small business borrowers.[17] In addition, the OCC would expect an SPNB involved in lending to provide sufficient disclosures and clear information to ensure that all borrowers, including consumers and small businesses, can make informed credit decisions. The OCC recognizes the efforts by some companies in the online lending community to address this important issue. The OCC

---

[13] Federal consumer financial laws are supervised and enforced by either the OCC or CFPB as set forth in Title X of the Dodd–Frank Act.

[14] See 12 USC 85.

[15] Applicable laws include for example the Equal Credit Opportunity Act, the Fair Credit Reporting Act, and section 5 of the FTC Act.

[16] The FTC Act, by its terms, does not limit the prohibition against unfair or deceptive acts or practices to individual consumers. 15 USC 45(a) (". . . unfair or deceptive acts or practices in or affecting commerce, are hereby declared unlawful").

[17] As previously noted, federal consumer financial laws are enforced by either the OCC or CFPB, as set forth in Title X of the Dodd–Frank Act.

Case 1:18-cv-02449-DLF   Document 1-7   Filed 10/25/18   Page 10 of 17

OCC Summary of Comments and Explanatory Statement:
Special Purpose National Bank Charters for Financial Technology Companies

would look favorably on an applicant's commitment to educate small business borrowers about their rights and responsibilities.

**Financial Inclusion**

The OCC's statutory mission includes ensuring that national banks provide fair access to financial services and treat customers fairly.[18] To fulfill that mission, the OCC is guided by certain principles in determining whether to approve a charter application to establish a national bank. These principles include encouraging a national bank "to provide fair access to financial services by helping to meet the credit needs of its entire community" and "promoting fair treatment of customers, including efficiency and better service."[19]

The OCC requires an applicant for a traditional national bank charter to submit a business plan that demonstrates how the proposed bank plans to respond to the needs of the community, consistent with the safe and sound operation of the bank.[20] As outlined in appendix B to the draft Supplement, the OCC also would expect an applicant for an SPNB charter that intends to engage in lending or provide financial services to consumers or small businesses to include a financial inclusion plan as a component of its business plan. The nature of the commitment would depend on the entity's business model and the types of products or services it intends to provide.

The OCC received many comments on whether it should seek a financial inclusion commitment from SPNBs and how these institutions could promote financial inclusion. Many commenters argued that SPNBs can provide valuable services to underserved communities and should make a commitment to financial inclusion. They urged the OCC to require financial inclusion plans that include measurable goals and are formulated with input from the community. Without requiring a financial inclusion commitment, one commenter warned, many individuals and communities could remain underserved.

Other commenters were opposed to requiring such a commitment. Some commenters suggested that fintech companies naturally promote financial inclusion, and therefore no formal commitment is necessary.

Many commenters urged the OCC to be flexible in evaluating how different SPNBs promote financial inclusion. Some commenters proposed specific activities SPNBs could engage in to demonstrate their commitment. For example, a number of commenters suggested that SPNBs could establish financial literacy programs or provide funding for credit building and credit counseling services in low- and moderate-income communities. Other commenters viewed partnerships and investments as promising means for SPNBs to promote financial inclusion. Some commenters specifically identified Community Development Financial Institutions as potential partners or investments for SPNBs.

---

[18] See 12 USC 1(a).

[19] See 12 CFR 5.20(f)(1)(ii) and (iv).

[20] See 12 CFR 5.20(h)(5).

Case 1:18-cv-02449-DLF   Document 1-7   Filed 10/25/18   Page 11 of 17

OCC Summary of Comments and Explanatory Statement:
Special Purpose National Bank Charters for Financial Technology Companies

The OCC agrees that many fintech companies have significant potential to expand access to financial services. To help ensure that this potential is realized, the OCC would expect a formal commitment to, and plan for, financial inclusion from SPNBs engaged in lending activities or providing financial services to consumers or small businesses.

The OCC also agrees that there are many different activities SPNBs could engage in to promote financial inclusion. The OCC encourages the development of innovative products or services designed to address the needs of low- and moderate-income individuals and communities. SPNBs could also demonstrate their commitment to financial inclusion in more traditional ways. For example, the OCC has supported national banks' participation in programs, such as financial literacy and credit counseling services, that improve individuals' understanding of the financial products and services that meet their needs. Investments in certain funds or organizations may also be part of an effective financial inclusion plan. The OCC looks forward to working with potential SPNB applicants on both new and conventional ways to promote financial inclusion.

**Regulatory and Supervisory Standards**

The OCC has been clear that it would hold companies granted SPNB charters to the same high standards of safety, soundness, and fairness that all other federally chartered banks must meet. As it does for all banks, the OCC would tailor these requirements based on the bank's size, complexity, and risk, consistent with applicable law. While most commenters agreed with that standard, some commenters urged the OCC to be flexible in its regulation and supervision of fintech companies that become national banks. For example, certain commenters questioned whether start-up fintech companies would be able to meet the OCC's standards, even when tailored to the companies' size, risk, and complexity. These commenters asked whether the OCC would consider adapting its standards for fintech start-ups, with some suggesting that the OCC consider separate, more lenient standards for start-ups.

The OCC is sensitive to commenters' concerns regarding the need for appropriate standards. As the prudential regulator for approximately 1,400 national banks and federal savings associations, including nearly 1,200 community banks and savings associations, the OCC is experienced in evaluating whether a proposed bank would be able to meet the criteria to become an SPNB. Size alone is not a disqualifying factor. As explained in the draft Supplement, there are, however, certain minimum statutory and regulatory standards an institution must meet to qualify for a national bank charter. For example, an applicant must demonstrate that the bank has a reasonable chance of success, will operate in a safe and sound manner, and will foster healthy competition. In evaluating whether an institution meets those standards, the OCC considers, among other factors, whether the organizers and proposed management have the appropriate skills and experience to operate as a national bank. Further, banks must maintain sufficient liquidity and adequate capital. Additional criteria are outlined in the draft Supplement and the "Charters" booklet of the *Comptroller's Licensing Manual.*

Other commenters emphasized the need for flexibility to give SPNBs the ability to innovate rapidly. For example, some commenters expressed concern that the OCC may require SPNBs to obtain the OCC's approval before making significant deviations from their business plans and that such a requirement could make them less nimble. Specifically, these commenters referred to

Case 1:18-cv-02449-DLF   Document 1-7   Filed 10/25/18   Page 12 of 17

OCC Summary of Comments and Explanatory Statement:
Special Purpose National Bank Charters for Financial Technology Companies

the condition imposed on all de novo banks to provide notice and obtain a supervisory non-objection letter from the OCC before making significant deviations from their approved business plans.

The OCC recognizes that certain deviations may be necessary and desirable to meet changes in market conditions or to introduce technological innovations that improve the customer experience. As explained in appendix F of the "Charters" booklet, however, new banks are particularly vulnerable to significant internal and external risks until they achieve a certain level of stability and profitability. The significant deviation condition provides the OCC with the opportunity to evaluate whether a proposed change could significantly increase a bank's risk profile and whether the bank can properly manage any increased risk.

It is also important to understand that the condition does not apply to all changes, just those changes that constitute significant deviations from a bank's business plan.[21] For example, a bank may decide to significantly reduce its emphasis on its targeted niche (e.g., consumer or small business lending) in favor of expanding into another area (e.g., payments processing). In that case, the bank would need to obtain the OCC's supervisory non-objection before undertaking changes to its business plan or operations. The significant deviation condition, however, would not preclude limited testing or piloting of new products or services, provided the bank has put in place appropriate internal controls and protections for targeted customers.

**Capital and Liquidity Requirements**

Commenters also addressed potential capital and liquidity requirements for SPNBs. Some commenters felt strongly that capital and liquidity requirements should be as consistent with current national bank chartering requirements as possible. They argued that without consistent requirements, fintech companies chartered as special purpose national banks would have a competitive advantage. Others held that capital and liquidity requirements should be commensurate with the scope of activities contemplated in the company's charter application. Some commenters recommended that a fintech company chartered as a special purpose national bank only be required to have the capital and liquidity necessary to wind down its business plan without harming customers in the event of failure. Along these lines, some suggested that companies with simpler business models or a narrower range of services, such as an online lending platform, should have lower capital requirements than full-service national banks.

    **Capital**

Like all national banks, SPNBs would be subject to the leverage and risk-based capital requirements in 12 CFR 3. As commenters pointed out, however, for any entities that have few on-balance-sheet exposures, it will be necessary to tailor an SPNB's capital requirements to capture the different risks associated with limited balance sheets or nontraditional strategies. The

---

[21] See appendix F, "Significant Deviations After Opening," of the *Comptroller's Licensing Manual,* "Charters," pp. 105-06. The "Charters" booklet defines "significant deviation" as a "material variance from the bank's business plan or operations, or introduction of any new product, service, or activity or change in market that was not part of the approved business plan." Significant deviations may include, but are not limited to, significant deviations in the bank's projected growth, business strategy, lines of business, or funding sources.

Case 1:18-cv-02449-DLF   Document 1-7   Filed 10/25/18   Page 13 of 17

OCC Summary of Comments and Explanatory Statement:
Special Purpose National Bank Charters for Financial Technology Companies

OCC acknowledges that the minimum capital requirements set forth in 12 CFR 3, which measure regulatory capital levels relative to an entity's assets and off-balance-sheet exposures, may not be sufficient for measuring capital adequacy for some SPNBs. In those cases, the OCC will use alternative approaches to determine the appropriate capital requirement. As noted in the draft Supplement, the OCC has considerable experience imposing individual capital and liquidity requirements when appropriate.

Beyond those minimum requirements, capital levels must be commensurate with the risk and complexity of the bank's proposed activities (including on- and off-balance-sheet activities). The OCC's evaluation of capital adequacy considers the risks and complexities of the proposed products, services, and operating characteristics, taking into account factors such as the scope and nature of the bank's proposed activities, quality of management, and stability or volatility of sources of funds. The OCC also considers on- and off-balance-sheet composition, credit risk, concentrations, and market risk.

### Liquidity

As with capital, the OCC would consider any applicant's specific business model when evaluating its liquidity profile and liquidity risk management. For other types of special purpose national banks, the OCC has imposed tailored requirements to ensure adequate liquidity. Such requirements could include entering into a liquidity maintenance agreement with a parent company or maintaining a certain amount of high-quality liquid assets.

Some commenters urged the OCC to require SPNBs to assess their liquidity needs over various periods and scenarios, including normal and stressed conditions. They highlighted that many fintech companies emerged during a period of strong credit conditions and have not yet been tested throughout a full credit cycle. One commenter suggested that fintech companies chartered as national banks engaged in lending be required to have adequate funds to meet a specified level of future loan originations, to ensure lending continues during a liquidity crisis.

The OCC is aware that many companies and business models have not yet operated in stressed conditions. As a result, the OCC expects any charter applicant to consider and address, among other items, projected borrowing capacity under normal and adverse market conditions. For instance, a fintech bank could establish a minimum number of months of current projected operating expenses to maintain adequate liquidity. In addition, the OCC believes SPNBs should establish comprehensive contingency funding plans, just as other national banks do.

**Charter Application Process**

While many commenters wanted flexible and tailored regulation, they also advocated for a clear understanding of the standards that would apply during the chartering process. In particular, they urged the OCC to make the application process transparent by establishing at the outset the conditions a fintech company would be required to meet. Other commenters advised the OCC to adopt a clear definition of "fintech" and identify the types of companies the OCC views as eligible for an SPNB charter.

Case 1:18-cv-02449-DLF   Document 1-7   Filed 10/25/18   Page 14 of 17

OCC Summary of Comments and Explanatory Statement:
Special Purpose National Bank Charters for Financial Technology Companies

Commenters also expressed concern that having the OCC make chartering decisions on a case-by-case basis could lead to inconsistent treatment. Certain commenters were concerned that exercising such broad discretion could put the OCC in the position of picking winners and losers. To ensure consistent treatment, a number of commenters urged the OCC to outline the criteria for charter approval clearly, limit the use of charter conditions and operating agreements, and make chartering decisions, including applicable conditions, publicly available.

The OCC strives to make the charter application process clear, understandable, and transparent. The OCC provides detailed information about this process in its charter regulation at 12 CFR 5.20 and in the "Charters" booklet. These materials list the OCC's criteria and requirements for charter approvals of national banks, including special purpose national banks. As discussed above, the OCC is also issuing for public comment a draft Supplement to the *Comptroller's Licensing Manual* for any fintech companies seeking an SPNB charter. In addition, applicants would have an opportunity to ask questions about the process, including the conditions for approval, through multiple prefiling meetings with OCC Licensing and supervisory staff. The OCC's Office of Innovation also is available to facilitate the application process.

The decision to impose special conditions for approval of a charter application is made on the basis of many factors, including the applicant's business plan, proposed management, and relevant experience. Conditions may be imposed directly in the preliminary approval letter, or the OCC may require as a condition of approval that the applicant enter into an operating agreement. The operating agreement may impose safeguards to address certain aspects of a bank's operations, including growth, capital, or liquidity. The OCC publishes all conditional approvals, which disclose the existence of an operating agreement.

As the prudential regulator for national banks and federal savings associations, the OCC must exercise its judgment in deciding whether to approve a national bank charter to a particular company. As explained in the "Charters" booklet and the draft Supplement, the OCC's decision to approve a charter is guided by its mission to promote a vibrant and diverse banking system that benefits consumers, communities, businesses, and the U.S. economy. In general, the OCC would approve applications to charter an SPNB from any companies that have a reasonable chance of success, will provide fair access to financial services, will ensure compliance with applicable laws and regulations, and will promote fair treatment of customers and foster healthy competition.[22]

**Coordination Among Regulators**

Many commenters urged the OCC to coordinate with other federal and state regulators to provide consistency and clarity regarding the regulation of fintech companies. Some commenters suggested this coordination could be achieved by the creation of an interagency working group or a special subcommittee of the Federal Financial Institutions Examination Council (FFIEC).

The OCC agrees with commenters that coordination among federal and state regulators is essential to fostering responsible financial innovation. The OCC will continue to engage with

---

[22] The charter regulation, 12 CFR 5.20(e), *Comptroller's Licensing Manual*, "Charters," and the draft Supplement outline the factors the OCC considers in reviewing a charter application.

Case 1:18-cv-02449-DLF   Document 1-7   Filed 10/25/18   Page 15 of 17

OCC Summary of Comments and Explanatory Statement:
Special Purpose National Bank Charters for Financial Technology Companies

other regulators in a collaborative way regarding financial technology to promote a common understanding and consistent application of laws, regulations, and guidance. The OCC regularly coordinates with other state and federal banking regulators through its participation in the FFIEC. For example, the OCC participated in the FFIEC's cybersecurity initiative to raise financial institutions' awareness of cybersecurity concerns and strengthen the oversight of cybersecurity readiness.[23] The OCC also currently chairs the FFIEC Task Force on Consumer Compliance. In addition, the OCC collaborates with the CFPB on consumer-related matters, and the OCC is an active member of many of the U.S. Department of the Treasury's working groups and committees, including one for marketplace lending. The OCC also co-chairs the Basel Committee's Task Force on Financial Technology (TFFT).[24] The OCC will continue to leverage these channels of communication to collaborate and share information regarding the chartering and supervision of SPNBs.

Depending on the structure of a fintech bank and the activities it conducts, other regulators may have oversight roles as well. As a result, any fintech company considering an SPNB charter likely will need to engage with other regulators in addition to the OCC. In considering applications, the OCC would coordinate as appropriate with other federal regulators with jurisdiction over the SPNB, including to facilitate simultaneous consideration of any applications or approvals that may be required by those regulators.

**Ongoing Supervision**

Commenters questioned how the OCC would supervise fintech companies that become national banks. Several commenters asserted that SPNBs should be subject to the same oversight and regular examination as traditional banks. Specifically, commenters noted the importance of having regular, rigorous examinations to ensure compliance with requirements regarding safety and soundness, Bank Secrecy Act/anti-money laundering (BSA/AML) provisions, financial inclusion, fair lending, and other applicable laws. Other commenters asserted that the OCC did not have the resources or expertise necessary to properly supervise fintech companies that would become SPNBs.

As discussed in appendix A of the draft Supplement, an SPNB would be subject to the same oversight and supervision as other national banks. The OCC's supervisory process for all national banks and federal savings associations establishes minimum supervisory standards, reflects the unique characteristics of each institution, and is responsive to changes within individual institutions and the markets where they compete. Consistent with the OCC's supervision of other national banks, the OCC's supervisory strategy for SPNBs would be tailored to each bank's business model and include on-site and off-site supervisory activities conducted by an experienced, knowledgeable examination team.

---

[23] FFIEC Cybersecurity Awareness Initiative, available at https://www.ffiec.gov/cybersecurity.htm.

[24] The TFFT fosters financial stability through the assessment of the risks and supervisory challenges associated with innovation and technological changes affecting banking. The TFFT's work is currently focused on the impact that fintech has on banks and banks' business models, and the implications this has for supervision.

Case 1:18-cv-02449-DLF   Document 1-7   Filed 10/25/18   Page 16 of 17

OCC Summary of Comments and Explanatory Statement:
Special Purpose National Bank Charters for Financial Technology Companies

The OCC has technical expertise in a number of areas that would likely be relevant for a newly chartered SPNB, including compliance with capital, liquidity, risk management, and consumer protection requirements. As it does with any other de novo charter, the OCC would leverage those examiners who have expertise appropriate for the bank's business model and activities. Likewise, dedicated licensing specialists, economists, other subject matter experts (e.g., those specialized in credit risk, compliance, financial inclusion, BSA/AML, operational risk, cybersecurity, or information technology), lawyers, and other staff would be assigned to individual charters, as appropriate, to support their supervision. For example, the examination team for a fintech company specializing in payment processing technology would be assisted by the OCC's Payments Systems Policy Group, whose expertise includes the latest innovations in payments systems, including distributed ledger technology. In addition, the OCC has significant experience assisting national banks in their assessment and management of risks associated with technology service providers and other third-party relationships.[25] Further, to ensure consistency in OCC supervision, a dedicated Assistant Deputy Comptroller would oversee any SPNB.

Other commenters noted the importance of ensuring that SPNBs maintain robust compliance and risk management programs. As detailed in the draft Supplement, the OCC would require any SPNB to establish and maintain well-developed, robust compliance and risk management programs that address, among other things, BSA/AML, consumer protection, third-party risk management, and data and information security requirements. The OCC expects a bank's risk management systems to be commensurate to the size, complexity, and risks of its activities. Regardless of the risk management program's design, it should address the following: risk identification, risk measurement, risk monitoring, and risk control. For example, the OCC would expect SPNBs to have a rigorous cybersecurity framework in place to assess cybersecurity risks and respond to, manage, and defend against cyber attacks.

Some commenters recommended that the OCC develop and deploy technology to modernize its approach to regulation and supervision. The OCC is committed to broadening and increasing its expertise in areas related to innovation. As part of its Responsible Innovation initiative, the OCC is open to considering ways current procedures and processes can be improved through the use of technology.

**Chartering Authority**

Some commenters questioned the OCC's authority to charter SPNBs that are not authorized to offer FDIC-insured deposits. They asserted that the OCC could only charter non-deposit-taking banks when expressly authorized by statute, as is the case for trust banks, bankers' banks, and credit card banks. In these commenters' view, to be chartered as a national bank under the National Bank Act, the bank must engage in the "business of banking," which they suggest requires, at a minimum, taking deposits.

Under the National Bank Act, the OCC has broad authority to grant charters for national banks to carry on the "business of banking." The OCC has interpreted the "business of banking" to include any of the three core banking functions of receiving deposits, paying checks, or lending money. The Act does not require that a bank take deposits in order to be engaged in the

---

[25] See OCC Bulletin 2013-29, "Third-Party Relationships: Risk Management Guidance" (October 30, 2013).

Case 1:18-cv-02449-DLF   Document 1-7   Filed 10/25/18   Page 17 of 17

OCC Summary of Comments and Explanatory Statement:
Special Purpose National Bank Charters for Financial Technology Companies

"business of banking." Rather, under the Act, performing only one of these three activities is sufficient to be performing core banking functions. This is reflected in the OCC's regulation 12 CFR 5.20, which provides that, to be eligible for a national bank charter, a special purpose bank must either be engaged in fiduciary activities or conduct at least one of three core banking functions: receiving deposits, paying checks, or lending money.

**Separation of Banking and Commerce**

Some commenters expressed concern that granting a national bank charter to a non-depository fintech company could erode the traditional separation of banking and commerce. As noted in the draft Supplement and above, the OCC will not approve charter proposals that would result in the inappropriate commingling of banking and commerce. Such proposals could introduce into the banking system risks associated with nonbanking commercial activities, interfere with the efficient allocation of credit throughout the U.S. economy, and foster anti-competitive effects and undesirable concentrations of economic power.

## Conclusion

The OCC appreciates the suggestions, issues, and concerns raised in the more than 100 comment letters that we received in response to the SPNB Paper. These comments informed our development of the draft Supplement, which explains how the OCC would evaluate applications from fintech companies for SPNB charters. For more information about the envisioned application process for fintech companies seeking an SPNB charter, please refer to the draft *Comptroller's Licensing Manual Supplement: Evaluating Charter Applications From Financial Technology Companies*.

The OCC will accept comments on the Supplement through close of business April 14, 2017. Comments should be submitted to specialpurposecharter@occ.treas.gov.