# EXHIBIT H



April 13, 2017

Office of the Comptroller of the Currency
Legislative and Regulatory Activities Division
400 7th Street SW, Suite 3E-218
Mail Stop 9W-11
Washington, DC 20219

Re: *Comptroller's Licensing Manual Draft Supplement: Evaluating Charter Applications From Financial Technology Companies*

Dear Comptroller Curry,

State regulators remain firmly opposed to the Comptroller's unprecedented, unlawful expansion of its chartering authority to create a national nonbank charter. As we have discussed at length in previous comment letters, the OCC lacks the requisite authority to issue the proposed nonbank charter. Courts have long held and Congress has long since affirmed that a national bank must possess and exercise the power to receive deposits to carry on "the business of banking"—the purpose for which national banks are chartered. Unless an institution can be chartered for a special purpose expressly authorized by Congress— as are trust banks, bankers' banks and credit card banks—the failure of the institution to possess and exercise the power to receive deposits precludes the institution from carrying on the business of banking and renders its charter unlawful and invalid.[1]

In addition to the OCC's manifest lack of authority to approve nonbank charters, the OCC's approval of such charters would inflict enormous harms on our economy and citizens and would also undermine the carefully-designed regulatory and supervisory frameworks that Congress has established for our banking and financial systems.  As shown below, the OCC's nonbank chartering proposal, if implemented, would:

- create tremendous distortions in the nondepository financial services industry through inconsistent and *ad hoc* regulatory treatment for recipients of the proposed nonbank charters;
- create an unlevel playing field to the advantage of recipients of the proposed nonbank charters and to the disadvantage of traditional, full-service banks;
- erode and potentially destroy the congressionally-mandated policy of separating banking and commerce; and
- create significant consumer harm by allowing recipients of nonbank charters to assert that they are entitled to preemption of vital state consumer protection laws.

## Fundamental Flaws in the Regulatory Framework

State regulators have already demonstrated that the OCC lacks the requisite authority to create the proposed nonbank charter.[2] Predictably, the OCC's response is devoid of any citation of authority except for its own regulation, 12 C.F.R. § 5.20. If a federal agency could expand its authority by simply relying on previous unlawful assertions of authority, then no federal agency would be governed by law.[3] Having previously demonstrated that the OCC's claim of authority to approve nonbank charters is unprecedented and unlawful, this letter will illustrate how the implementation of the OCC's nonbank chartering proposal would cause great harm to our economy and citizens while undermining and destabilizing the regulatory and supervisory frameworks that Congress has established for our banking and financial systems.

The many fundamental flaws evident in the nonbank regulatory framework are symptomatic of the fact that the OCC is acting beyond the limits of its chartering authority. If Congress had intended for the OCC to charter national nonbanks, Congress would have specifically authorized the granting of special purpose nonbank charters and made clear how federal banking laws would apply to such nonbanks. However, Congress has not done so. Thus, the OCC is fundamentally in error when it asserts that a nondepository institution, upon receiving OCC approval for a nonbank charter, "becomes a national bank subject to the laws, regulations, and federal supervision that apply to all national banks."[4]

Most federal banking laws apply to FDIC-insured banks, not uninsured nonbanks.[5] Requirements applicable to FDIC-insured banks under these laws that would not, based on their terms, apply to the proposed nonbanks include:
- prompt corrective action rules,
- risk-based capital rules,
- safety and soundness standards,
- prudential safeguards,
- source of strength requirements,
- community reinvestment rules,
- change in control and merger restrictions,
- audit requirements,
- uniform accounting standards,
- record retention rules,
- anti-tying rules,
- commercial affiliation restrictions,
- proprietary trading restrictions, and
- consolidated supervision.

To the extent that the OCC asserts that its regulations implementing these laws will directly apply to the proposed nonbanks as purported "national banks," the regulations themselves would be overbroad and invalid.[6] In the same vein, to the extent that the OCC attempts to incorporate requirements imposed under these laws and regulations through "conditions" imposed on the approval of a nonbank charter, the conditions themselves would be subject to potential legal challenges as unauthorized and invalid.

Nevertheless, because most federal banking laws will *not* apply to the proposed nonbank charters, the OCC states that it will "impose special conditions similar to those in laws that apply by statute to insured banks only" through an "operating agreement" entered into in the chartering process.[7] State regulators believe that the OCC cannot lawfully truncate and vitiate the requirements of federal banking laws by imposing watered-down "conditions" on nonbank charters through operating agreements formulated on an *ad hoc* basis. In any event, the use of *confidential* "operating agreements" is a poor substitute for the *public* federal banking laws and regulations and the uniformity, impartiality, and fairness such laws guarantee in the regulation of the banking business.

Several commenters requested that the OCC make publicly available the contents of each operating agreement entered into with each national nonbank. Those requests were motivated by serious concerns about the unqualified breadth and potential arbitrariness of the discretion that the OCC evidently intends to exercise in establishing regulatory and supervisory "conditions" for each nonbank charter. Making the operating agreements publicly available would help to ensure that otherwise inapplicable rules are incorporated in a more uniform, impartial and consistent manner rather than on an *ad hoc*, preferential and arbitrary basis. The OCC has refused this request for transparency.

According to the OCC, there should be no concern because the "existence" -- but *not* the contents -- of the operating agreement will be disclosed in the conditional approval of charter applications.[8] Given that the vast majority of federal banking laws and regulations will need to be incorporated through an operating agreement if they are to apply at all, and thus these agreements will essentially function as individualized regulatory codes, it remains a critical deficiency of the OCC's regulatory framework that the contents of *each* agreement would not be made publicly available in *full* detail.

# Consequences of Fundamental Flaws in the Regulatory Framework

The breadth of the discretion the OCC intends to exercise in establishing regulatory requirements for nonbanks undercuts any promise of uniform, consistent, impartial treatment among the proposed nonbanks themselves as well as any assurance that the proposed nonbanks will be subject to the *same* regulatory and supervisory standards as insured banks.[9] Two consequences inevitably flow from the OCC's planned use of *ad hoc* and confidential operating agreements to compensate for the absence of generally applicable laws: (1) the creation of an unlevel playing field that favors approved nonbanks and disadvantages traditional, full-service banks and (2) the establishment of the OCC as the official arbiter of financial innovation, picking winners and losers in the nondepository financial services industry as it accords preferential regulatory treatment to its preferred nonbank business models.

### *Absence of Regulatory Consistency and Impartiality*

The OCC claims that the proposed nonbanks would be held to "the same high standards of safety and soundness, fair access, and fair treatment of customers that all federally chartered institutions must meet." The OCC then contradicts this claim by stating that it would "tailor these requirements based on the bank's size, complexity, and risk, *consistent with the applicable law*" (emphasis added).[10] In fact, because the vast majority of federal banking laws will not apply to the proposed nonbank charters, there is no "applicable law" with which the OCC must remain consistent as it constructs *ad hoc* regulatory and supervisory "conditions" to fit the business models of nonbank applicants. The OCC evidently plans to exercise arbitrary and unbridled discretion in determining the degree to which, and the manner in which, otherwise inapplicable laws and regulations will or will not apply to the favored recipients of nonbank charters.

If the OCC were committed to applying a uniform and impartial regulatory system across prospective nonbank charters, then presumably it would expand the scope of its regulations which currently only apply to insured national banks, for instance, its prompt corrective action and safety and soundness regulations, as well as limits on loans to bank insiders.[11] The OCC's failure to expand the scope of these regulations demonstrates a lack of commitment to uniform and impartial treatment across nonbanks. In sum, the lack of generally applicable rules for national nonbanks means that the OCC will not apply uniform, consistent regulation and supervision to chartered nonbanks, and the confidentiality of the operating agreements precludes any assurance that otherwise inapplicable rules are incorporated and made applicable to different nonbanks to the same extent and in the same manner.

### *Threats to Regulatory Fairness and Competitive Markets*

The OCC's regulatory framework for chartered nonbanks will inevitably create an unlevel playing field that favors chartered nonbanks and imposes great disadvantages on traditional, full-service, FDIC-insured banks.[12] Due to the absence of generally applicable laws and the lack of any transparency in the rule setting process, it is virtually certain that chartered nonbanks will *not* "be held to the same high standards that all federally chartered banks must meet," contrary to the OCC's assurances.[13]

It is manifestly inconsistent for the OCC to claim, on the one hand, that chartered nonbanks will be subject to the same regulatory requirements as a full-service bank, and, on the other hand, state that "where a law does not apply directly, the OCC may *work with a fintech company to achieve the goals of a particular statute or regulation* through the OCC's authority to impose conditions on its approval of a charter . . .".[14]  If the OCC actually intended to subject chartered nonbanks to the same rules that apply to a full-service national bank, then the OCC would be willing to disclose the contents of the operating agreements to demonstrate its commitment to preserving competitive equality between chartered nonbanks and full-service banks.  Instead, as stated above, the OCC has indicated that it will not disclose the contents of the operating agreements that govern chartered nonbanks.

However, even if the operating agreements were made public in full detail, an unlevel playing field would still prevail, for the OCC intends to afford chartered nonbanks the luxury of proposing and customizing the regulatory requirements that will govern their operations. Full-service insured banks have never been afforded such latitude in proposing, and persuading their regulators to accept, the rules and regulations that will govern their activities, including the applicability and content of safety and soundness requirements, prompt corrective action rules, merger restrictions, insider lending limits, and change in control rules.

In sum, the OCC's regulatory framework for chartered nonbanks will create severe regulatory disadvantages for traditional full-service banks because the lack of generally applicable rules entails that the many rules and requirements with which traditional insured banks must comply will not apply to the proposed nonbanks. Moreover, due to the confidentiality of the operating agreements for chartered nonbanks, industry competitors and the public will never know the extent to which particular chartered nonbanks have benefited from special regulatory deals crafted by the OCC as it picks winners and losers among its preferred nonbank business models. In combination, these two sources of regulatory disparity will inevitably create an unlevel playing field that is heavily tilted in favor of the chartered nonbanks, to the detriment of traditional, full-service, FDIC-insured banks.

## Undermining the Separation of Banking and Commerce

In September 2016, the Fed, FDIC and OCC issued a joint report to Congress pursuant to Section 620 of the Dodd-Frank Act.[15]  That report included the following statement about the importance of the longstanding federal policy of separating banking and commerce: "For many years, Congress has sought to maintain the general separation of banking and commerce in the United States out of concern that the mixing of banking and commerce might, in effect, extend the federal safety net to commercial entities and make insured banks susceptible to the reputational, operational, and financial risks of their commercial affiliates.  Congress also expressed concern that allowing banks and commercial firms to affiliate with each other could lead to the concentration of economic power in a few very large conglomerates."[16]

The 2016 interagency report cited a Senate committee report, which was issued when Congress closed the "nonbank bank loophole" through the passage of the Competitive Equality Banking Act of 1987 (CEBA).[17]  The Senate committee report strongly reaffirmed the policy of separating banking and commerce and criticized the OCC for attempting to circumvent that policy by allowing commercial and industrial firms to acquire national banks that refrained from engaging in either the acceptance of demand deposits or the making of commercial loans.  In adopting CEBA, Congress declared its intention to prevent a dangerous expansion of the federal safety net for banks and to protect the integrity of the payments system administered by the Fed.[18] Furthermore, after the OCC announced its intention to create the proposed nonbank charter in 2016,  two members of the Senate Banking Committee urged the OCC not to proceed with the creation of a nonbank charter, in part because "nothing would ensure" that the

proposed nonbank charters would not threaten to erode the separation of banking and commerce. In keeping with the congressional policy affirmed by CEBA in 1987, the Senators expressed their strong opposition against any acquisitions of chartered nonbanks by commercial firms because of the strong risk of an undesirable expansion of the federal safety net.[19]

The OCC has stated that it will not allow an "inappropriate commingling of banking and commerce" when it approves nondepository fintech national bank charters.[20] However, as shown by Congress' decisive action in closing the "nonbank bank loophole" in 1987, the OCC does not have authority to allow *any* "commingling of banking and commerce," and it therefore does not have authority to decide *how much* "commingling" would be "inappropriate." The OCC has no power to assume the responsibilities of the Federal Reserve (Fed) under the BHC Act, including the duty to uphold the congressional policy separating banking and commerce, particularly given that the OCC has, through this process, demonstrated a tenuous fidelity to the law that it is actually charged with implementing, the National Bank Act.

# Potential Threat of Preemption with Resulting Consumer Harms

In creating the proposed nonbank charter, the OCC would create a potential risk of tremendous harms to consumers by enabling chartered nonbanks to assert that they are entitled to immunity, through federal preemption, from critical consumer protections afforded under state law. The OCC states that some types of state laws would *apply* to the proposed nonbank charter. State regulators doubt the extent to which such state laws would actually "apply" to chartered nonbanks, as a practical matter, given the disregard that the OCC has previously shown towards recognizing and enforcing compliance with State law. The long history of OCC disregard for state laws and the fact that the OCC' is not officially responsible for enforcing compliance with state consumer protection laws, have prompted significant concerns among State regulators that the OCC will be far from rigorous and vigilant in enforcing state laws against chartered nonbanks and that a long train of consumer harm and abuses will naturally follow.

At least some important categories of state law—including state licensing laws, state administrative supervision and enforcement authorities, and state usury laws—would potentially be subject to preemption if the OCC grants nonbank charters to nondepository providers of financial services.[21] In this regard, it is important to note that an uninsured national bank, like an uninsured state bank, has never been given the privilege of exporting the usury law in the state in which it is located on loans made to borrowers in other states. The OCC has suggested that, because FDIC-insured state banks can export their home state usury rates, the OCC is justified in permitting uninsured national nonbanks to avoid state interest rate caps. However, the exportation privilege is available only to FDIC-insured state banks and has never been made available to uninsured nondepository state-chartered institutions.[22] State regulators strongly oppose the OCC's unlawful attempt to permit uninsured, national nonbanks to benefit from exportation provisions that have been traditionally reserved to FDIC-insured banks, which must comply with the full range of regulatory requirements that accompany FDIC-insured status.

Finally, in discussing preemption, the OCC failed to address the specific and detailed requirements of the Dodd-Frank Act, which apply to any OCC regulation or order that has preemptive effect.[23] Under 12 U.S.C. 25b, the OCC must satisfy stringent standards and is subject to demanding scrutiny from the courts whenever it issues a regulation or order that has the effect of preempting state consumer financial laws (except for state usury laws). Whenever the OCC issues a regulation or order that has the effect of preempting state consumer protection laws, the OCC must proceed on a "case-by-case basis" and must also show "substantial evidence" of each claim of preemptive authority.[24] The OCC has not satisfied any

of these standards or procedural requirements for preemption determinations, despite the fact that the prospective nonbank charter could have far-reaching preemptive implications.

## Lack of Interagency Coordination and Consultation

### *Federal Agencies*

Under the Federal Reserve Act, any national nonbank will automatically become a member of the Federal Reserve System.[25] The OCC has not addressed the questions of whether the proposed nonbanks will have access to the discount window or whether they will be given access to the payments system. Both questions raise grave concerns about the potential extension of the federal safety net and the payments system to benefit and protect nontraditional providers of financial services and their commercial affiliates, none of which will be subject to consolidated supervision by the Fed.

The OCC has not disclosed whether it has discussed the proposed nonbank charter with the Fed or how the Fed intends to regulate the proposed nonbanks.[26] Similarly, the OCC has not indicated that there has been any effort to consult or coordinate with the Securities and Exchange Commission (SEC) and the CFPB. Despite the fact that CSBS has pointed out significant regulatory gaps[27] and jurisdictional overlaps[28] in previous letters, these issues remain unaddressed in the draft supplement. The apparent lack of interagency consultation and coordination at the federal level on a plan with such enormous implications for the future of our financial system is a fundamental and fatal flaw.

### *State Regulators*

Since the Comptroller first announced its intention to offer a nonbank charter, the OCC has failed to acknowledge or address its encroachment upon an existing regulatory system of great national importance, namely, the state system for licensing and regulating nondepository financial services providers. State regulators have worked diligently over the past decade to establish the Nationwide Multistate Licensing System (NMLS) in order to increase uniformity, reduce regulatory burden and enhance consumer protection in the licensing and supervision of nondepository financial service companies. In facilitating and streamlining the licensing and regulatory functions of State regulators, NMLS has served an invaluable role in enabling the emergence of innovative financial services and products without sacrificing critical consumer protections or safety and soundness standards.

The OCC's failure to acknowledge the state licensing system is troubling, not only because it discounts the pivotal role of NMLS in fostering financial innovation, but also because, as the OCC acknowledges, Dodd-Frank imposed restrictions on the ability of the Comptroller to charter an institution which is subject to formal investigation or enforcement action by another regulator, including state regulators.[29] The OCC's failure to consult with State regulators at any point throughout this entire process does not inspire confidence that the OCC will consult with state regulators in the future to "ensure that a company's obligation to remediate or pay penalties for any violations" stemming from a state enforcement action are not flouted by allowing that company to seek refuge under a national charter. State regulators take seriously their official duty to enforce their respective laws and therefore strongly oppose the OCC's nonbank charter proposal, which poses a clear threat of jeopardizing the ability of state regulators to fulfill their oversight and enforcement responsibilities.

## Conclusion

State regulators remain firmly opposed to the OCC's intended actions due to: the unprecedented and unlawful nature of the proposed nonbank charter; the unlevel playing field and competitive distortions that would result from fundamental flaws in the nonbank regulatory framework; the dangerous hazards

that would be created by commingling banking and commerce; the consumer harms that would flow from the threatened preemption of state consumer protection laws; and the OCC's lack of interagency coordination and consultation before advancing such an unprecedented and radical change to our banking and financial regulatory systems. Thus, State bank regulators strongly oppose the OCC's intended actions, for, if taken to their logical conclusion, such actions would result in the dismantling of many fundamental institutions and policies that are of crucial importance for the financial and economic welfare of this country—including the separation of banking and commerce, the dual banking system, and the inherent authority of the States under our federal Constitution to protect the welfare of their communities and citizens.

Sincerely,

//S//
_____

John W. Ryan
President & CEO

[1] *See* CSBS Comment Letter, Exploring Special Purpose National Bank Charters for Fintech Companies, Jan. 13, 2017 (hereinafter "White Paper Comment Letter"); CSBS Comment Letter, Receiverships for Uninsured National Banks, Nov. 14, 2016 (hereinafter "Receivership Comment Letter"). Nevertheless, given the OCC's stated intentions, this issue will continue to be subject to dispute, even if that culminates in the forfeiture of the "rights, privileges, and franchises" the Comptroller unlawfully attempts to afford in granting a nonbank charter. *See* 12 U.S.C. § 501a (triggered by a violation of 12 U.S.C. § 222).

[2] *See supra* note 1, White Paper Comment Letter at 1-9; Receivership Comment Letter at 2-4.

[3] The Supreme Court has repeatedly rejected such claims, declaring that "an agency may not bootstrap itself into an area where it has no jurisdiction by repeatedly violating its statutory mandate." *See SEC v. Sloan*, 436 U.S. 103, 119 (1978) (quoting *FMC v. Seatrain Lines*, Inc., 411 U.S. 726, 745 (1973)).

[4] *See* Draft Supplement to the Licensing Manual, March 2017 (hereinafter "Draft Supplement"), at 2. *See also* OCC Summary Comments and Explanatory Statement, March 2017 (hereinafter "Comments Summary"), at 2.

[5] The following federal banking laws apply, in whole or in part, to "insured depository institutions" and, accordingly, will not apply to the proposed nonbanks: the Federal Deposit Insurance Act, the Federal Reserve Act, the Bank Holding Company Act, the Bank Service Company Act, the Community Reinvestment Act, the Change in Bank Control Act, the Bank Merger Act, and the Dodd-Frank Act. *See supra* note 1, White Paper Comment Letter, at 9.

[6] The following OCC regulations apply to "national banks" and implement laws applying only to insured banks: 12 C.F.R. Part 3 (regulatory capital requirements), Part 6 (prompt corrective action requirements), Part 11 (securities exchange act disclosure rules), Part 12 (recordkeeping and confirmation requirements for securities transactions), Part 14 (consumer protection in sales of insurance), Part 16 (securities offering disclosure rules), Part 26 (management official interlocks), Part 31 (extensions of credit to insiders and transactions with affiliates), Part 34 (real estate lending and appraisals). In addition, the portions of 12 C.F.R. Part 5 implementing the Change in Bank Control Act and the Bank Merger Acts and the portions of 12 C.F.R. Part 19 implementing the anti-tying provisions of the BHCA (12 U.S.C. 1971 et. seq.) apply to "national banks" and implement laws applying only to insured banks. Again, to the extent that the OCC declares that these regulations apply to the proposed nonbanks, the regulations themselves are overbroad and invalid. When Congress clearly defines the scope and applicability of a law, a federal agency cannot simply expand the scope of the law through regulatory implementation. *See*, *e.g.*, *Metro. Sch. Dist. of Wayne Twp. v. Davila*, 969 F.2d 485, 488-89 (7th Cir. 1992) (if an interpretive rule creates a new duty, it functions like a legislative rule and is, therefore, unlawful).

[7] *See supra* note 4, Draft Supplement at 15.

[8] *See supra* note 4, Draft Supplement at 15; Comments Summary at 12.

[9] If the OCC were authorized to exercise the degree of discretion contemplated in the Draft Supplement, then the scope of the OCC's authority itself would implicate constitutional doctrines barring the delegation of legislative power. *See DOT v. Ass'n of Am. R.R.*, 135 S. Ct. 1225 (2015); *Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199 (2015). A federal agency's exercise of rulemaking authority, regardless of whether it is styled an "operating agreement" or a "supervisory standard", is lawful only insofar as it is bound by statutory law. *See generally* Kimberly L. Wehle, *Defining Lawmaking Power*, 51 WAKE FOREST L. REV. 881 (2016).

[10] *See supra* note 4, Comments Summary at 9.

[11] *See* 12 C.F.R. 30. Of course, this is not to say that amending 12 C.F.R. 30 to cover uninsured nonbanks would be a valid implementation of 12 U.S.C. 1831p-1. Rather, it simply points out that, since the OCC believes it can validly apply regulations to uninsured institutions even if the law only covers insured institutions, there is no reason for the OCC not to amend 12 CFR 30 to cover uninsured institutions.

[12] *See supra* note 1, White Paper Comment Letter at 4, 9-10.

[13] *See supra* note 4, Comments Summary at 3. The OCC concedes this point when it states "SPNB charter provides a framework of uniform standards and robust supervision for companies that qualify". *See supra* note 4, Draft Supplement at 1. This assertion turns on its head the traditional approach to bank regulation which has prevailed for nearly two centuries, namely, that a chartered institution operates within a regulatory framework based on generally applicable regulations implementing generally applicable laws promulgated by Congress. Instead, as the OCC surprisingly admits, the regulatory and supervisory framework will flow from each individual nonbank charter, with each nonbank being endowed with a unique set of powers and subject to a unique set of regulatory and supervisory requirements.

Students of banking history will recognize this method of special chartering and *ad hoc* regulation as reminiscent of an era in which each individual banks was chartered and regulated by special acts passed by the legislature. *See* Susan Pace Hamil, *From Special Privilege to General Utility: A Continuation of Willard Hurst's Study of Corporations*, 49 AM. U. L. REV. 81, 146-158 (1999). Due to opposition by Jacksonian democrats, this system of special chartering was done away with both to democratize access to bank and corporate charters and to limit rampant cronyism, in particular, wariness surrounding favoritism exercised by the legislatures in the granting of special privileges. See *Louis K. Ligget Co. v. Lee*, 228 U.S. 517, 549. *See generally* Herbert Hovenkamp, *The Classical Corporation in American Legal Thought*, 76 GEO. L.J. 1593 (1988). For banks, the system of special chartering finally disappeared with the emergence of the federal deposit insurance system in the 1930s. *See* Hamil, at 152. It is unsurprising that, as the OCC attempts today to divorce national charters from the deposit insurance system, many of the same critiques are applicable, by way of analogy, to the proposed nonbank charter and associated regulatory framework.

[14] *See supra* note 4, Draft Supplement at 15 (emphasis added).

[15] *See* Report to the Congress and the Financial Stability Oversight Council Pursuant to Section 620 of the Dodd-Frank Act (September 2016) (hereinafter "Section 620 Report").

[16] *See supra* note 15, Section 620 Report at 33.

[17] *See supra* note 15, Section 620 Report at 33 (citing S. Rep. No. 100-19 (1987)).

[18] *See* S. Rep. No. 100-19, at 7-8 (1987) ("The impetus for nonbank banks stems primarily from large diversified companies wanting to invade the banking business while avoiding the regulatory restraints of the Bank Holding Company Act."). The Report goes on to state that "[t]he need for prompt congressional action to close the nonbank bank loophole has been greatly enhanced by recent developments in the courts. . . . [T]he Comptroller of the Currency has moved to vacate the district court injunction that prevents him from chartering new nonbank banks." The Report is referencing the preliminary injunction entered by the Florida district court in *Independent Bankers Ass'n of America v. Conover*, 1985 U.S. Dist. LEXIS 22529 (M.D. Fla. Feb. 15, 1985) on the basis that nonbanks that refrained from engaging in deposit-taking were not engaged in the business of banking under the National Bank Act. That district court decision was never vacated or reversed and remains an applicable legal precedent today. It is noteworthy that the OCC has not mentioned the decision in any of its materials related to the proposed nonbank charter. *See supra* note 1, White Paper Comment Letter at 4.

[19] *See* Letter from Senators Sherrod Brown and Jeff Merkley to Comptroller Curry, at 4 (Jan. 9, 2017).

[20] *See supra* note 4, Comments Summary at 2, 15 (emphasis added); *see also supra* note 4, Draft Supplement at 7.

[21] *See* 12 U.S.C. 25b(b)(f). See, e.g., *Cuomo v. Clearing House Ass'n*, 557 U.S. 519 (2009).

[22] *See* Remarks by Thomas J. Curry, Comptroller of the Currency at LendIt USA 2017 ("[I]t is important to remember that state banks have the same power as national banks to export the usury laws in their home state. Congress granted this power to state banks in 1980.").

[23] *See* Dodd-Frank Act, sections 1044-1046, 124 Stat. at 2014-2017.

[24] Under Section 25b(b)(5), the OCC is not entitled to judicial deference when it issues rules or orders with preemptive effect and instead has the burden of showing the "thoroughness" and "validity of its reasoning" as well as "consistency with other valid determinations made by the agency". *See* 12 U.S.C. 25b(b)(5).

[25] *See* 12 U.S.C. 222.

[26] Equally noteworthy, the OCC has not discussed how a proposed nonbank could possibly comply with a mandate under the Federal Reserve Act that all national banks become insured banks upon becoming members of the FRS. *See* 12 U.S.C. 222.

[27] The OCC will not have at its disposal the enforcement authority under federal securities law that it typically enjoys with respect to full-service national banks, because the exercise of that authority hinges upon the regulated institution being engaged in the business of receiving deposits. *See supra* note 1, White Paper Comment Letter at 16.

[28] Under the Dodd-Frank Act, the OCC must consult with the CFPB whenever the OCC issues a regulation or order that will have a preemptive impact on multiple state consumer financial laws. *See* 12 U.S.C. 25b(b)(3). The OCC has not disclosed whether it has discussed its fintech charter plan with the CFPB, let alone, how the CFPB proposes to regulate the proposed national nonbanks.

[29] *See supra* note 4, Draft Supplement at 8, n. 22.