# EXHIBIT I

# BankThink OCC's Otting: Why do state regulators want to limit consumer choice?

By **Joseph Otting**
Published **September 18 2018, 9:55am EDT**

More in **Fintech,Fintech regulations,Joseph Otting,OCC,CSBS,NYDFS**

The decision by the Office of the Comptroller of the Currency to begin accepting applications for special purpose national bank charters from fintech companies promotes innovation, gives consumers and businesses greater choice and creates economic growth and opportunity.

It is also good for America's dual banking system, which the president of Conference of State Bank Supervisors and the superintendent of the New York Department of Financial Services ignore in their recent articles and statements.

Since 1863, the United States has benefited from a dual banking system in which companies seeking to conduct the business of banking can choose to operate via state licenses and charters or apply for federal charters and operate nationwide. Each option has unique advantages, and prospective banks can choose based on their business strategies. That system allows the greatest variety of choices for consumers and businesses and has the positive benefit of increasing competition. I am puzzled by their efforts, and presumption of authority, to limit the choice of consumers and businesses in a way that harms the dual banking system and the citizens it serves.

My decision to exercise the OCC's authority to consider national bank charter applications from fintech companies engaged in the business of banking maintains *parity* with options already available in certain states. An example of similar actions taken at the state level include New York's recent decision to license two cryptocurrencies.

It remains to be seen how many fintech companies will seek to become a national bank. Fintech companies that become national banks will be expected to meet the same standards and will be subject to the same supervision and regulation that similarly situated banks receive. When fintech companies discover the expectations for capital, liquidity, consumer protection, financial inclusion and contingency planning, many realize that a federal charter may not be in their future. Many will choose to continue operating at the state level, provide services to banks and consumers directly or pursue partnerships or other business combinations with banks, as they do today.

A few will choose to become federal banks. For those that do, we welcome the innovation and competition they bring that will provide more choice and promote improving banking products and services that benefit consumers, businesses, and communities across the nation. Contrary to reports, interest in the charter remains robust, and we expect multiple applications by the end of the year.

The few critics of the OCC's decision to accept special purpose charter applications make three basic arguments, all of which are without basis.

First, critics allege national charters for fintech companies undermine consumer protection and will pave the way to widespread predatory payday lending. That's wrong. The consumer protection regime has changed significantly in the past decade. Congress created the Bureau of Consumer Financial Protection and gave it broad authority to write rules that apply to banks and nonbanks. If a fintech that becomes a national bank grows beyond $10 billion in assets, they would be subject to supervision by the bureau as well as the OCC. It also is incorrect to assume that all state consumer protection laws cease to apply when a company becomes a national bank. State laws that address anti-discrimination, fair lending, debt collection, taxation, zoning, crime and torts all generally apply to national banks and would also apply to special purpose national banks. Additionally, state laws that prohibit unfair or deceptive acts or practices that address concerns such as material misrepresentations and omissions about products and services in billing, disclosure

and marketing materials also generally apply to national banks. The law also recognizes the authority of state attorneys general to bring an action in court against a national bank to the extent that a state law prohibiting unfair or deceptive acts or practices applies to a national bank. Finally, it is fiction to suggest that state-regulated institutions have treated consumers any better than federally regulated institutions. Simply consider the fact that where predatory payday lending and high-fee check cashing operates today, it exists in state-licensed and regulated service providers as pointed out by the Pew Charitable Trusts.

The second argument is that state regulators are better suited to supervise financial innovation. Many states *are* well resourced and have professional experienced staff who perform their jobs well. At the same time, revenue pressure strains other states' capabilities and budgets. State law, state requirements and state supervisionvary wildly. The OCC has resources to support consistently robust supervision from year to year, bank to bank, without being affected by budget shortfalls, revenue pressures or politics. The OCC also has a long history supervising banking technology and innovation. The OCC's national perspective informs its oversight, allowing companies to benefit from broad industry-wide perspective as well as in-depth on-site knowledge and expertise. Every onsite OCC examiner is supported by policy, risk, information technology and legal experts who support their supervision. As a banker with more than three decades of experience, OCC's local presence and national perspective is one of the distinguishing traits of the OCC I have come to appreciate, which is one of the reasons I always sought as a banker to operate under a national charter.

The third argument goes to authority. Under the National Bank Act, the OCC has broad authority to grant charters for national banks to carry on the "business of banking." The OCC has interpreted the "business of banking" to include any one of the three core banking functions of receiving deposits, paying checks or lending money. The law does not require that a bank take deposits in order to be engaged in the "business of banking." Rather, under the law, performing any one of these three

activities is sufficient, as reflected in OCC regulation. I am confident that courts, if necessary, will uphold this authority if challenged.

The complaints about the OCC's decision really come down to defending turf and licensing revenue of a few big states at the expense of economic opportunity for others. What is masquerading as concern for the health of the nation's banking system is really a protectionist effort to set federal standards and limit competition for state institutions. The effort to promote interstate branching and banking in the early 1990s was met with similar reactionary criticism, even though that change ultimately resulted in more choice for consumers, greater accessibility to financial services and lower costs, and it was affirmed by Congress and the courts.

Fortunately, the nation *has* a dual banking system that supports banking on a national level as well as a state level. The nation benefits from a strong federal banking system that provides an opportunity for banking to grow and evolve responsibly so that it can continue to be a source of strength for the nation and to serve consumers, businesses and communities nationwide, under a single primary prudential regulator and a uniform framework of laws and regulations. That system includes more than a thousand small community banks as well as the nation's largest and most internationally active banks.

It is the responsibility of the Comptroller of the Currency to ensure that system continues to operate in a safe and sound manner, treats customers fairly and serves the interest of the nation and its economy. That's what President Lincoln intended when he signed the National Bank Act, and that's what we are committed to today.

## Joseph Otting

### BankThink submission guidelines

BankThink is American Banker's platform for informed opinion about the ideas, trends and events reshaping financial services. View our **detailed submission criteria and instructions**.