**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| CONFERENCE OF STATE BANK SUPERVISORS, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 1:18-CV-02449 (DLF) |
| OFFICE OF THE COMPTROLLER OF THE CURRENCY, | ) ) ) | **ORAL ARGUMENT REQUESTED** |
| and | ) ) | |
| JOSEPH M. OTTING, COMPTROLLER OF THE CURRENCY, | ) ) ) | |
| Defendants. | ) ) | |

## PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FOR LACK OF JURISDICTION AND FOR FAILURE TO STATE A CLAIM

Jennifer Ancona Semko (Bar No. 481119)
Steven M. Chasin (Bar No. 495853)
Graham Cronogue (Bar No. 104436)
BAKER & McKENZIE LLP
815 Connecticut Avenue NW
Washington, DC 20006
Tel: +1 202 835-4250
Fax: +1 202 416-7055
jennifer.semko@bakermckenzie.com
steven.chasin@bakermckenzie.com
graham.cronogue@bakermckenzie.com

John Gorman
Margaret Liu
Michael Townsley
CONFERENCE OF STATE BANK SUPERVISORS
1129 20th Street, NW
Washington, DC 20036
Tel: +1 202 296-2840
bgorman@csbs.org
mliu@csbs.org
mtownsley@csbs.org

# **TABLE OF CONTENTS**

INTRODUCTION .................................................................................................................. 1

BACKGROUND .................................................................................................................. 3

LAW AND ARGUMENT ................................................................................................... 11

I.      CSBS's PROCEDURAL INJURY CLAIM (COUNT III) IS IRREFUTABLY RIPE. ......... 11

II.     CSBS'S STATE MEMBERS HAVE SUFFICIENTLY ALLEGED STANDING, AND
        OCC'S ACTIONS SINCE THE COURT'S PRIOR RULING ESTABLISH THAT THE
        REMAINING COUNTS ARE RIPE FOR REVIEW. ........................................................... 11

        A.      OCC's claim preclusion argument is meritless in light of its decision to issue
                Nonbank Charters and its extensive activities toward issuing such charters. ............ 11

        B.      CSBS establishes standing based on its actual and imminent harm. ......................... 12

        C.      This Dispute is Presumptively Ripe for Judicial Review, and OCC Has Not
                Overcome That Presumption. ................................................................................... 17

        D.      Alternatively, Before Ruling on OCC's 12(b)(1) Motion, CSBS is Entitled to
                Jurisdictional Discovery and Amendment of its Complaint. ...................................... 19

III.    OCC'S NONBANK CHARTER PROGRAM IS FINAL AGENCY ACTION FOR
        PURPOSES OF COUNT IV. ............................................................................................. 20

IV.     CSBS'S CHALLENGE TO SECTION 5.20(e)(1) IS TIMELY. ........................................... 22

        A.      CSBS's Challenge is Not Time-Barred Because the Nonbank Charter Program
                Necessarily Relies upon Section 5.20(e)(1) for its Legal Validity. ............................ 22

        B.      Because OCC Revisited Section 5.20(e)(1) Within the Statutory Period, CSBS's
                Claims Are Timely Under the "Reopening" Doctrine. ............................................... 23

        C.      CSBS's Challenge is also Timely Under the Constructive Reopening Doctrine. ....... 24

        D.      CSBS Could File a Petition for Amendment/Rescission of Section 5.20(e)(1). ......... 25

V.      OCC's STATUTORY INTERPRETATIONS ARE NOT ENTITLED TO *CHEVRON*
        DEFERENCE BECAUSE THEY HINGE UPON THE INTERPRETATION OF
        STATUTES OVER WHICH IT LACKS EXCLUSIVE AUTHORITY. .............................. 25

VI.     THE TERM "BUSINESS OF BANKING" IS NOT AMBIGUOUS IN THE CONTEXT OF
        THIS CASE ...................................................................................................................... 27

        A.      In Determining Ambiguity, the Court Must Look Beyond the NBA. ......................... 27

        B.      The Statutory Context of the NBA—including the Interplay Between the NBA, FRA,
                FDIA and BHCA—Reflects Congress's Intent that a National Bank Must Engage in
                Deposit Taking to Carry on the "Business of Banking." ............................................ 28

1.    Pursuant to the NBA, FDIA, and FRA, to be lawfully entitled to commence the "business of banking," a national bank must be "engaged in the business of receiving deposits."..............................................................................................30

2.    The "business of banking" must be interpreted consistently with the BHCA definition of a "bank," which encompasses only deposit-taking institutions. ....33

VII.   COURTS HAVE REPEATEDLY STRUCK DOWN OCC'S ATTEMPTS TO CHARTER ENTITIES THAT WOULD NOT CARRY ON THE "BUSINESS OF BANKING," AND OCC HAS BEEN REQUIRED TO OBTAIN SPECIFIC CONGRESSIONAL AUTHORITY BEFORE DOING SO. ..................................................................................36

A.    OCC's Effort to Charter National Trust Companies Not Engaged in the "Business of Banking" Was Rejected by a Federal Court, and OCC Could Not Grant This Type of Charter Until Specific Authority Was Granted in an NBA Amendment. ..................36

B.    OCC's Power to Charter Banker's Banks, Another Special-Purpose National Bank, Derives From Specific Statutory Authority................................................................38

C.    A Federal Court and Congress Have Both Rejected OCC's Prior Efforts to Issue National Charters to "Nonbank Banks." ....................................................................38

D.    *ICBA v. FRB* Undermines, Rather than Supports, OCC's Promulgation of Section 5.20(e)(1) and the Nonbank Charter Program. .........................................................41

E.    *Nationsbank* and Similar Cases are Inapplicable Because They Address the *Outer* Limits of the Business of Banking, Not the *Inner* Limits. .........................................42

VIII.  OCC UNREASONABLY EQUATES THE "BUSINESS OF BANKING" WITH THE DEFINITION OF "BRANCH." ...............................................................................................44

A.    Conflating a "national bank" with a "branch" of a national bank ignores the plain statutory language of the NBA. ..................................................................................45

B.    OCC's interpretation expands its power through statutes designed to limit it. ..........46

C.    Clarke v. Securities Industry Association undermines OCC's position....................47

IX.    OCC HAS NOT DEMONSTRATED A "CLEAR INDICATION" THAT IT HAS AUTHORITY TO PREEMPT STATE LAW BY ISSUING NATIONAL BANK CHARTERS TO NON-DEPOSITORY INSTITUTIONS, AND CSBS'S TENTH AMENDMENT CLAIM THEREFORE SHOULD NOT BE DISMISSED.........................50

X.     THE NONBANK CHARTER PROGRAM IS AN UNLAWFUL PREEMPTION DETERMINATION (AND OCC'S ASSERTIONS TO THE CONTRARY ARE ENTITLED TO *SKIDMORE* DEFERENCE AT BEST). .........................................................................53

CONCLUSION....................................................................................................................................55

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abuelhawa v. United States,*
    556 U.S. 816 (2009) ........................................................................................................... 29

*Adamski v. McHugh,*
    2015 U.S. Dist. LEXIS 99980 (D.D.C. July 31, 2015) .................................................... 22

*All Am. Tel. Co. v. FCC,*
    867 F.3d 81 (D.C. Cir. 2017) .......................................................................... 12, 15, 55

*Am. Ins. Ass'n v. Clarke*
    743 F. Supp. 491 (W.D. Tex. 1989) ................................................................................. 45

*Am. Petroleum Inst. v. EPA,*
    683 F.3d 382 (D.C. Cir. 2012) ......................................................................................... 17

*American Ins. Ass'n. v. Clarke,*
    865 F.2d 278 (D.C. Cir. 1989) ................................................................. 35, 48, 49, 50

*American Library Ass'n v. FCC,*
    401 F.3d 489 (D.C. Cir. 2005) ......................................................................................... 12

*Ark Initiative v. Tidwell,*
    895 F. Supp. 2d 230 (D.D.C. 2012) ................................................................................ 11

*Arnold Tours Inc. v. Camp,*
    472 F.2d 427 (1st Cir. 1972) ............................................................................................ 45

*Attias v. Carefirst, Inc.,*
    865 F. 3d 620 (D.C. Cir. 2017) ................................................................................. 13, 15

*Atwater v. D.C. Dep't of Consum. & Reg. Affairs,*
    566 A.2d 462 (D.C. 1989) ................................................................................................ 45

*Board of Governors of the Fed. Reserve Sys. v. Dimension Financial Corp.,*
    474 U.S. 361 (1986) .......................................................................................................... 41

*Brown* v. *Gardner,*
    513 U.S. 115 (1994) ..................................................................................................... 28, 30

*Calderon v. Berryhill,*
    2019 U.S. Dist. LEXIS 759 (D.D.C. Jan. 3, 2019) ........................................................ 19

*California Bank v. Kennedy,*
    167 U.S. 362 (1897) .......................................................................................................... 28

*Casden v. Burns*,
    306 Fed. Appx. 966 (6th Cir. Jan. 16, 2009) .......................................................................... 19

*Cement Kiln Recycling Coal. v. EPA*,
    493 F.3d 207 (D.C. Cir. 2007) ................................................................................................. 18

*Ciba-Geigy Corp. v. EPA*,
    801 F.2d 430 (DC Cir. 1986) ................................................................................................... 17

*CITA-Wireless Ass'n v. FCC*,
    466 F.3d 105 (D.C. Cir. 2006) ........................................................................................... 23, 24

*Citicorp*,
    67 Fed. Res. Bull. 181 (1981) ................................................................................................. 42

*City of Dania Beach, Fla. v. FAA*,
    485 F. 3d 1181 (D.C. Cir. 2007) ............................................................................................. 21

*Clark v. Suarez Martinez*,
    543 U.S. 371 (2005) ................................................................................................................. 28

*Clarke v. Sec. Indus. Ass'n*,
    479 U.S. 388 (1987) ........................................................................................................... *passim*

*Colo. Nat'l Bank v. Bedford*,
    310 U.S. 41 (1940) ................................................................................................................... 30

*Columbia Falls Aluminum Co. v. EPA*,
    139 F. 3d 914 (D.C. Cir. 1998) ............................................................................................... 23

*Conference of State Bank Supervisors v. Office of the Comptroller of the Currency*,
    No. 1:17-cv-0763-DLF ...................................................................................................... *passim*

*CSBS v. Conover*,
    710 F.2d 878 (D.C. Cir. 1983) ........................................................................................... 51, 53

*CSBS v. Lord*,
    532 F. Supp. 694 (D.D.C. 1982) ............................................................................................. 13

*Davis v. Fed. Electron Comm'n*,
    554 U.S. 724 (2008) ................................................................................................................. 14

*Dep't of Banking & Consumer Fin. v. Clarke*,
    809 F.2d 266 (5th Cir. 1987) ................................................................................................... 50

*Empire Health Found. v. Burwell*,
    209 F. Supp. 3d 261 (D.D.C. 2016) ........................................................................................ 21

*Epic Sys. Corp. v. Lewis*,
    138 S.Ct. 1612 (2018) ................................................................................................... 26, 30, 33

*ETSI Pipeline Project v. Missouri,*
    484 U.S. 495 (1988) ..................................................................................................... 29

*FDA v. Brown & Williamson Tobacco Corp.,*
    529 U.S. 120 (2000) ............................................................................................. *passim*

*First Nat'l Bank of Logan v. Walker Bank & Trust Co.,*
    385 U.S. 252 (1966) ............................................................................................. 28, 48

*First Nat'l Bank v. Missouri,*
    263 U.S. 640 (1924) ..................................................................................................... 47

*Frank LLP v. Consumer Fin. Prot. Bureau,*
    288 F. Supp. 3d 46 (D.D.C. 2017) ...................................................................... 15, 16

*Friedman v. FAA,*
    841 F. 3d 537 (D.C. Cir. 2016) .................................................................................. 21

*Garrelts v. Smithkline Beecham Corp.,*
    943 F. Supp. 1023 (N.D. Iowa 1996) ........................................................................ 51

*Grant Thornton, LLP v. Office of Comptroller,*
    514 F.3d 1328 (2008) .................................................................................................. 26

*Hopkins Fed. Sav. & Loan Asso. v. Cleary,*
    296 U.S. 315 (1935) .................................................................................................... 53

*Indep. Bankers Ass'n of Am. v. Conover,*
    1985 U.S. Dist. Lexis 22529 (M.D. Fla. 1985) ................................................. *passim*

*Indep. Cmty. Bankers Assoc. v. Bd. of Governors of the Fed. Reserve Sys.,*
    820 F.2d 428 (D.C. Cir. 1987) ............................................................................ 41, 42

*Indep. Ins. Agents of Am., Inc. v. Hawke,*
    211 F.3d 638 (D.C. Cir. 2000) ...................................................................... 29, 30, 45

*Independent Bankers Asso. v. Smith,*
    534 F.2d 921 (D.C. Cir. 1976) .................................................................................. 46

*Independent Ins. Agents of Am. v. Ludwig,*
    997 F.2d 958 (D.C. Cir. 1993) .................................................................................. 35

*Jeong Seon Han v. Lynch,*
    223 F. Supp. 3d 95 (D.D.C. 2016) ............................................................................ 19

*Kennecott Utah Copper Corp. v. DOI,*
    88 F.3d 1191 (D.C. Cir. 1996) .................................................................................. 24

*Kravitz v. United States,*
    336 F. Supp. 3d 545 (D. Md. 2018) .......................................................................... 15

*Leonardi v. Chase Nat'l Bank,*
    81 F.2d 19 (2d Cir. 1936) ................................................................................... 47

*Long Term Care Pharm. Alliance v. Leavitt,*
    530 F. Supp. 2d 173 (D.D.C. 2008) .................................................................... 19

*Lowry National Bank,*
    29 Op. Att'y Gen. 81 (1911) .................................................................... 32, 47, 49

*M&M Leasing Corp. v. Seattle First Nat'l Bank,*
    563 F.2d 1377 (9th Cir. 1977) ............................................................................ 45

*Massachusetts v. EPA,*
    549 U.S. 497 (2007) ............................................................................................ 16

*MCI Telecomms. Corp. v. AT&T Co.,*
    512 U.S. 218 (1994) ............................................................................................ 27

*Mendoza v. Perez,*
    754 F. 3d 1002 (D.C. Cir. 2014) ........................................................................ 22

*Metropolitan Life Ins. Co. v. Massachusetts,*
    471 U.S. 724 (1985) ............................................................................................ 52

*Nat'l Ass'n of Broadcasters v. FCC,*
    789 F.3d 165 (D.C. Cir. 2015) ........................................................................... 15

*Nat'l Ass'n of Mfrs. v. DOI,*
    134 F.3d 1095 (D.C. Cir. 1998) ......................................................................... 24

*Nat'l Res. Def. Council v. EPA,*
    571 F.3d 1245 (D.C. Cir. 2009) ......................................................................... 25

*Nat'l Ass'n of Greeting Card Pub. v. USPS,*
    607 F.2d 392 (D.C. Cir. 1979) ........................................................................... 23

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.,*
    545 U.S. 967 (2005) ...................................................................................... 26, 35

*Nationsbank of North Carolina, N.A. v. Variable Annuity Life Ins. Co.,*
    513 U.S. 251 (1995) ...................................................................................... 43, 44

*Natural Resources Defense Council v. Environmental Protection Agency,*
    513 F.3d 257 (D.C. Cir. 2008) ........................................................................... 23

*New York State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.,*
    514 U.S. 645 (1995) ............................................................................................ 51

*New York v. FCC,*
    486 U.S. 57 (1988) .............................................................................................. 52

*New York v. FERC*,
535 U.S. 1 (2002)...................................................................................................51, 52

*New York v. U.S. Department of Commerce*,
2019 U.S. Dist. LEXIS 6954 (S.D.N.Y. Jan. 15, 2019)...............................14, 15, 55

*NLRB Union v. FLRA*,
834 F.2d 191 (D.C. Cir. 1987) .............................................................................23

*Olson v. U.S.*,
953 F. Supp. 2d 223 (D.D.C. 2013) ......................................................................22

*Oulton v. German Sav. & Loan*,
84 U.S. 109 (1872).............................................................................................41

*Owens v. Sudan*,
No. 14-5105, 2017 U.S. App. LEXIS 13695 (D.C. Cir. July 28, 2017) ...................22

*Pennsylvania v. Trump*,
2019 U.S. Dist. LEXIS 6161 (E.D. Pa. Jan. 14, 2019) ....................................16, 17

*Peterson v. Transp. Workers Union of Am.*,
75 F. Supp. 3d 131 (D.D.C. 2014) .......................................................................13

*Pineland State Bank v. Proposed First Nat'l Bank*,
335 F. Supp. 1376 (D.N.J. 1971) .........................................................................47

*Public Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*,
489 F.3d 1279. (D.C. Cir. 2007) .........................................................................16

*Public Citizen v. Nuclear Regulatory Com.*,
901 F.2d 147 (D.C. Cir. 1990)........................................................................23, 25

*Rhea Lana, Inc. v. Dept. of Labor*,
824 F. 3d 1023 (D.C. Cir. 2016) ..........................................................................21

*Sabre, Inc. v. DOT*,
429 F.3d 1113 (D.C. Cir. 2005) ...........................................................................18

*Scahill v. District of Columbia*,
909 F.3d 1177 (D.C. Cir. 2018) ..........................................................11, 14, 19, 20

*Selden v. Equitable Tr. Co.*,
94 U.S. 419 (1876).............................................................................................41

*Sierra Club v. EPA*,
551 F.3d 1019 (D.C. Cir. 2008) .....................................................................24, 25, 28

*Sierra Club v. Jewell*,
764 F. 3d 1 (D.C. Cir. 2014) ............................................................................15, 16, 24

*Skidmore v. Swift & Co.*,
    323 U.S. 134 (1944) .......................................................................... 54, 56

*Solid Waste Agency v. U.S. Army Corps of Eng'rs*,
    531 U.S. 159 (2001) .......................................................................... 51, 52

*Sullivan v. Stroop*,
    496 U.S. 478 (1990) .......................................................................... 29, 30

*Texas v. United States*,
    809 F.3d 134 (5th Cir. 2015) ............................................................ 16, 17

*United States v. Shimer*,
    367 U.S. 374 (1961) ................................................................................ 52

*Vullo v. Office of the Comptroller of the Currency*,
    No. 17-cv-03574-NRB (S.D.N.Y.) ............................................... *passim*

*Warren v. Shook*,
    91 U.S. 704 (1875) ................................................................................. 41

*Watters v. Wachovia Bank, N.A.*,
    550 U.S. 1 (2007) ................................................................................... 53

*Weaver v. Federal Motor Carrier Safety Admin.*,
    744 F. 3d 142 (D.C. Cir. 2014) ............................................................. 23

*Whitman v. American Trucking Assns., Inc.*,
    531 U.S. 457 (2001) ............................................................................... 22

*Williams v. Taylor*,
    529 U.S. 420 (2000) ............................................................................... 30

**Statutes**

12 U.S.C. § 21 .................................................................................... 28, 31

12 U.S.C. § 22 .................................................................................... 37, 50

12 U.S.C. § 24 ................................................................... 31, 34, 37, 44

12 U.S.C. § 25b .................................................................................... *passim*

12 U.S.C. § 27 ............................................................................ 32, 37, 38

12 U.S.C. § 35 ............................................................................................ 31

12 U.S.C. § 36 .................................................................................... *passim*

12 U.S.C. § 43 .................................................................................... 54, 56

12 U.S.C. § 93a .................................................................................................... 27, 48

12 U.S.C. § 222 ................................................................................................ 31, 32, 33

12 U.S.C. § 378 ........................................................................................................ 34

12 U.S.C. § 484 ........................................................................................................ 3, 8

12 U.S.C. § 1813 ....................................................................................................... 33

12 U.S.C. § 1815 ............................................................................................... 31, 32, 33

12 U.S.C. § 1828 ....................................................................................................... 33

12 U.S.C. § 1841 ................................................................................................ 34, 35, 40

12 U.S.C. § 1842 ....................................................................................................... 34

12 U.S.C. § 1843 ................................................................................................... 34, 35

28 U.S.C. § 2401 ....................................................................................................... 22

S.A.F.E. Mortgage Licensing Act, Pub. L. 110–289, §1501 *et. seq.*, 122 Stat. 2810
(2008)(12 U.S.C. § 5101 *et. seq.*) ............................................................................. 52

## Other Authorities

12 C.F.R. 5.4 ............................................................................................................ 7

12 C.F.R. 5.20 ..................................................................................................... *passim*

12 C.F.R. 5.24 .......................................................................................................... 31

12 C.F.R. 303.14 ....................................................................................................... 31

12 C.F.R. 7.4000 ........................................................................................................ 3

12 C.F.R. 7.4007 ...................................................................................................... 3, 4

12 C.F.R. 7.4008 ................................................................................................... 3, 4, 56

*Economic Growth and Regulatory Paperwork Reduction Act: Hearing on S. 650
Before the S. Comm. on Banking*, 104th ................................................................... 33

Symons, Edward L. Jr., *The "Business of Banking" in Historical Perspective*, 51
Geo. Wash. L. Rev. 676, 718 (1983) ......................................................................... 35

# INTRODUCTION

The Conference of State Bank Supervisors ("CSBS"), the nationwide organization of state banking regulators in the United States, challenges the Office of Comptroller of the Currency's ("OCC") newly created special-purpose national bank charter for financial technology ("fintech") and other nonbank companies (the "Nonbank Charter Program"). OCC lacks the requisite statutory authority under the National Bank Act ("NBA") to encroach upon the regulation of nonbanks by issuing national bank charters to institutions that do not take deposits, and therefore do not engage in the "business of banking," as that term is defined under the NBA and related federal banking laws. OCC's actions allow chartered nonbanks to operate outside the bounds of existing state regulation, undermining the states' abilities to enforce their own laws and interfering with state sovereignty.

CSBS's challenge previously came before this Court in 2017.  *Conference of State Bank Supervisors v. Office of the Comptroller of the Currency*, No. 1:17-cv-0763-DLF ("*CSBS I*").  At that time OCC asserted that the lawsuit was premature because it had not yet determined whether it would implement the Nonbank Charter Program at all.  In parallel litigation brought by New York's state banking regulator, OCC conceded that the matter would be justiciable once OCC made a decision to begin offering nonbank charters and once "the doors are open" to applications--but assured the court that time had not yet come. Relying significantly upon this representation, the New York federal court dismissed that action.  This Court likewise relied on OCC's assertions and followed suit, dismissing CSBS's lawsuit on April 30, 2018.

Yet just three months later, OCC publicly announced its final decision to launch the Nonbank Charter Program and that its doors were open to charter applicants, publishing its final Licensing Manual Supplement.  Since that time, OCC has made significant progress toward granting nonbank charters.  The Comptroller has stated that he has had "hundreds" of meetings with interested companies, the application process is underway for "a number of institutions," and charter decisions

are expected no later than mid-2019.  OCC's own public records (submitted herewith) also show that OCC historically has approved charter applications at a very high rate and quite promptly. Taking all of this into account, and because the Nonbank Charter Program process allows for submission of "draft" applications for OCC's review and input, it is clear that OCC has already made significant progress toward vetting (and ultimately approving) nonbank charters.  Despite all this, OCC still contends that CSBS's legal challenge is premature. OCC's argument disregards its own actions and public statements, and overlooks the actual and imminent harm CSBS's members have asserted. Additionally, OCC cannot reasonably dispute that CSBS's claim for procedural injury (Count III) is ripe for consideration.  Nor can OCC plausibly assert that CSBS's claim related to the application of 12 C.F.R. 5.20(e)(1) is both *premature* and *untimely* at the same time--and in any event, a number of well-settled doctrines permit CSBS to challenge that regulation now.

As to the substance of CSBS's claims, resolution of the legal question before the Court goes beyond the National Bank Act ("NBA") and requires the interpretation of other federal banking statutes that OCC does not administer--including the Bank Holding Company Act ("BHCA"), Federal Deposit Insurance Act ("FDIA"), and the Federal Reserve Act ("FRA").  Thus, OCC is entitled to no *Chevron* deference here.  When all the traditional tools of statutory construction are taken into account, the proper interpretation of the "business of banking" is clear and unambiguous. The Court must consider the statutory context of the term, including a regulatory regime that encompasses each of the referenced federal banking statutes.  Read together, these statutes reflect Congress' intent that the "business of banking" necessarily requires that the chartered entity be "engaged in the business of receiving deposits" as defined in the FDIA.  Ultimately, OCC has the power to charter a national bank only if it is organized to carry on the "business of banking" (which, under current law, requires taking deposits, at a minimum) *or* where Congress has provided specific authorization to charter an entity to carry on a special purpose.  Neither scenario exists here.

Further, OCC's attempt to wrest control over nonbank financial services providers by administrative fiat also violates the Tenth Amendment. OCC cannot make the necessary "clear showing" that Congress has approved such a result. Finally, OCC's decision to preempt state law via its Nonbank Charter Program required a formal preemption determination procedure (including notice and comment) that was not followed. This defies Congress's very purpose in mandating this procedure, which was to prevent OCC from improperly preempting state regulation "to attract additional charters."

## **BACKGROUND**

CSBS's members have been successfully overseeing and regulating nonbank companies--including nonbank lenders, payment providers, and financial services companies--for more than a century. Compl. ¶¶ 42-50. Among other things, states generally require nondepository institutions to obtain a license to engage in regulated financial activities, impose product restrictions like limitations on interest rates and finance charges, and regulate business conduct through protections such as restrictions on customer communications and net worth requirements. *Id.* ¶¶ 42-45. Every state regulates nondepository financial activities, like mortgage lending, consumer lending, and money transmission. *Id.* ¶ 46; State Licensing/Regulatory Law Survey (Compl. Ex. D) (Doc. 1-4).

National banks chartered by OCC, however, are subject exclusively to the regulatory authority of the federal government, and state laws authorizing state bank regulators to apply state regulation to national banks and to otherwise supervise and examine national banks are expressly preempted. 12 U.S.C. § 484; 12 C.F.R. § 7.4000 (2018). Additionally, under the NBA "state consumer financial laws" that "prevent or significantly interfere" with a national bank's exercise of its powers are preempted. 12 U.S.C. § 25b. OCC regulations list categories of state laws it has determined are preempted under this standard--such as state laws governing loan terms, interest rates, advertising, and disclosure. 12 C.F.R. §§ 7.4007, 7.4008; 34.4 (2018). It is within this broad preemptive

framework that OCC created its Nonbank Charter Program and improperly extended OCC's regulatory reach into traditional areas of state concern--the regulation and supervision of nonbanks.

***The Creation of the Nonbank Charter Program and the States' Initial Lawsuits***

OCC began this unprecedented expansion of its chartering authority in earnest in 2016. Compl. ¶¶ 86-108. By December 2016, then-Comptroller Curry publicly announced that OCC had decided to create a new special-purpose charter for nonbank companies, commenting that OCC had the authority to do so as long as the company conducted "at least one of three core banking activities--receiving deposits, paying checks or lending money." *Id.* ¶¶ 91-92. By March 2017, OCC had published a "draft" supplement to the Comptroller's Licensing Manual, which explicitly stated that the new nonbank charter was intended for companies that do not take deposits. *Id.* ¶ 103. Recognizing that OCC had not responded to the numerous concerns raised about the Nonbank Charter Program and intended to move forward, CSBS initiated a lawsuit in this Court in April 2017, seeking declaratory and injunctive relief. *Id.* ¶ 109.

But in August 2017 OCC moved to dismiss CSBS's lawsuit, arguing that the suit was premature because OCC had not, in fact, made a final decision regarding whether it would actually exercise its newly claimed power. *Id.* ¶ 111. OCC moved to dismiss a similar lawsuit filed in the Southern District of New York by the Superintendent of the New York State Department of Financial Services on the same grounds. *Vullo v. Office of the Comptroller of the Currency*, No. 17-cv-03574-NRB (S.D.N.Y.). At oral argument on its motion, counsel for OCC conceded that OCC's arguments regarding prematurity would be significantly weakened when and if OCC made a final decision to move forward with the Nonbank Charter Program:

> THE COURT:  But as a matter of sensible policy as well as law, a policy from all perspectives -- the comptroller, DFS, potential applicants -- does it not moot the threshold argument if and when the OCC says that it has decided to proceed to accept applications from fintech companies for special purpose charters under 5.20?

4

In other words, once you make that final decision and you announce it, isn't that the point at which these standing and ripeness issues and final agency action issues come to an end, and come to an end sensibly? In other words, there is no benefit to having companies spend all sorts of money applying for these charters if, in fact, it turns out that a court says you don't have any right under the law to issue them. In a sense, what else do we need to know and aren't we sort of considering all of the relevant interests?

MR. CONNOLLY: Your Honor, you may well be right.

THE COURT: I am asking you to take a position, in the context of this case, as to at what point do these arguments that you have been making, which I think do have some currency, come to an end by virtue of what the comptroller decides to do?

MR. CONNOLLY: When OCC says -- and I suspect that it would be a two-part statement -- we have decided to issue 5.20(e)(1) charters to fintech companies and are accepting applications for them, in other words, **the decision is made and the process is commencing, at that point,** the standing arguments that the government has made and the final agency action arguments that the government has made would likely -- **we would likely be in a very different posture then**, your Honor. Then DFS would be able to make better arguments with respect to the harms.

* * *

THE COURT: Do you have any quibble with me that at the moment, if they ever decide to proceed, that that would be a ripe and appropriate time to get to the merits?

MR. CONNOLLY: I don't want to foreclose any arguments that the government might have, depending on what posture we are in, **but certainly if a decision is made to issue 5.20(e)(1) charters to non-depository fintech companies, and that decision is presumably going to come hand and glove with, the doors are open now to the acceptance of these applications, certainly then we are talking about a final decision being made and a process being in motion that DFS is certainly more plausibly going to be able to argue leads to imminent harm.**

*See* Transcript of Proceedings at 11-12, 22 ("*Vullo* Transcript") (emphasis added) (Ex. 1 hereto).

Relying upon OCC's representations that it had not yet decided to proceed with the Nonbank

Charter Program, and noting that the decision to pursue the program was "increasingly uncertain,"

the *Vullo* court dismissed the action. *Vullo*, 2017 U.S. Dist. LEXIS 205259 (S.D.N.Y. Dec. 12, 2017).

Consistent with the oral argument, the court emphasized that OCC's decision to offer Nonbank

Charters would be the turning point for standing and ripeness.  *Id*. at *21 (noting the state's "alleged

injuries will only become sufficiently imminent to confer standing once OCC makes a final

determination that it will issue SPNB charters to fintech companies"); *24 (finding claims to be unripe

5

"because they are 'contingent on future events that may never occur,' namely the decision by OCC to issue SPNB charters to fintech companies"); and *26 (claims "will be better resolved if and when plaintiff can point to a final decision by OCC to issue fintech charters.").

This Court favorably cited the *Vullo* decision when it reached a similar conclusion on April 30, 2018, dismissing CSBS's initial action without prejudice. *CSBS I*, 313 F. Supp. 3d 285, 296-98, 301, Doc. 19 (D.D.C. 2018). Within a mere three months, however, OCC announced it had begun accepting applications for Nonbank Charters. Compl. ⁋ 112; Ex. A (Doc. 1-1).

### *OCC's Decision to Accept Nonbank Charter Applications and the Rapid Progression of the Nonbank Charter Program*

The same day OCC announced its decision to offer Nonbank Charters, the Comptroller issued a Policy Statement, reiterating OCC's belief that 12 C.F.R. 5.20 permits it to issue Nonbank Charters to an entity that performs any one of the three OCC-described "core banking functions." Compl. ⁋ 114; Ex. B (Doc. 1-2). The Policy Statement also made clear that OCC "is open and receptive to charter applications from qualified fintech companies." *Id*. That day OCC also published a final Comptroller's Licensing Manual Supplement, which outlined the eligibility criteria, application process, OCC's considerations when evaluating applicants, the requirements for the charter holder, and OCC's approach to supervising chartered nonbank entities. Compl. ⁋⁋ 115-16; Ex. C (Doc. 1-3).

In the ensuing months, the Comptroller made numerous public statements stressing that OCC believed both applications and charter decisions were imminent. *See*, *e.g.*, Comptroller Otting Sept. 2018 article in *American Banker* (Ex. I; Doc. 1-9) ("interest in the charter remains robust, and we expect multiple applications by the end of the year"); Comptroller Otting October 2018 article in *Politico* (Ex. J; Doc. 1-10) (OCC in active discussions with "a number of highly interested institutions" and will receive applications by the end of the year, with charter decisions expected shortly thereafter, no later than mid-year 2019).

Even after CSBS initiated the instant lawsuit in late October 2018, OCC continued to publicly emphasize its rapid progress with the Nonbank Charter Program. For example, during a fintech event in November 2018, Comptroller Otting stated that a "number of institutions are currently going through the application process, and the agency expects to receive its first application by the end of [2018] or early next year." *See* "Fintechs interested in OCC charter despite lawsuits: Otting," *American Banker*, Nov. 7, 2018 (Ex. 2 hereto). On January 16, 2019, Otting noted the "hundreds of meetings" he, as the agency head, has had with fintechs interested in the Nonbank Charter, and that "most of these entities that today would apply to be a bank, many of them are operating today as a state-chartered or state-licensed lender . . ." *See* "Fed not an impediment to fintechs' charter ambitions: OCC's Otting" in *American Banker*, Jan. 16, 2019 (Ex. 3). Otting also stated that a number of fintech companies were finalizing their applications. *See* "Fintech Charter Seekers Shouldn't Fret About Fed Access: Otting," in *Bloomberg Law*, Jan 16, 2019 (Ex. 4).[1]

The Comptroller's description of "hundreds of meetings" with potential Nonbank Charter applicants is consistent with the extensive pre-filing vetting OCC undertakes prior to the formal submission of a charter application. As OCC's Licensing Manual Supplement explains, the application process begins with a "prefiling phase" that includes initial discussions with OCC's Office of Innovation and further discussions with OCC Staff and the Licensing Department. *See* Compl. Ex C at 3-4. If "the company decides to pursue a charter," Licensing will hold additional meetings and may determine that a "draft application" should be submitted prior to the formal application. *Id*.

Although the submission of a draft application does not guarantee final approval, OCC's regulations provide that submission of draft materials may expedite the filing review process. 12 C.F.R. 5.4(f). OCC uses this draft application process to obtain information from the applicant and

---

[1] Although OCC's motion seeks to delay resolution of the merits of this litigation, Otting has stated that OCC is working to resolve CSBS's lawsuit "as soon as possible." (Ex. 3, 4)

ensure the formal application is complete and merits approval.  Licensing Manual Supplement (Ex. C) at 3-4.  Notably, although OCC has attested that "no application for an SPNB Charter has been filed with the OCC" (Lybarger Decl. ⁋ 6), OCC is silent as to the status of any *draft* applications, or the ongoing vetting of upcoming applications.  Given the Comptroller's public references to "hundreds" of meetings and the imminent submission of final charter applications, OCC's vetting process is well underway.  Troublingly, OCC has no obligation provide notice of any draft applications or the status of anticipated formal applications.

Equally concerning, the corporate entity that receives the national bank charter is formed at or before the time of application, and OCC has asserted that the preemptive effect of the national bank charter is applied *retroactively* to that entity's conduct from the moment of its creation and thus *prior to* receiving the charter.  More specifically, a national bank is formed when its organizers file articles of association and a certificate of organization with OCC--a step that can predate preliminary approval and, if the draft application process is used, can even occur at the same time that the application is filed.  *See* 12 U.S.C. §§ 21, 22, and 24; Comptroller's Licensing Manual: Charters at pp. 3, 28 (Ex. 5).  National banks are exempted from state visitorial authority (12 U.S.C. § 484) and certain state laws (12 U.S.C. § 25b(b)), and the OCC has recently asserted that this preemption is triggered with the formation of the legal entity and applies even to activities occurring *before* the company became a national bank.  *See*, *Amicus Curiae* brief of OCC at pp. 24-25 (Doc. 35-1), submitted in *Bank of Tokyo Mitsubishi*, No. 1:17-cv-08691-SHS (Ex. 6).  OCC disregards this significant consequence.

OCC also downplays the significance of any pre-charter-approval activities, asserting that a preliminarily approved applicant has up to 18 months to commence business, and that preliminary approval of an application is no guarantee of final approval.  *See* Lybarger Dec. ⁋⁋ 17-18.  This may be true, but the Comptroller himself has publicly stated that approval of a Nonbank Charter is likely by the middle of 2019, reflecting an approval process that is well underway.  Moreover, empirical

8

data for charter applications received since January 1, 1991 (retrieved from OCC's publicly available Corporate Application Search Tool ("CAST")) tell a very different story.  *See* Declaration of M. Townsley and CAST data (Ex. 7 and 7A).  The time from preliminary charter approval to final approval averages a mere 111 days.  Townsley Dec. ¶ 6.  In one recent noteworthy case, OCC permitted a state-licensed branch of a Japanese bank to convert to a federal branch a mere *eight days* after its application--and while the branch was subject to multiple state enforcement actions.  *See* "MUFG draws Senate scrutiny for its switch to OCC" in *American Banker*, April 26, 2018 (Ex. 8).[2]

Additionally, OCC approves applications at a very high rate: about 87% of applications since January 1, 1991 have received preliminary approval, and approximately 93% of preliminarily approved applicants received final approval.  Townsley Dec. ¶ 7.  The number of applications denied by OCC (as opposed to abandoned or withdrawn) is *de minimis*-- roughly 1%. *Id*.  Indeed, in the last 11 years, OCC has denied only *one* national bank charter application. OCC Corporate Decision #2008-10 (Dec. 2008) (available at https://www.occ.gov/topics/licensing/interpretations-and-actions/2008/cd08-10.pdf). For Nonbank Charter applicants, the timing of approval is likely to be even swifter, and the likelihood of final approval even greater, because no approval from the FDIC or Federal Reserve is required.

***The Nonbank Charter Program's Harm to the States***

The Nonbank Charter program extends to charter recipients the same laws and regulations that apply to national banks, including the federal laws affording preemption and rendering state licensure and consumer financial laws inapplicable.  Compl. ¶ 138.  In announcing its final decision to establish the Nonbank Charter Program, OCC made clear that the Nonbank Charter is an option that would vitiate the necessity of pursuing state licensure. *Id*. ¶ 139. The preemptive effect of the Nonbank

---

[2] After its federal branch license was granted, the Japanese bank sued a state regulator to prevent the continued application of existing state enforcement actions.  Complaint, *Bank of Tokyo Mitsubishi UFJ (BTMU) v. Vullo*; No. 1:17-cv-08691-SHS (S.D.N.Y. Nov. 8, 2017).

Charter Program occurs regardless of the nature, size or location of the charter holder's business. *Id*. Regardless of whether the program applies to "fintechs" or other types of companies, interference with state regulatory authority is inevitable because an institution must engage in lending or transmitting money to be eligible for the Nonbank Charter, all states license and regulate the activities of lending and transmitting money, and OCC has asserted that the application of state regulatory authority to Nonbank Charter holders is preempted. *Id*. ⁋ 140.

OCC's actions impede all 50 states' ability to continue regulating of financial services companies within their borders and to enforce state laws designed to protect the public and ensure the safety and soundness of nondepository companies--as described in the survey of affected state laws submitted with CSBS's Complaint. *Id*. ⁋ 142; Ex. D (Doc. 1-4). This also creates difficulties for the states in detecting unlicensed activity within their borders. *Id*. Similarly, companies facing or at risk of state enforcement actions escape state enforcement authority by obtaining a national charter, as occurred in the case of the Japanese bank referenced above.

And as noted above, OCC has asserted that preemption can occur as soon as the entity seeking a charter is formed and may be applied retroactively to conduct that occurred even *before* a national bank charter is granted. Based on OCC's own position, interference with the regulatory operations of CSBS's members has already begun to materialize even before a formal application has been submitted. Additionally, since OCC began its campaign to redefine what it means to be a bank under federal law, confusion has arisen as to the meaning of banking under state regulatory and criminal laws prohibiting persons from referring to themselves as "banks" without a bank charter. *Id*. ⁋ 143. The Nonbank Charter Program also poses challenges for CSBS's members in allocating resources for examination and enforcement, given the risk that companies may seek to escape state jurisdiction by obtaining a Nonbank Charter. *Id*.

## LAW AND ARGUMENT

**I.      CSBS's PROCEDURAL INJURY CLAIM (COUNT III) IS IRREFUTABLY RIPE.**

There can be no question that CSBS has standing to assert its claim for procedural injury. Count III alleges deprivation of procedural protections under both the preemption determination provisions of 12 U.S.C. § 25b(g) and the APA. "Standing for a procedural injury is special . . . because a person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy." *Ark Initiative v. Tidwell*, 895 F. Supp. 2d 230, 239 (D.D.C. 2012).

**II.     CSBS'S STATE MEMBERS HAVE SUFFICIENTLY ALLEGED STANDING, AND OCC'S ACTIONS SINCE THE COURT'S PRIOR RULING ESTABLISH THAT THE REMAINING COUNTS ARE RIPE FOR REVIEW.**

**A.      OCC's claim preclusion argument is meritless in light of its decision to issue Nonbank Charters and its extensive activities toward issuing such charters.**

OCC argues that claim preclusion bars relitigation of justiciability because its July 2018 decision to grant Nonbank Charters does not satisfy the "curable defect exception" to issue preclusion. *See* Defendant's Memorandum of Points and Authorities (Doc. 12-1) ("OCC Brief") at 8-9. But that exception, which "allows relitigation of jurisdictional dismissals when a material occurrence subsequent to the original dismissal remedies the original deficiency," is clearly met here. *Scahill v. District of Columbia*, 909 F.3d 1177, 1182 (D.C. Cir. 2018).

At the time of the Court's first decision, OCC had avowed uncertainty as to whether it would move forward with the Nonbank Charter Program. *CSBS I*, 315 F. Supp. 3d at 301. OCC asserted it was "incontrovertible that the OCC ha[d] not decided whether it would move forward with the Nonbank Charter Program at all."[3]  This was a key factor in the Court's decision. *Id*. ("it is particularly speculative to guess whether the OCC will continue down [this] path[]").

---

[3] *See* Reply in Support of Defendant's Motion to Dismiss at p. 14, filed in *CSBS I* (Doc. 15).

But just three months later, OCC issued its written decision that it had begun accepting Nonbank Charter applications, accompanied by both a formal Policy Statement, and a Supplement to Comptroller's Licensing Manual detailing supervision, capital, liquidity, and other specifics for applicants. *See* Compl. Ex. A, B and C. Since then, OCC has made numerous public statements emphasizing the imminence of applications and charter grants--for example, that OCC "expects to receive its first application by the end of [2018] or early next year." *See* Ex. 2. The Comptroller has also touted his "hundreds of meetings" he has had with interested applicants and has stated that a "number of institutions" are currently going through the application process--in the case of Nonbank Charters, this includes the option of submitting *draft* applications that allow for OCC input and vetting even before formal applications are submitted. Ex. 2, 3; Compl. Ex. C.

OCC's final decision to accept applications, its announcements regarding the imminence of applications and charters, and the extensive steps OCC has already taken to vet applicants, are clearly "material occurrence[s]" that remedy any prior justiciablity deficiencies. Indeed, in *Vullo*, upon which this Court previously relied, OCC's counsel conceded that "we would likely be in a very different posture" once OCC decides to accept applications, and the court held that the OCC's decision to accept applications would be the "trigger point" for standing and ripeness. *See* Ex. 1 at 11-12, 22; *Vullo*, 2017 U.S. Dist. LEXIS 205259 at *21, 24-26. Thus, by OCC's own admission, the events that have occurred since the Court's prior ruling support the curable defect exception.

**B.     CSBS establishes standing based on its actual and imminent harm.**

To establish standing, CSBS must demonstrate either (1) actual injury, (2) a "certainly impending" injury, or (3) "substantial risk" of such an injury. *All Am. Tel. Co. v. FCC*, 867 F.3d 81, 93 (D.C. Cir. 2017). Here, CSBS meets all three tests, based upon the harm to CSBS's member states

that has already occurred, and the undisputed additional harm that will occur imminently.[4]   Indeed, as shown below, CSBS makes a particularly strong showing, even though this is just "the pleading stage, where plaintiffs are required only to state a *plausible* claim that each of the standing elements is present." *Attias v. Carefirst, Inc.*, 865 F. 3d 620, 625 (D.C. Cir. 2017).

First, CSBS has sufficiently alleged actual harm.  This Court previously acknowledged that "regulatory interference with a state is indeed a concrete and particularized injury." *CSBS I*, 313 F. Supp. 3d at 296.  This regulatory interference has already begun. Because of OCC's position regarding the timing and retroactive application of preemption, it must also concede that CSBS's members have already lost regulatory authority over applicants that have formed the corporate entity that will apply for a charter (*supra* pp. 8-10). States are also already grappling with the confusion OCC has created regarding the application of state laws restricting the use of the term "bank" (Compl. ¶ 143) and are facing budgetary and resource allocation complications because state-regulated entities are now able to convert to federally chartered nonbanks with no advance notice (*Id.*).

Second, even if actual injury were not yet established, the current facts meet the "certainly impending" test which, to be clear, "does not mean that the injury must be *certain* to occur." *Peterson v. Transp. Workers Union of Am.*, 75 F. Supp. 3d 131, 136 (D.D.C. 2014) (citing *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1150 n.5 (2013)).  The Court has already determined that there will be actual injury the moment OCC grants a charter.  *CSBS I*, 313 F. Supp. 3d at 298.  Now, in light of OCC's unequivocal decision to issue charters, its public statements stressing the imminence of an

---

[4] CSBS has associational standing because (1) at least one of its members has standing to sue; (2) the interests it seeks to protect are germane to its purpose; and (3) neither the claim asserted nor the relief requested requires the participation of an individual member. *See American Library Ass'n v. FCC*, 401 F.3d 489, 492 (D.C. Cir. 2005).  OCC does not challenge CSBS's satisfaction of the second and third prongs, nor could it.  *See CSBS v. Lord*, 532 F. Supp. 694, 695-96 (D.D.C. 1982), *aff'd CSBS v. Conover*, 710 F.2d 878, 881 n.3 (D.C. Cir. 1983).

actual charter, and the extensive steps it has taken toward vetting and chartering applicants, CSBS establishes sufficient threat of future injury to satisfy this test.

In *Vullo,* which this Court referenced in its Opinion (*Id.* at 293-301), the court held that the state's injuries would become "sufficiently imminent to confer standing once the OCC makes a final determination that it will issue SPNB charters to fintech companies." *Vullo,* 2017 U.S. Dist. LEXIS 205259 at *21.  OCC made that final determination on July 31, 2018, and the finality of that decision is undisputed--nowhere in OCC's brief, declaration, or supporting documents is there any suggestion that OCC might reverse course.  Indeed, this final determination meets *OCC's own standard for injury* expressed in the *Vullo* litigation.  Counsel for the OCC, when pressed to identify the trigger point for jusiticability, conceded that harm would be imminent upon a final decision to move forward with the Nonbank Charter Program and open the door to applications.  Ex. 1 at 11-12, 22.  The court in *Vullo* relied upon this for its holding, and this Court should not allow OCC to argue otherwise now.  OCC is well past this "final determination," in any event, for all of the reasons noted above (including "hundreds of meetings" with potential applicants and OCC's expectation that a charter will be issued in "the first quarter of 2019.")

Further, two recent decisions, *Scahill*, 909 F.3d at 1182 , and *New York v. U.S. Department of Commerce*, 2019 U.S. Dist. LEXIS 6954, *188-91 (S.D.N.Y. Jan. 15, 2019), confirm that actual issuance of a charter is unnecessary for injury.  These two decisions both rest on *Davis v. Fed. Electron Comm'n,* 554 U.S. 724 (2008), which held that a political candidate had standing to challenge campaign contribution limits based on prospective risks of harm.  As the D.C. Circuit put it, "*Davis* . . . held that Article III injury is satisfied at the outset of the litigation even if the anticipated injury fails to come to fruition." *Scahill*, 909 F.3d at 1182.  The Southern District of New York elaborated that *Davis* "yields three insights":

> First, [*Davis*] establishes that . . . Article III is concerned with the risk of future injury, rather than its ultimate realization . . . Second, [*Davis*] makes plain that the risk of future

injury may satisfy Article III's injury and causation requirements **even if several steps on the causal chain still stand between a defendant's conduct and the plaintiff's injury when the case is filed** . . . Third . . . a party can establish standing to challenge government action **even where its theory of injury depends on choices made by independent actors not before the courts**, so long as—through statistical analysis, common sense, or record evidence—the court can "predict" that those independent actors will respond to the government action in a way that causes the injury.

*New York,* 2019 U.S. Dist. LEXIS 6954 at*189-91 (emphasis added).  This reasoning makes clear that the existence of remaining mechanical steps to actually grant a fintech charter does not defeat the "certainly impending" showing.  Moreover, as a practical matter, it would be inappropriate to treat each step that must occur before a charter is issued as linear, successive events that occur in isolation from one another.  Given the availability of the OCC's pre-filing meetings and draft application process, and the extensive feedback and vetting that these entail, it is clear that activities toward application, review and approval occur simultaneously and on an overlapping basis.

Finally, CSBS also meets the "substantial risk" test.  OCC argues this test requires "costs incurred by a plaintiff" or "efforts" to mitigate or avoid future harm (OCC Brief at 11), but that is incorrect.  The D.C. Circuit has repeatedly recognized "substantial risk" without reference to these purported requirements.  *See, e.g., All Am. Tel. Co. v. FCC*, 867 F.3d 81, 93 (D.C. Cir. 2017), *Attias*, 865 F. 3d at 626-29;[5].  *Nat'l Ass'n of Broadcasters v. FCC*, 789 F.3d 165, 180-82 (D.C. Cir. 2015); *Sierra Club v. Jewell*, 764 F. 3d 1, 7-8 (D.C. Cir. 2014); *see also Frank LLP v. Consumer Fin. Prot. Bureau,* 288 F. Supp. 3d 46, 57-59 (D.D.C. 2017).

OCC also argues that CSBS cannot show a "substantial risk" because "third-party applicants [must] submit successful applications." OCC Brief at 11.  OCC publicly boasts, however, that applications are imminent and a successful charter will be granted shortly.  And as explained in *New York*, courts have found "substantial risk" relying on evidence to "predict" how third parties will likely

---

[5]  In *Attias*, the Court held that plaintiffs' mitigation costs established *redressability*--not injury. 865 F. 3d at 629.  The court's separate analysis of "substantial risk" never references those costs.  *Id*. at 626-629.

respond to government action. *New York,* 2019 U.S. Dist. LEXIS 6954, *29-32; *Kravitz v. United States*, 336 F. Supp. 3d 545, 558-59 (D. Md. 2018) ("substantial risk" established in challenge to census citizenship question because plaintiffs "have sufficiently alleged" the inefficacy of measures designed to rectify potential self-report undercount, although discovery and testimony could later show otherwise).[6]

Here, the Court need hardly make a "prediction"-- OCC's July 31 Announcement and its subsequent public statements reflect OCC's own expectation that nonbank companies will apply for the charter, and that OCC will grant them. Nothing in OCC's brief or declaration is to the contrary, and this is dispositive. *See, e.g., Sierra Club*, 764 F.3d at 7-8 (holding that mining companies' own statements "assert[ing] an expectation that they would mine in the [historic Battlefield site] . . . coupled with their conduct of mining operations close to the Battlefield . . . suffices to establish a substantial probability of mining in the Battlefield," and hence, a "substantial probability of injury"); *Frank LLP v. Consumer Fin. Prot. Bureau,* 288 F. Supp. 3d 46, 59 (D.D.C. 2017)(plaintiff established "substantial risk" to challenge agency's FOIA exemption policy because of averments that he and the agency "have discussed the possibility" of his filing new FOIA requests that he expects would trigger the exemption and because of plaintiff's "line of work" generally).

Additionally, this Court must give consideration to the status of CSBS's members as sovereign states. Although factually distinguishable, *Massachusetts v. EPA*, 549 U.S. 497, 518-520 (2007), recognizes that states "are not normal litigants for the purposes of invoking federal jurisdiction" and "are entitled to special solicitude in [the] standing analysis," including the analysis of both "actual"

---

[6] *See also Texas v. United States*, 809 F.3d 134, 155 (5th Cir. 2015), *aff'd by an equally divided Court,* 136 S. Ct. 2271 (2016) *(per curiam)* (State had standing because it "would incur significant costs in issuing driver's licenses to DAPA beneficiaries," as there was "little doubt that many would do so."); *Pennsylvania v. Trump*, 2019 U.S. Dist. LEXIS 6161, *25 (E.D. Pa. Jan. 14, 2019)(future injury established, reasoning that " although . . . the States have not yet identified a woman resident who has lost contraceptive coverage . . . the States need not sit idly by and wait for fiscal harm to befall them.).

and "imminent" injury. *See Public Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*, 489 F.3d 1279, 1294 n. 2.  (D.C. Cir. 2007).  *See also, e.g., Texas,* 809 F.3d at 154-155; *Pennsylvania v. Trump*, 2019 U.S. Dist. LEXIS 6161, *20-25 (E.D. Pa. Jan. 14, 2019).[7]

### C.   This Dispute is Presumptively Ripe for Judicial Review, and OCC Has Not Overcome That Presumption.

Notwithstanding its concessions in *Vullo*, its final decision in July 2018 to begin offering Nonbank Charters, the Comptroller's public announcement of imminent charters, and the steps it has already taken to charter nonbanks, OCC argues that "this matter remains constitutionally unripe because CSBS does not face a sufficiently 'imminent' injury in fact …. [and] remains prudentially unripe because the OCC has not finalized its decision to issue an SPNB Charter to a particular applicant." OCC Br. at 11-12.  This contention is meritless. First, constitutional ripeness is "subsumed by" standing's injury-in-fact requirement and is thus established for all the reasons discussed in Section II(B) above. *Am. Petroleum Inst. v. EPA*, 683 F.3d 382, 386 (D.C. Cir. 2012).

As for prudential ripeness, the continued validity of this doctrine is in question, as this Court has previously observed.  *CSBS I*, 313 F. Supp. 3d at 299-300 (noting that "[t]he prudential ripeness doctrine is indeed in tension with the 'virtual unflagging' obligation of a federal court to hear cases within its jurisdiction") (*quoting Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1386 (2014)).  Nevertheless, to the extent the Court proceeds to consider prudential ripeness, it evaluates (1) the fitness of the issue for decision, and (2) the hardship to the parties of withholding court consideration. *Ciba-Geigy Corp. v. EPA*, 801 F.2d 430, 434 (DC Cir. 1986).

The fitness prong "depends on whether [the issue] is purely legal, whether consideration of the issue would benefit from a more concrete setting, and whether the agency's action is sufficiently final." *Am. Petroleum,* 683 F. 3d at 387 (quotation omitted).  CSBS establishes each of these.  First,

---

[7] With injury-in-fact established, the remaining elements of standing—causation and redress—follow. Indeed, Defendants do not substantively argue to the contrary.  *See* OCC Brief at 9.

the "purely legal" nature of the issue before the Court was effectively conceded in the first line of OCC's brief.  *See* OCC Brief at 1 ("The essential legal question raised . . . presents a narrow issue of statutory construction"); *see also Id*. at 11-13.   This matter therefore is *presumptively* ripe: "a purely legal claim in the context of a facial challenge . . . is presumptively reviewable," especially where it is a claim "that an agency's action is arbitrary and capricious or contrary to law." *Cement Kiln Recycling Coal. v. EPA*, 493 F.3d 207, 215 (D.C. Cir. 2007) (quotation omitted). OCC cannot overcome this presumption of reviewability.

Moreover, a more concrete setting is unnecessary.  Because a purely legal question is at issue, and eligibility for the charter is designed in a manner that is incapable of being lawful, the specifics regarding the applicant or charter recipient will not affect the merits of this case.  And given the nationwide breadth of CSBS's membership and the national privileges afforded to a Nonbank Charter recipient, one of CSBS's state members will be injured, regardless of the identity or location of charter applicants.  "[T]he doors are open now to the acceptance of these applications," as OCC counsel put it (Ex. 1 at 22), which alleviates a key concern in this Court's prior decision--that it is "particularly speculative to guess whether the OCC will continue down paths considered by a previous Comptroller." *CSBS I*, 313 F. Supp. 3d at 301.   Finally, it is undisputed that the Nonbank Charter Program is final--nowhere does the OCC suggest that it might change course.

The hardship prong, "absent institutional interests favoring postponement of review," does *not* require a petitioner to "show that delay would impose individual hardship to show ripeness." *Sabre, Inc. v. DOT*, 429 F.3d 1113, 1119-20 (D.C. Cir. 2005).  The OCC previously argued, and the Court agreed, that this carried less weight "when considered against the hardship to the OCC if each minor step towards a potential agency policy were litigated one-by-one as the policy becomes more settled." *CSBS I*, 313 F. Supp. 3d at 301.  But now that the OCC has confirmed the Nonbank Charter Program, the "agency policy" of chartering fintechs is settled, and there is no longer the specter of minor step-

by-step litigation as potential policy develops. To the contrary, resolution of this litigation on the

merits would reduce the risk of future litigation on the same issues. And any unsettled policy issues

(*e.g.*, capital liquidity, financial inclusion requirements) are not material to CSBS's challenge.

Regardless, CSBS clearly establishes current hardship. OCC effectively concedes the harm

resulting from delayed resolution of this matter, acknowledging "that an authoritative resolution of

this question would benefit the parties and the banking industry as a whole." OCC Brief at 1. The

harm to charter applicants is undisputable--as the *Vullo* court noted during argument "there is no

benefit to having companies spend all sorts of money applying for these charters if, in fact, it turns

out that a court says you don't have any right under the law to issue them." Ex. 1 at 11. Additionally,

the Complaint alleges current harm being suffered by CSBS's member states, as detailed above (*see*

pp. 13-19). The Court must treat these "factual allegations as true and afford the plaintiff the benefit

of all inferences that can be derived from the facts alleged." *Jeong Seon Han v. Lynch*, 223 F. Supp.

3d 95, 103 (D.D.C. 2016) (internal quotation omitted).[8]

### D.     Alternatively, Before Ruling on OCC's 12(b)(1) Motion, CSBS is Entitled to Jurisdictional Discovery and Amendment of its Complaint.

In the event that this Court concludes that CSBS has not already sufficiently established

subject matter jurisdiction, it should permit CSBS to take jurisdictional discovery. As set forth more

fully in the accompanying Motion For Leave to Take Jurisdictional Discovery, courts regularly permit

plaintiffs the opportunity to take discovery in APA cases to develop the record on standing, and this

Circuit's standard for permitting jurisdictional discovery is "quite liberal." *See*, *e.g.*, *Long Term Care*

*Pharm. Alliance v. Leavitt*, 530 F. Supp. 2d 173, 180 (D.D.C. 2008). Jurisdictional discovery will

---

[8] The Court should consider any "intervening change in circumstances" occurring between the filing of the Complaint and the time of the Court's review. *Casden v. Burns*, 306 Fed. Appx. 966, 972-73 (6th Cir. Jan. 16, 2009). Thus, if necessary, this Court should allow CSBS to allege new curative facts, rather than dismissing the action and making CSBS "go through the unnecessary hassle and expense of filing a new lawsuit when events subsequent to filing the original complaint have fixed the jurisdictional problem." *See Scahill, 909 F.3d at* 1183-84; *Calderon v. Berryhill*, 2019 U.S. Dist. LEXIS 759 (D.D.C. Jan. 3, 2019).

enable CSBS to bolster its showing of jurisdiction, by establishing the status of Nonbank Charter applications and draft applications, the extent of OCC's vetting of applicants thus far, and the imminence of formal applications and approvals. This is particularly appropriate given the D.C. Circuit's recent instruction to permit amendment of the complaint to add jurisdictional facts arising after the original complaint, in lieu of dismissal (*Scahill*, 909 F.3d at 1182-1184) and so the Court can consider "intervening change in circumstances" when evaluating ripeness, as explained *supra*, n. 8.

## III.  OCC'S NONBANK CHARTER PROGRAM IS FINAL AGENCY ACTION FOR PURPOSES OF COUNT IV.

OCC seeks to dismiss Count IV, arguing that the Nonbank Charter Program[9] does not amount to final agency action for APA purposes. Once again, OCC's argument belies its concession in *Vullo*. Ex. 1 at 11-12, 22 (conceding that once OCC has "decided to issue charters and we are accepting applications for them, at that point . . . the final agency actions arguments that the government has made would likely -- we would likely be in a very different posture then"). Thus, by the OCC's own admission, OCC's decision to issue charters and accept applications is final agency action.

Nevertheless, OCC now argues that "neither *Bennett* requirement has been satisfied," and there is no final agency action until the OCC has issued an actual charter. See OCC Br. at 14.  Under *Bennett*, an action is final if it (1) "mark[s] the consummation of the agency's decision-making process—it must not be of a merely tentative or interlocutory nature;" and (2) "be one by which rights or obligations have been determined, or from which legal consequences will flow." *Id*. OCC's position is meritless.

---

[9] OCC's argument that "the true target for CSBS's challenge is not the July 31 Announcement, but rather its interpretative core… 12 C.F.R. § 5.20(e)(1)" (OCC Br. at 13) belies the Complaint's clear challenge to the Nonbank Charter Program, which the OCC definitively announced in July 2018. See Compl. ¶¶ 7-12, 163.  OCC does not (and cannot) argue that promulgation of the underlying regulation, 5.20(e)(1), was non-final agency action. To the extent OCC contends that any challenge to that regulation is time-barred, see Section III *infra*.

Now that OCC has officially begun its Nonbank Charter Program, it cannot reasonably deny that the first prong of the *Bennett* test is satisfied.  Indeed, the agency has been unequivocal that it has "made up its mind." *See*, *e.g.*, *Friedman v. FAA,* 841 F. 3d 537, 543 (D.C. Cir. 2016). OCC does not suggest that its underlying decision is "tentative, open to further consideration, or conditional on future agency action." *See City of Dania Beach, Fla. v. FAA*, 485 F. 3d 1181, 1188 (D.C. Cir. 2007).

Nor is there merit to OCC's argument that the second *Bennett* prong is unsatisfied because its Nonbank Charter Program is merely a "statement of general policy of the OCC's readiness to accept charter applications" that "does not control the outcome of any chartering process," and that there is no final agency action until OCC has issued an actual charter.  OCC Brief at 14.  This argument ignores the necessarily "pragmatic and flexible nature of the [finality] inquiry as a whole." *Rhea Lana, Inc. v. Dept. of Labor*, 824 F. 3d 1023, 1027 (D.C. Cir. 2016)(internal quotations omitted).

Viewed in this light, the Nonbank Charter Program is not just a "general policy" or "guidance," but OCC's authoritative determination that engaging in the "business of banking" (and consequently, eligibility for a national bank charter) does not require taking deposits, and its creation of a completely new category of national bank charters.  This is a definitive legal position from which "rights . . . have been determined" and "legal consequences . . . flow."  For example, in legal disputes implicating the issue of what it means to be a "bank" or engaged in the "business of banking" under state regulatory or criminal laws, the Nonbank Charter Program is the OCC's authoritative determination with legal force.  *See generally*, Compl. ¶ 143.

In light of the "pragmatic" approach the Court must take, this is not a case for dismissal to "let the administrative gears keep grinding." *See Empire Health Found. v. Burwell*, 209 F. Supp. 3d 261, 263 (D.D.C. 2016).  CSBS's challenge is to OCC's statutory authority.  The creation of the Nonbank Charter Program *is* OCC's definitive, final statement of that authority.  That OCC has not yet issued an actual Fintech charter misses the point, because OCC has made the final decision to exercise its

purported statutory authority.  As the Supreme Court explained, "The bite in the phrase 'final action' is not in the word 'action'. . . . It is rather in the word 'final,' which requires that the action under review 'mark the consummation of the agency's decision making process.'"  *Whitman v. American Trucking Assns., Inc.*, 531 U.S. 457, 478 (2001)(citations omitted).[10]

## IV.    CSBS'S CHALLENGE TO SECTION 5.20(e)(1) IS TIMELY.

OCC argues that CSBS's challenge to Section 5.20(e)(1) is time-barred by the six-year statute of limitations found in 28 U.S.C. § 2401(a). As a threshold matter, OCC's fundamental premise for this argument—that Section 2401(a) "'is a jurisdictional condition' that "must be strictly construed'" (OCC Brief at 15-16)(quoting *Spannaus v. U.S. Dept. of Justice*, 824 F.2d 52, 55 (D.C. Cir. 1987))— has been rejected or questioned by the D.C. Circuit, including as recently as July 2017. *See, e.g.*, *Owens v. Sudan*, No. 14-5105, 2017 U.S. App. LEXIS 13695 at *112 (D.C. Cir. July 28, 2017); *Mendoza v. Perez*, 754 F. 3d 1002, 1018 n.11 (D.C. Cir. 2014); *see also Olson v. U.S.*, 953 F. Supp. 2d 223, 232 (D.D.C. 2013). OCC is incorrect in its assertion that the statute of limitations must be "strictly construed," and several well-established exceptions apply.

### A.    CSBS's Challenge is Not Time-Barred Because the Nonbank Charter Program Necessarily Relies upon Section 5.20(e)(1) for its Legal Validity.

The D.C. Circuit has long recognized an "application exception," enabling courts to entertain otherwise stale challenges to an agency's authority to promulgate a regulation if accompanied by a timely challenge to the regulation's application. *See, e.g.*, *Adamski v. McHugh*, 2015 U.S. Dist. LEXIS 99980, *15-17 (D.D.C. July 31, 2015)("'limiting the right of review of the underlying rule would effectively deny many parties ultimately affected by a rule an opportunity to question its validity.'")(quoting *Functional Music, Inc. v. FCC*, 274 F.2d 543, 546 (D.C. Cir. 1958)); *see also,*

---

[10] OCC also argues Count IV should be dismissed because its Nonbank Charter decision does "not require notice-and-comment rulemaking" (OCC Brief at 14-15), but Count IV does not allege deprivation of notice-and-comment procedures.

*NLRB Union v. FLRA*, 834 F.2d 191, 196 (D.C. Cir. 1987).   The D.C. Circuit takes a broad view of this exception. *See, e.g., Weaver v. Federal Motor Carrier Safety Admin.*, 744 F. 3d 142, 145 (D.C. Cir. 2014). The exception can apply where a plaintiff challenges the statutory authority underlying an agency decision outside the limitations period. *Natural Resources Defense Council v. Environmental Protection Agency*, 513 F.3d 257, 260 (D.C. Cir. 2008).

This approach is consistent with the well-established D.C. Circuit doctrine "that to the extent that an agency's action 'necessarily raises' the question of whether an earlier action was lawful, review of the earlier action for lawfulness is not time-barred." *Public Citizen v. Nuclear Regulatory Com.*, 901 F.2d 147, 151-152 (D.C. Cir. 1990)(quotation omitted); *see also, National Ass'n of Greeting Card Pub. v. USPS*, 607 F.2d 392, 425 n.59 (D.C. Cir. 1979)(court may examine "prior agency action on which the validity of the later agency action under review depends").

**B.     Because OCC Revisited Section 5.20(e)(1) Within the Statutory Period, CSBS's Claims Are Timely Under the "Reopening" Doctrine.**

CSBS's challenge to Section 5.20(e)(1) is also timely under the "reopening" doctrine. This "well established" exception "arises where an agency conducts a rulemaking or adopts a policy on an issue at one time, and then in a later rulemaking restates the policy or otherwise addresses the issue again without altering the original decision." *CITA-Wireless Ass'n v. FCC*, 466 F.3d 105 (D.C. Cir. 2006). Put differently, "[o]nce an agency reopens an issue, whether by soliciting comments or indicating a willingness to reconsider, a new review period is triggered." *Columbia Falls Aluminum Co. v. EPA*, 139 F. 3d 914, 921 (D.C. Cir. 1998)(internal quotation omitted). The reopening doctrine applies here because, as OCC concedes, the Nonbank Charter Program is the first instance in which OCC applied its purported authority under Section 5.20(e)(1). OCC cannot dispute that it "reopened" this issue.   OCC's March 2017 Explanatory Statement reflects OCC received input regarding its authority, considered it, and ultimately did not change its decision. Compl. Ex. G at 14. Thus, OCC

"opened the issue up anew . . . [and] its renewed adherence is substantively reviewable." *CITA*, 466

F.3d at 110 (internal quotation omitted).

**C.     CSBS's Challenge is also Timely Under the Constructive Reopening Doctrine.**

"An agency [also] may be deemed to have 'constructively reopened' a previously

unchallenged decision if its original rulemaking did not give adequate notice or incentive to contest

the agency's decision." *Nat'l Ass'n of Mfrs. v. DOI*, 134 F.3d 1095, 1104 (D.C. Cir. 1998).

Specifically, "changed circumstances can constructively reopen a rule by the change in the regulatory

context." *Sierra Club v. EPA*, 551 F.3d 1019, 1025 (D.C. Cir. 2008)(internal quotation omitted). For

example, "[a] constructive reopening occurs if the revision of accompanying regulations significantly

alters the stakes of judicial review, as the result of a change that could have not been reasonably

anticipated." *Id*. (internal quotations omitted). *See, e.g., Kennecott Utah Copper Corp. v. DOI*, 88

F.3d 1191, 1227 (D.C. Cir. 1996) ("Simply put, [the challenged regulations] may not have been worth

challenging in 1986, but the 1994 Regulations gave them a new significance.").

Here, as in *Sierra Club*, the Nonbank Charter Program has "changed the calculus for [the

member states] in seeking judicial review, and thereby constructively reopened [Section 5.20(e)(1)]"

for substantive challenge. 551 F.3d at 1026. Given the scant legal analysis accompanying the 2003

rulemaking, it was unsettled—until the Nonbank Charter Program began—how OCC interpreted or

would implement Section 5.20(e)(1). For example, it was unclear how OCC defined the core banking

functions, or whether OCC would require a national bank to engage in certain functions, at least to

the extent necessary to be eligible for deposit insurance under the FDIA. OCC took *no* action to

exercise its purported authority under Section 5.20(e)(1) for nearly fourteen years, and first made its

legal position clear through its Nonbank Charter Program. This program was thus a "sea change,"

which enables the states to challenge the validity of Section 5.20(e)(1). *See Nat'l Res. Def. Council

v. EPA*, 571 F.3d 1245, 1266 (D.C. Cir. 2009).

24

Additionally, by OCC's own admission, the rapid growth of the fintech industry (to which the Nonbank Charter Program is primarily, but not exclusively, directed) was not imaginable when Section 5.20(e)(1) was promulgated in 2003. Indeed, the Licensing Manual Supplement begins by explaining that "[t]echnological innovations have revolutionized the way financial products and services are delivered and have enabled the development of new products and service." Compl. Ex. C. The agency's future action, and the resulting degree of infringement on the states' jurisdiction over nonbanks, "could not have been reasonably anticipated" in 2003. *See Sierra Club,* 551 F.3d at 1025.

### D. CSBS Could File a Petition for Amendment/Rescission of Section 5.20(e)(1).

Finally, allowing an otherwise time-barred challenge to proceed "is supported by [the D.C. Circuit's] long-standing rule that . . . a claim that agency action was violative of statute may be raised outside a statutory limitations period, by filing a petition for amendment or rescission of the agency's regulations, and challenging the denial of that petition." *Public Citizen v. NRC*, 901 F.2d 147, 152 (D.C. Cir. 1990). Although CSBS has not filed such a petition, it is not required to do so because such a requirement "would be a waste of everyone's time and resources." *Id.*

## V. OCC's STATUTORY INTERPRETATIONS ARE NOT ENTITLED TO *CHEVRON* DEFERENCE BECAUSE THEY HINGE UPON THE INTERPRETATION OF STATUTES OVER WHICH IT LACKS EXCLUSIVE AUTHORITY.

OCC's determination that it had authority to institute the Nonbank Chartering Program rests on the interpretation of two fundamental questions: the requirements under federal banking statutes to be lawfully entitled to commence and carry on the "business of banking"; and the definition of "branch" found in the McFadden Act. *See* 68 Fed. Reg. 70122, 70127 (2003) (stating that the purpose of amending Section 5.20(e)(1) was to clarify that a "limited purpose national bank may exist" provided it conducts at least one of three core banking functions and that "[t]hese functions are based

on 12 U.S.C. 36, which identifies activities that cause a facility to be considered a bank branch."). It receives deference for neither interpretation.

OCC's interpretation of the requirements to be lawfully entitled to commence and carry on the "business of banking" is not entitled to deference because it is based on a reading of several statutes OCC lacks the authority to administer. As detailed in Section VI below, OCC cannot interpret its chartering authority in isolation.  Rather, the NBA requires OCC to comply with multiple legal restrictions when chartering associations to carry on the "business of banking," necessitating a careful balance of Congress's related but separate statutory regimes governing the commencement of the business of banking--including the BHCA, FDIA and FRA, which are administered by other agencies. This Supreme Court has recently reiterated that the "reconciliation" and harmonization of separate statutory regimes is a "'matter for the courts,' not agencies." *Epic Sys. Corp. v. Lewis*, 138 S.Ct. 1612, 1629 (2018).  Accordingly, OCC's interpretation of whether the legal restrictions from other statutes governing the commencement of the business of banking require "national banks" to take deposits is entitled to no deference.  *See, e.g.  Grant Thornton, LLP v. Office of Comptroller,* 514 F.3d 1328, 1331 (2008) ("We review the OCC's interpretation of FIRREA and related statutory provisions *de novo* because multiple agencies besides the Comptroller administer the act.").  OCC points to several cases in which its interpretation of the NBA was afforded deference (OCC Br. at 19), but those cases stand only for the proposition that OCC receives deference where it is interpreting an *ambiguous* term in the NBA in *isolation*. Agencies receive no deference with respect to unambiguous statutes.  *See National Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 984 (2005).  And none of those cases concerned OCC's chartering authority or the interpretation of other banking statutes.

Nor is OCC's interpretation of the definition of "branch" in the McFadden Act (12 U.S.C. § 36) entitled to deference.  OCC admits that its definition of "national bank" is premised on its understanding of Section 36's "branch" definition.  Because OCC explicitly does not have authority

26

to administer Section 36, its interpretation of this requirement gets no deference. *See* 12 U.S.C. § 93a ("[T]he Comptroller of the Currency is authorized to prescribe rules and regulations to carry out the responsibilities of the office, except that the authority conferred by this section *does not apply to section 36* of this title") (emphasis added).

The breadth of authority OCC has asserted also militates heavily against deference. *See, e.g., FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000) (refusing to defer to agency in light of "the history and the breadth of authority that the FDA has asserted"). *Compare MCI Telecomms. Corp. v. AT&T Co.*, 512 U.S. 218, 231 (1994) ("highly unlikely that Congress would leave the determination of whether an industry will be entirely, or even substantially, rate-regulated to agency discretion -- and even more unlikely that it would achieve that through such a subtle device as permission to "modify" rate-filing requirements."), *with* OCC Br. at 27 (using definition of a branch of a bank to charter thousands of new fintechs). Thus, even if the court were to find that OCC's interpretation derives principally from a statute it administers, *Chevron* is still inapplicable in that the interpretation represents an agency's attempt to vastly increase the scope of its authority to reach a separate and distinct financial sector.

## VI.    THE TERM "BUSINESS OF BANKING" IS NOT AMBIGUOUS IN THE CONTEXT OF THIS CASE

### A.    In Determining Ambiguity, the Court Must Look Beyond the NBA.

OCC is not entitled to deference because the term "business of banking" is unambiguous in this context. In arguing ambiguity, OCC fixates on the absence of an express definition *within* the NBA. However, the analytical framework established by *Chevron* does not allow a myopic focus on definitional provisions or plain language. It requires courts to "exhaust traditional tools of statutory construction" to determine whether Congress has spoken on the subject. *Sierra Club v. EPA*, 551 F.3d 1019, 1027 (D.C. Cir. 2008). *See, e.g. Clark v. Suarez Martinez*, 543 U.S. 371, 402 (2005) ("before deferring to an agency's interpretation of a statute, so too should we exhaust those tools

27

before deciding that a statute is ambiguous and that an alternative plausible construction of the statute should be adopted").  To that end, the Court must examine not only any relevant definitions but also employ such familiar tools as *in pari materia*, statutory context, legislative history, the rule against surplusage, *expressio unis*, and common sense. *See, e.g. Brown* v. *Gardner,* 513 U.S. 115, 118 (1994) ("Ambiguity is a creature not of definitional possibilities but of statutory context").  These tools reveal there is no "gap."  The only plausible reading requires the taking of deposits.

> B.      **The Statutory Context of the NBA—including the Interplay Between the NBA, FRA, FDIA and BHCA—Reflects Congress's Intent that a National Bank Must Engage in Deposit Taking to Carry on the "Business of Banking."**

Contrary to OCC's assertions, "business of banking," as used in the NBA chartering provisions, cannot be considered in isolation.  The NBA makes clear OCC must ensure that a charter is "not inconsistent with the law" (12 U.S.C. § 21), and that national banks are "lawfully entitled to commence the business of banking," and able to "carry on the business of banking" under the NBA *and the laws of the United States*. *See* (12 U.S.C. §§ 26 and 27(a); 12 U.S.C. §§ 37 and 25b(a)(1)(A) (defining national bank); see also *California Bank v. Kennedy*, 167 U.S. 362, 366 (1897) ("United States statutes relative to national banks constitute the measure of the authority of such corporations . . ."). Other banking statutes mandating certain actions in commencing and carrying on the business of banking or otherwise share a significant purpose with the NBA chartering provisions, and necessarily bear upon the nature and type of national banks OCC can lawfully charter.  For this reason, the promulgation of Section 5.20(e)(1) and the establishment of the Nonbank Charter Program cannot, as OCC asserts, rest solely on OCC's interpretation of the NBA's text. *See First Nat'l Bank of Logan v. Walker Bank & Trust Co.*, 385 U.S. 252, 261 (1966) ("[i]t is a strange argument that permits one to pick and choose what portion of the law binds him")

The NBA is a piece of a multi-faceted banking regulatory scheme that includes a variety of regulatory agencies and interrelated federal statutes—including not only the NBA, but also the FRA,

FDIA, and BHCA. The Court must consider each of these statutes to determine meaning of the "business of banking." To interpret this provision of the NBA otherwise would upend the harmony across this regulatory regime by empowering OCC to create and charter a wholly separate class of national banks, evading the congressionally-intended application of other federal banking statutes. *See Whitney*, 379 U.S. 411 (holding that OCC cannot approve charter under the NBA if the charter would violate the BHCA).

Such a result also would violate the settled presumption that, absent congressional authorization to the contrary, terms in related statutes or the same administrative scheme must be interpreted in tandem, as balanced parts of a coherent regulatory regime. *See, e.g.*, S*ullivan v. Stroop*, 496 U.S. 478, 484 (1990); *see also ETSI Pipeline Project v. Missouri*, 484 U.S. 495, 517 (1988)(agencies may not exercise authority "in a manner that is inconsistent with the administrative structure that Congress enacted into law"). "In determining whether Congress has specifically addressed the question at issue, a reviewing court should not confine itself to examining a particular statutory provision in isolation." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000); *Abuelhawa v. United States*, 556 U.S. 816, 819 (2009)("statutes are not read as a collection of isolated phrases")(citation omitted). "The meaning—or ambiguity—of certain words or phrases may only become evident when placed in context." *Id.*; *Indep. Ins. Agents of Am., Inc. v. Hawke*, 211 F.3d 638, 643 (D.C. Cir. 2000)("While the word 'incidental' may be a poster child for ambiguity, we find that it is not ambiguous in the context of general insurance activities.").

Thus, a court must ensure that the statutory provision is interpreted in harmony with (and reference to) related statutes dealing with the same subject and the same general principle, so as to give effect to a joint regulatory scheme. *Sullivan*, 496 U.S. at 484. To that end, comparable words used in different statutes on the same subject are interpreted to have consistent meanings. *Williams v. Taylor*, 529 U.S. 420 (2000); *see also Brown v. Gardner*, 513 U.S. 115, 118 (1994)("Ambiguity is a

creature not of definitional possibilities but of statutory context."). A "broad statute when passed 'may have a range of plausible meanings,' but subsequent acts can narrow those meanings 'where the scope of the earlier statute is broad but the subsequent statutes more specifically address the topic at hand.'" *Hawke*, 211 F.3d at 643 (citations omitted).

Here, the NBA is only one of several banking statutes designed to address similar principles and reflect Congress's banking regulatory goals. *See, e.g.*, *Colo. Nat'l Bank v. Bedford*, 310 U.S. 41, 48 (1940)(recognizing that the NBA "correlated with the Federal Reserve Act, . . . has developed the present nationwide banking facilities"). Thus, this Court must employ the only interpretation of the "business of banking" that ensures harmony among these related statutes.[11]  *Epic Sys. Corp. v. Lewis*, 138 S.Ct. 1612, 1632 (2018) ("Because we can easily read Congress's statutes to work in harmony, that is where our duty lies.").

> **1.   Pursuant to the NBA, FDIA, and FRA, to be lawfully entitled to commence the "business of banking," a national bank must be "engaged in the business of receiving deposits."**

The interplay of the FRA, FDIA and the NBA makes clear that the business of banking must include engaging in receiving deposits.  To form a national bank, the NBA requires natural persons[12] to: (1) file articles of association containing provisions "not inconsistent with the law," 12 U.S.C. §

---

[11] OCC's argument that the Court should ignore later-enacted statutes because they were authored by a different Congress (OCC Brief pp. 38-39) is contrary to law. *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 143, 120 S. Ct. 1291, 1306 (2000) ("classic judicial task of reconciling many laws enacted over time, and getting them to 'make sense' in combination, necessarily assumes that the implications of a statute may be altered by the implications of a later statute."). In fact, OCC's entire interpretation rests upon a provision of a later-enacted statute, namely, the definition of branch in the McFadden Act of 1927, Pub. L. 69-639, § 7(f), 44 Stat. 1228 (1927).

[12] The NBA only allows natural persons to organize national banks; a legal entity can only become a national bank through a conversion under 12 U.S.C. § 35. This section requires that the conversion not be "in contravention of state law" and that the entity qualify as a "bank," which the OCC has defined to mean any banking institution "engaged in the business of receiving deposits." 12 C.F.R. 5.24(c)(2). So the Nonbank Charter Program for nonbank fintech *companies* is effectively allowing for the *de facto* conversion of a nonbank general business corporation (or some analogous state charter) to a federal corporate charter in a manner that is not permitted or covered by Section 35.

21; and (2) be "lawfully entitled to commence the business of banking." 12 U.S.C. §§ 26 and 27(a).

Only if *both* of these conditions are met may the Comptroller grant the charter.  Once the charter is

granted, the national bank is empowered to exercise powers necessary to carry on the business of

banking, but these too are "subject to law." 12 U.S.C. § 24(Seventh).

A national bank cannot lawfully commence the business of banking unless it becomes an

FDIC-insured bank.  The FRA requires every national bank, upon "commencing business," to become

a member of the Federal Reserve System and an "insured bank" under the FDIA. *See* 12 U.S.C. §

222.  To become an "insured bank," a bank must take the specific action of applying to the FDIC for

deposit insurance.  To be eligible to apply, a bank must be "engaged in the business of receiving

deposits other than trust funds." 12 U.S.C. § 1815(a)(1). Thus, due to the FRA deposit insurance

mandate, a national bank cannot lawfully commence the business of banking under the NBA unless

it "engages in the business of receiving deposits other than trust funds" as defined under the FDIA

and FDIC regulations. *See* 12 C.F.R. 303.14 (defining being "engaged in the business of receiving

deposits other than trust funds").

Absent specific congressional authorization to charter an institution to carry on a business

other than banking, national banks chartered by OCC must, *at a minimum*, be engaged in receiving

deposits in order to comply with federal law found in the FRA and FDIA so as to be "lawfully

entitled" to commence the banking business under the NBA. Congress has provided such

authorization for other entities, such as special purpose national trust companies, 12 U.S.C. § 27(a),

which, by definition, lack the power to engage in receiving deposits other than trust funds.  But OCC

does not claim any such express authorization for Nonbank Charters.

OCC also downplays the significance of Section 222, arguing it simply "confer[s] the status

of 'insured bank' on those national banks that need to obtain deposit insurance under 12 U.S.C. §

1815(a)(1)."  But OCC ignores the plain language and legislative intent of Sections 222 and 1815.

Interpreting Section 222 as automatically conferring this status would render Section 1815's application requirement irrelevant surplusage. It would also relegate to *OCC* the authority to make a final determination as to whether a *national bank* is eligible for (or required to obtain) deposit insurance. For a period, national banks did automatically receive deposit insurance and, consequently, OCC used to be authorized to make the first and final determination as to whether an institution was engaged in the business of receiving deposits. But that is no longer the case. Congress, with the enactment of the Federal Deposit Insurance Corporation Improvement Act of 1991 ("FDICIA"), Pub. L. 102-242, 105 Stat. 2236 (1991), purposefully *took away from OCC* and gave to the FDIC the exclusive authority to make such determinations. *See id.* at § 115(b), 105 Stat. 2249; *see also* 12 U.S.C. §§ 1815(a)(6) (FDIC's authority to deny applications is nondelegable) 1818(p) (FDIC's termination finding "shall be conclusive"). Additionally, OCC's interpretation of Section 222 as a passive statute, imposing no real requirements, also ignores that Section 222 clearly requires action. The text provides that "failure to do so shall subject such bank to the penalty provided by Section 501a of this title." Section 501a provides that "[s]hould any national banking association in the United States now organized fail . . . to become a member bank . . . all of the rights, privileges, and franchises of such association granted to it under the [NBA] . . . shall be forfeited."

Thus, Section 222 must be read, as the FRB (the agency with authority to administer this provision) has interpreted it; namely, to "require a national bank both to become a member of the Federal Reserve and to be insured by the FDIC." *See Economic Growth and Regulatory Paperwork Reduction Act: Hearing on S. 650 Before the S. Comm. on Banking*, 104th Cong., 91-92 (1995) (testimony of then-Comptroller Ludwig quoting FRB's interpretation and advocating for repeal of the FRA deposit insurance mandate to allow for the chartering of uninsured national banks). To interpret Sections 222 and 1815 otherwise would be contrary to the intent of FDICIA, as it would authorize OCC to wield the FDIC's authority and make final determinations as to whether an institution is

"engaged in the business of receiving deposits."  This is precisely the sort of power grab to which courts have refused to defer.  *See Epic Sys. Corp.*, 138 S. Ct. at 1629;  *Brown*, 529 U.S. at 160.

OCC's other attempts at interpreting the FDIA are equally unconvincing.  Eligibility to file a deposit insurance application under Section 1815(a)(1) is limited to those institutions "engaged in the business of receiving deposits, other than trust funds" because "state savings associations" are not, like "state banks," defined to only include institutions engaged in receiving deposits, *see* 12 U.S.C. § 1813(a)(2), (b)(3),  or, like national banks and federal savings associations, required to obtain deposit insurance under federal law, *see* 12 U.S.C. § 222 (national banks); 12 C.F.R. § 5.20(e)(3) (federal savings associations). Additionally, the only references to "non-insured banks" were added to require FDIC approval of mergers between uninsured state banks and savings associations and FDIC-insured banks. *See* 12 U.S.C. § 1828(c)(1).  Finally, the FDIA reference to uninsured banks was added shortly after OCC was given the authority to charter national trust companies, *see infra* Section VII A, and at the same time OCC was given authority to charter national bankers banks, *see infra* Section VII C, to ensure OCC had enforcement authority with respect to these special purpose charters expressly authorized by the NBA. *See* S. Rep. No. 97-536, at 61 (1982).

> **2.    The "business of banking" must be interpreted consistently with the BHCA definition of a "bank," which encompasses only deposit-taking institutions.**

The "business of banking" must require engaging in receiving deposits in order to give full effect to the BHCA and the NBA's joint regulatory scheme. Congress envisioned that the BHCA and NBA would operate in harmony to fulfill a common purpose: restricting entry into the banking system and maintaining the separation of banking and commerce. It is through the BHCA's and NBA's overlapping regulations concerning "banks" and the "business of banking" that these purposes are accomplished. *See Whitney*, 379 U.S. at 417-26 (the NBA and BHCA should be interpreted in harmony and OCC cannot approve that would violate the BHCA's terms or clearly intended policies).

Just as a state or national bank charter is required to engage in the business of banking, 12 U.S.C. § 378(a)(2), the BHCA prohibits a company from acquiring a "bank" without prior approval by the FRB, 12 U.S.C. 1842(a). Additionally, just as the powers of national banks are limited to those within the business of banking, 12 U.S.C. § 24(Seventh), the activities of a bank holding company are limited to those "closely related to banking," 12 U.S.C. § 1843(c)(8).

The BHCA defines a "bank" as an organization that either (1) is an insured bank as defined in Section 3(h) of the FDIA or (2) accepts demand deposits or deposits that may be withdrawn by check or similar means for payments to third parties or others; *and* engages in the business of making commercial loans. 12 U.S.C. §§ 1841(c)(1)(A) and (B). Because Congress expressly defined a "bank" in the BHCA as a deposit-taking institution, any interpretation of the NBA's comparable term "business of banking" that allows chartering nonbanks creates a class of bank charters wholly outside BHCA's restrictions, thereby allowing commerce and banking to commingle without oversight by FRB. Due to the interplay between the two agencies and these two statutes, the only definition of "bank" under the BHCA must be one that establishes the "inner limits,"[13] *i.e.* the essential elements, of what constitutes the "business of banking" under the NBA. *Indep. Bankers Ass'n of Am. v. Conover*, 1985 U.S. Dist. Lexis 22529, *33 (M.D. Fla. 1985).

OCC argues that there is precedent for ignoring the BHCA in this context, but none of their cases involved chartering national banks. Instead, they involved national bank *activities*, to which the BHCA bore only a "tangential relationship." *See Independent Ins. Agents of Am. v. Ludwig*, 997 F.2d 958, 962 (D.C. Cir. 1993) (assessing validity of OCC's interpretation of geographic restrictions on insurance sales); *see also American Ins. Ass'n. v. Clarke*, 865 F.2d 278, 288 (D.C. Cir. 1989)

---

[13] Symons, Edward L. Jr., *The "Business of Banking" in Historical Perspective*, 51 Geo. Wash. L. Rev. 676, 718 (1983).

(declining to find that OCC approval of application to establish operating subsidiary to offer municipal bond insurance constituted a substantial issue under the BHCA).

Because the BHCA unambiguously requires that national banks take deposits, the Court's interpretation, not OCC's, controls. *See Brand X*, 545 U.S. at 984. Alternatively, to the extent the Court finds ambiguity regarding the BHCA's language or reach, that ambiguity cannot be resolved by OCC. In the national bank chartering context, the Federal Reserve Board must make the initial consideration of legality under the BHCA. *See Whitney*, 379 U.S. at 426 n.7. As long as a substantial BHCA issue is present, an applicant is not "lawfully entitled to commence the business of banking" as required by the NBA. *See id.* at 425. The present case deals with substantial questions under the BHCA, namely, whether the BHCA anti-tying restrictions would apply to Nonbank Charters as they do to institutions explicitly exempted from the definition of bank, *see* 12 U.S.C. 1843(h), and whether the recipient of a Nonbank Charter should, unlike institutions explicitly exempted from the definition of bank, be permitted unrestricted access to Federal Reserve services, including payments system and discount window access. *See* 12 U.S.C. 1841(c)(2)(D)(iv) (exempting trust companies from definition of bank provided they do not obtain payments system or discount window access), (H)(ii) (exempting industrial loan companies from definition of bank provided they do not use certain federal reserve payment services). The *Whitney* doctrine is designed precisely to capture circumstances where the Comptroller's actions would, as here, prevent effective review by the Federal Reserve Board of a substantial issue arising under the BHCA. *See Whitney*, 379 U.S. at 423, 426 n. 7, 427-428.

Accordingly, to adopt OCC's argument would allow OCC to interpret the "business of banking" in a manner that would nullify any separation of banking from commerce, undermine the intent of Congress in closing the nonbank bank loophole, *see infra* Section VII C, and permit OCC to determine issues falling exclusively within the jurisdiction of the Federal Reserve Board.

## VII.   COURTS HAVE REPEATEDLY STRUCK DOWN OCC'S ATTEMPTS TO CHARTER ENTITIES THAT WOULD NOT CARRY ON THE "BUSINESS OF BANKING," AND OCC HAS BEEN REQUIRED TO OBTAIN SPECIFIC CONGRESSIONAL AUTHORITY BEFORE DOING SO.

This is not the first time OCC has exceeded the limits of its chartering authority. Each time, the courts struck down those efforts, concluding OCC is not empowered to charter such institutions unless specifically authorized by Congress. Ultimately, OCC is permitted to charter institutions: (1) where the institution is a national bank organized to carry on "the business of banking," which, under current law, includes (at a minimum) taking deposits (a "full-service national bank" or "national bank"), or (2) where Congress has, after an opportunity for consideration, taken specific action to allow OCC to charter an entity to carry on a special purpose (a "special purpose national bank").

Currently, Congressional authorization exists to charter only two categories of special-purpose national banks: national trust companies and banker's banks. *See* 12 U.S.C. § 27(a) and (b). Specific legislative authorization was required for these categories, because solely providing fiduciary services or correspondent banking services did not, under existing law, qualify as carrying on the business of banking. This would not have been necessary if OCC already possessed the broad authority it now claims. This legislative history, and litigation surrounding OCC's prior chartering efforts, illustrate that the sweeping authority OCC claims to possess simply does not exist under the current regulatory regime. The Court should be "obliged to defer not to the agency's expansive construction of the statute, but to Congress' consistent judgment" that OCC "does not have the power" to charter nonbanks. *FDA v. Brown & William. Tobac. Corp.*, 529 U.S. 120, 160 (2000).

### A.   OCC's Effort to Charter National Trust Companies Not Engaged in the "Business of Banking" Was Rejected by a Federal Court, and OCC Could Not Grant This Type of Charter Until Specific Authority Was Granted in an NBA Amendment.

OCC's authority to charter one category of special-purpose national banks—national trust companies—derives from a specific amendment to the NBA enacted in 1978, now codified in 12

U.S.C. § 27(a). Before this amendment, a federal court rejected OCC's attempt to charter a national bank whose activities would be limited to the fiduciary services provided by a trust company, holding that OCC lacked authority to charter an institution that would not engage in *any* of the general banking powers enumerated in Section 24(Seventh) of the NBA. *National State Bank*, 1977 U.S. Dist. LEXIS 18184.

The *National State Bank* court reasoned that the Comptroller may not deprive a national bank of the banking powers of deposit-taking and lending, since Section 24 mandates that a national bank "shall have" such powers, and Section 22 mandates that a national bank have "operations of discount and deposit." *Id*. at *21-24. The court further reasoned that, since general fiduciary duty activities were not part of the "business of banking" under the NBA, among other things, a national trust company would not be organized to avail itself of the advantages of the NBA (as required by Section 22) and would not be formed for the "legitimate objects" contemplated by the NBA (as required by Section 27). *Id*. at *22, 28.

In response to this litigation, OCC was required to obtain from Congress an amendment to the NBA that specifically authorized the chartering of national trust companies. *See* Financial Institutions Regulatory and Interest Rate Control Act of 1978 ("FIRIRCA"), Pub. L. 95-630, 92 Stat. 3641 (amending 12 U.S.C. § 27(a)).[14]   Congress gave OCC specific authorization to create national trust companies, the first type of special-purpose chartering authority conferred upon it. The amendment was adopted while the *National State Bank* ruling was on appeal, and the Third Circuit ultimately reversed the lower court's ruling based upon the retroactive application of the new statutory provision, without addressing the validity of the lower court's decision at the time it was made. *National State Bank*, 591 F.2d at 231-32.

---

[14] A sentence was added to Section 27(a) stating that "A National Bank Association . . . is not illegally constituted solely because its operations are or have been required by the Comptroller of the Currency to be limited to those of a trust company and activities related thereto."

OCC contends that the *National State Bank* ruling should be disregarded because it ceased to have any force and effect after the court's reasoning was superseded by the FIRIRCA amendment. But the change in the law effected by the amendment does not call into question the lower court's reasoning. By modifying the NBA to allow OCC to charter national trust companies, Congress effectively acknowledged the *National State Bank* lower court's ruling. Had Congress believed OCC had broad authority to issue a charter to organizations not engaged in the business of banking, like the trust company at issue, there would have been no need for this amendment.

**B.    OCC's Power to Charter Banker's Banks, Another Special-Purpose National Bank, Derives From Specific Statutory Authority.**

OCC's power to charter the second category of special-purpose banks—banker's banks— derives from explicit Congressional authority granted with the further amendment of Section 27 of the NBA. Section 27(b) was added to the NBA as another narrow addition to the OCC's chartering authority. *See* Pub. L. 97-320, title IV, § 404(a), Oct. 15, 1982, 96 Stat. 1511. As with the NBA amendment to add chartering authority for trust companies, Congress could have adopted language granting the OCC broader authority, but instead limited the authority to chartering institutions carrying on the special purpose of providing correspondent banking services.

**C.    A Federal Court and Congress Have Both Rejected OCC's Prior Efforts to Issue National Charters to "Nonbank Banks."**

In the decade following *National State Bank*, a court once again blocked OCC's efforts to issue special-purpose charters beyond its authority, granting an injunction prohibiting OCC from issuing such charters to "nonbank banks." *Independent Bankers Assn. of America v. Conover*, No. 84-1403-Civ-J-12, 1985 U.S. Dist. LEXIS 22529 (M.D. Fl. Feb. 15, 1985). In the 1980s, OCC began soliciting applications to charter nonbank banks to exploit a loophole that existed in the BHCA during that time which allowed banks to evade the restrictions of the BHCA.  Prior to the passage of Competitive Equality in Banking Act of 1987 ("CEBA"), the BHCA defined a bank as "any

institution . . . which (1) accepts deposits that the depositor has a legal right to withdraw on demand, *and* (2) engages in the business of making commercial loans." (emphasis added). Because it was framed in the conjunctive, however, it had the unintended effect of creating an apparent exemption for the chartering of "nonbank banks"—national banks that refrained from *either* accepting demand deposits or making commercial loans.

In the midst of the "nonbank bank loophole" controversy, the IBAA challenged OCC's authority to charter nonbank banks in *Conover*. The court held that the activities mentioned in the definition of "bank" in the BHCA, as amended in 1970, "represent[] a recognition by Congress that the acceptance of demand deposits and the making of commercial loans constitute the historic core activities of banks and the essence of the business of banking." *Conover,* 1985 U.S. Dist. LEXIS at *31. The court likewise noted that it must "favor statutory construction which enables statutes to complement one another" and construe statutes on the same subject matter "together to give effect to a joint regulatory scheme." *Id*. at *32. As a result, the court concluded that the activities included in the definition of "bank" under the BHCA constitute the minimum, essential elements of the "business of banking" under the NBA and, accordingly, "a financial institution that is legally unable to engage in both activities cannot engage in the 'business of banking' within the meaning of the NBA." *Id*. at *33.

The court also relied on the history of the amendments to the NBA that authorized the chartering of trust companies and bankers' banks:

> It is clear that when Congress has wanted to expand the authority of the Comptroller to charter national associations that are not to be engaged in the business of banking, it has done so through specific amendments. If Congress had intended that the Comptroller have broad chartering authority over various types of financial institutions, there would have been no need for the trust company and bankers' bank amendments, and those amendments would not have been narrowly drawn.

*Id*. at *35-36. Following OCC's defeat in *Conover*, Congress declined to adopt legislation extending to OCC the special-purpose chartering authority it had attempted to assert with respect to "nonbank

banks." To the contrary, after discussing *Conover* at length during hearings on the nonbank bank loophole[15] (*see* Section V(B), *supra*), Congress closed the loophole by amending the definition of "bank" in the BHCA (via the Competitive Equality in Banking Act of 1987)("CEBA")) to broaden its coverage to include all banks engaged in deposit-taking and thereby capture all full-service national banks. *See* 12 U.S.C. § 1841(c)(defining "bank" to include "insured banks"—*i.e.* banks "engaged in the business of receiving deposits" under the FDIA). Congress' aim of redefining "bank" so as to close the nonbank bank loophole and foreclose the chartering of new nonbank banks was only achievable by establishing, as the court did in *Conover*, that the prevailing definition of "bank" under the BHCA establishes the "inner limits," or minimum content, of the business of banking under the NBA. Thus, Congress codified *Conover* by incorporating the court's conclusion that, to be engaged in the "business of banking" under the NBA, an applicant must be a "bank" under the BHCA.

OCC contends that *Conover* is "not good law" because it was merely a ruling on a motion for preliminary injunction, which was later vacated when the case was voluntarily dismissed. OCC Brief at 35. But the subsequent resolution of the case does not detract from the court's reasoning, nor does it change Congress's action (and inaction) in response to the litigation.  OCC also argues that, to the extent *Conover* relied in part upon the "intentional avoidance of regulation" as justification for its ruling, that rationale was later "discounted" by the Supreme Court in *Board of Governors of the Fed. Reserve Sys. v. Dimension Financial Corp.*, 474 U.S. 361, 374 (1986).

OCC asserts that *Conover* conflicts with two cases upon which OCC significantly relies, *NationsBank* and *ICBA v. FRB*, but for the reasons discussed below (Sections VII(D) and (E)), these

---

[15] *See, e.g.*, S. Rep. No. 100-19, at 7 (1987)(stating the need for "prompt congressional action to close the nonbank bank loophole" because OCC "moved to vacate the district court injunction that prevents him from chartering new nonbank banks").

cases have no bearing on the issue before the Court.[16]

**D. *ICBA v. FRB* Undermines, Rather than Supports, OCC's Promulgation of Section 5.20(e)(1) and the Nonbank Charter Program.**

OCC relies heavily on the decision in *Indep. Cmty. Bankers Assoc. v. Bd. of Governors of the Fed. Reserve Sys.,* 820 F.2d 428 (D.C. Cir. 1987)("*ICBA v. FRB*") which held that a South Dakota statute permitting interstate acquisitions of credit card banks did not violate the BHCA and implied that the formation of a national credit card bank was not impermissible under the NBA. OCC asserts that the reasoning in *ICBA v. FRB* endorses OCC's authority to charter special purpose national banks and supports the promulgation of Section 5.20(e)(1).

However, unlike the present controversy, that case did not concern whether engaging in receiving deposits was required to be engaged in the "business of banking"; the credit card bank at issue indisputably engaged in the activities necessary to qualify as a "bank" under the BHCA, including deposit-taking, and was "engaged in the business of receiving deposits" under the FDIA. *See ICBA v. FRB*, 820 F.2d at 439. OCC hides in a footnote of its brief this particularly salient fact. *See* OCC Brief at 25. Contrary to OCC's assertion, the status of the credit card bank at issue as a "bank" under the BHCA due to its engagement in deposit-taking was absolutely central to the court's reasoning because this status was a necessary condition for there to be a controversy for the court to decide in the first place and the Federal Reserve Board approval relied upon by the court was conditioned upon the credit card bank being a "bank" under the BHCA and insured by the FDIC. *See Citicorp*, 67 Fed. Res. Bull. 181, 182-83 (1981).

---

[16] OCC's cite to *Oulton v. German Sav. & Loan*, 84 U.S. 109 (1872), does not change this analysis. *Oulton* involved a *savings and loan society* challenging the application of a *tax* statute levied on its *deposits*; the Court did not consider whether deposits were a necessary component of the business of banking under the NBA. Shortly after *Oulton*, the Supreme Court clarified that deposit-taking is an indispensable element of banking. *Warren v. Shook*, 91 U.S. 704, 708 (1875) (defining three core banking functions in conjunctive and including receipt of deposits); *Selden v. Equitable Tr. Co.*, 94 U.S. 419, 423 (1876) (confirming indispensable nature of deposit-taking, holding that a company that only "lent its own money, taking bonds and mortgages therefor" is not a "banker").

Accordingly, the court was not faced with the question raised by the Nonbank Charter Program and Section 5.20(e)(1), namely, whether chartering national bank that does not engage in receiving deposits "conflicts with the purposes of the NBA" because it "interferes with the bank's ability to fulfill its statutory obligations." *See ICBA v. FRB*, 820 F.2d at 440. Although the facts of *ICBA v. FRB* render its holding inapposite, were the test laid out in that case applied to here, OCC's interpretation would be unlawful because it authorizes the chartering of national banks that would be unable to fulfill their basic statutory obligations, see supra Section VI.

While there is no express reference to chartering authority for credit card banks in the NBA, additional explicit authority to charter credit card banks is not necessary because, as national banks, credit card banks must be FDIC insured and therefore *do* engage in deposit-taking activities and their formation has been approved on this basis. *See Citicorp*, 67 Fed. Res. Bull. 181, 182-83 (1981) (cited in *ICBA v. FRB*, 820 F.2d at 439-440); *see also* 12 U.S.C. §§ 1841(c)(2)(F) (contemplating that credit card banks accept "savings or time deposit[s]" and maintain one office "that accepts deposits"); Fein, Melanie, FEDERAL BANK HOLDING COMPANY LAW § 5.05[3][e] (2017). As entities that engage in receiving deposits (and unlike the entities that would receive the charter at issue here), credit card banks conduct the minimum, essential activities necessary to carry on the "business of banking," and thus fall squarely within OCC's chartering authority.

For all of the reasons set forth herein, to be *lawfully* entitled to commence the "business of banking" under the NBA, BHCA, FDIA and FRA, a national bank must be "engaged in the business of receiving deposits" as defined in the FDIA. The Nonbank Charter Program "interferes" with the charter-holder's ability to "fulfill its statutory obligations" under these banking laws.

E.   **Nationsbank and Similar Cases are Inapplicable Because They Address the Outer Limits of the Business of Banking, Not the Inner Limits.**

Many of the cases cited by OCC have no bearing on whether the minimal requirements to receive a national bank charter are ambiguous, because each of these cases involved the wholly

42

separate question of what an existing, properly chartered national bank can and cannot do.   OCC improperly conflates two distinct concepts: the threshold question of what powers a national bank must exercise in order to carry on the "business of banking," which implicates the *inner limits* of the term; and the separate question of the extent to which OCC can expand the scope of permissible banking activities not previously determined to be within the "business of banking," which implicates the *outer limits* of the term. This dispute requires an interpretation of the *inner* limits. Cases defining the *outer* limits of OCC's authority to expand the powers that emanate from that national charter have no bearing on this determination. *See Conover*, 1985 U.S. Dist. LEXIS 22529, at *21 n.2.

The primary case upon which OCC relies, *Nationsbank of North Carolina, N.A. v. Variable Annuity Life Ins. Co.*, 513 U.S. 251 (1995), did not consider, much less determine, whether the already chartered national bank at the center of the case was properly chartered, much less whether it must take deposits. The Court did not address the central question here—namely, whether OCC possesses the authority to charter a bank that does not exercise the power to receive deposits. Rather, the Court considered whether OCC could permit a full-service national bank (*i.e.*, a bank that takes deposits) to also act as an agent in the sale of annuities. Accordingly, the ruling turned on the extent to which OCC could permit a national bank to engage in *additional* activities beyond those that qualified it to receive a national bank charter. *Id*. at 257-58. In so doing, the Court focused on OCC's discretion to define the *outer* limits of the business of banking—something that is not at issue here.  The Court did not analyze what core activities constitute the "business of banking;" rather, it considered whether the sale of annuities fell within the broader universe of permissible activities within the business of banking. *Id*. at 257-58.

OCC particularly relies upon a footnote in *Nationsbank*, 513 U.S. at 258 n.2, but even this language makes clear that the focus of the ruling is the outer limits of permissible banking activities. In describing the limits of its holding, the Court warned that the Comptroller's interpretation of the

"business of banking" in this context "must be kept within reasonable bounds" and defined these "reasonable bounds" solely by reference to activities in which a national bank cannot engage. *See id*. The Court did not consider or assess the activities in which an entity must engage to carry on the "business of banking." The holding that the "'business of banking' is not limited to the enumerated powers in § 24(Seventh) and that the [OCC] therefore has discretion to authorize activities beyond those specifically enumerated," *Nationsbank*, 513 U.S. at 258 n.2, simply does not address the question at hand.

The same is true of the remaining cases cited by OCC. Several cases involve challenges to interpretive/approval letters issued by OCC authorizing certain activities *in addition to* traditional banking functions and, in doing so, discerning the *outer* limits of the "business of banking" clause but giving no consideration to its *inner* limits. *See, e.g.*, *M&M Leasing Corp. v. Seattle First Nat'l Bank*, 563 F.2d 1377, 1382 (9th Cir. 1977)(equipment lease financing is within the business of banking); *Am. Ins. Ass'n v. Clarke* 743 F. Supp. 491, 492-99 (W.D. Tex. 1989)(municipal bond issuance); *Arnold Tours Inc. v. Camp*, 472 F.2d 427, 431 (1st Cir. 1972)  (operating a travel agency is not within the business of banking). OCC cannot use these "outer limits" cases to redefine the purposes for which national banks may be formed.

## VIII.   OCC UNREASONABLY EQUATES THE "BUSINESS OF BANKING" WITH THE DEFINITION OF "BRANCH."

Even if the meaning of "business of banking" were ambiguous here (which it is not), OCC's interpretation fails because it is not "based on a permissible construction of the statute." *Hawke*, 211 F.3d at 646. OCC acknowledges that it bases its authority to promulgate Section 5.20(e)(1) and adopt the Nonbank Charter Program upon its interpretation of 12 U.S.C. § 36(j)—a provision of the NBA that sets out the activities that, when conducted apart from its chartered premises, will cause an office of a national bank to be considered a branch. This is a novel, unprecedented interpretation of a long-standing statute that OCC lacks authority to implement through rulemaking, and, accordingly, is

44

entitled to no deference. *See Atwater v. D.C. Dep't of Consum. & Reg. Affairs*, 566 A.2d 462, 468 (D.C. 1989). OCC's assertion that the definition of "branch" in Section 36(j) constitutes the inner limits, or minimum content, of the "business of banking" carried on by national banks, is indefensible. It nullifies any distinction between a "national banking association" and a mere "branch" of such an association, violates the legislative intent behind Sections 36 and 81, and is undermined by the Supreme Court's holding in *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388 (1987).

### A. Conflating a "national bank" with a "branch" of a national bank ignores the plain statutory language of the NBA.

Unlike the provisions of the FRA, BHCA, and FDIA cited above, the NBA chartering provisions and the separate McFadden Act restrictions on the location of national bank operations do not share a common purpose. The NBA chartering provisions (12 U.S.C. 21-27) limit the type or character of institutions that OCC may lawfully charter by designating "business of banking" or other special purposes as the purposes for which national banks may be chartered. The location provisions (12 U.S.C. 36 and 81), on the other hand, restrict geographic expansion within the national banking system by designating where certain activities of a national bank may be conducted. Thus, the term "general business" in Section 81 and the definition of "branch" in Section 36 are legally significant solely in restricting the geographic operations of an existing national bank, whereas the term "business of banking" in the NBA chartering provisions is legally significant in controlling whether a national bank may exist at all. Since the purpose and legal significance of the terms in the chartering provisions and location provisions do not bear even a tangential relation to one another, OCC's reliance on the latter to interpret the former is unreasonable and unpersuasive.

In concluding otherwise, OCC ignores clear statutory distinctions between chartering national banks and establishing branches and, relatedly, those between the main office of a national bank as opposed to its branch office(s). The plain language of the NBA clearly distinguishes between the branch of a national bank and the main office of a national bank, *see*, *e.g.*, 12 U.S.C. §§ 30, 36 and

81. By its express terms, Section 36 permits national banks only to "establish and operate branches," 12 U.S.C. § 36(c), and does not even come into consideration unless and until a national bank has been properly chartered. *See Independent Bankers Asso. v. Smith*, 534 F.2d 921, 951-52 (D.C. Cir. 1976)(to qualify as a "branch" under section 36, a facility must be "established" by a national bank).

Nothing in the text, structure, or legislative history of the NBA or the McFadden Act suggests that Congress meant for the definition of "branch" in Section 36 or the phrase "general business" in Section 81 to define the minimum activities required for a national bank charter. *See Leonardi v. Chase Nat'l Bank*, 81 F.2d 19, 22 (2d Cir. 1936) (Sections 36 and 81 refer to the establishment of branch banks, not national banks); *see also Pineland State Bank v. Proposed First Nat'l Bank*, 335 F. Supp. 1376, 1379 (D.N.J. 1971)(the definition of "branch" in 12 U.S.C. 36 "obviously . . . has no application to the creation or establishment of a new national bank").

### B.      OCC's interpretation expands its power through statutes designed to limit it.

Using Section 36's definition of "branch" to deconstruct the "business of banking" and redefine what qualifies as a national bank would turn the intent of the NBA branching and locational restrictions on its head. In conflating the circumstances under which activities of a national bank become subject to state laws regarding branching *restrictions* with the requirements for granting a national bank charter, OCC asks this Court to find that Congress used Sections 36 and 81 to prevent the proliferation of national bank offices without regard to state laws and, at the same time, to foster the creation of nondepository national banks that would enjoy substantial immunity from state laws. Clearly, Congress did not intend such an absurd result.

Prior to the passage of Section 36 in the McFadden Act, the Attorney General held that a national bank is not, under its charter, authorized to establish branches, *see Lowry National Bank*, 29 Op. Att'y Gen. 81 (1911), a conclusion reiterated by the Supreme Court in 1924. *First Nat'l Bank v. Missouri*, 263 U.S. 640, 659 (1924). Concerned about "unlimited branching," Congress promulgated

46

Section 36 as a "limited exception to the otherwise applicable requirement of Section 81 that 'the general business of each national banking association shall be transacted in the place specified in its organization certificate . . .'" *Clarke*, 479 U.S. at 388, 401. The broad definition of branch was not intended to mirror the requirements for issuing a lawful charter. Rather, to ensure that the specific exception permitting branching in Section 36 did not subsume the location restrictions in Section 81, Congress established the broadest possible definition of "branch" to include every statutory branching function, even if exercised separately from the other branching functions. 67 Cong. Rec. 2860 (Rep. Celler explaining that the definition of branch is intended to stop the proliferation of "teller windows" at which only one banking function takes place). To further preserve state law, Congress also limited OCC's discretion to alter the definition of "branch" by specifically denying OCC any rulemaking authority to implement Section 36. *See* 12 U.S.C. § 93a. This should, at a minimum, prohibit OCC from using Section 36 to bootstrap an expansion of its chartering authority.

Lastly, OCC's interpretation also undermines the very purpose of Section 36. Congress intended for Section 36 "to place national and state banks on a basis of 'competitive equality'," *see First National Bank of Logan*, 385 U.S. at 256, in part, by defining national banks and state banks consistently. But under OCC's prior interpretations, state banks are defined as entities that engage in *all three* core banking functions (*see* 1985 QJ LEXIS 812, at *21-22), while national banks would now be defined as entities that only engage in one. Finally, OCC's interpretation would enable the complete circumvention of Section 36 by enabling nonbank charter holders to use a holding company exempt from the BHCA to establish *de facto* branches that would not be subject to the restrictions of Section 36 because they would not be "established" by a national bank.

### C.     Clarke v. Securities Industry Association undermines OCC's position.

OCC's misplaced reliance on the Supreme Court's decision in *Clarke v. SIA* demonstrates the unreasonableness of its claim that a nondepository national bank can be chartered without express

authorization from Congress. As an initial matter, *Clarke* did not address the crucial question here—what constitutes the minimum content of the business of banking in determining whether a national bank charter may be properly issued. The Court considered only the entirely separate question of whether the restrictions on the location of a national bank's place of business apply to all activity within the "business of banking," or only those activities that are part of the bank's "core banking functions." *Clarke,* 479 U.S. at 388.  The Court specifically framed the question in *Clarke* as "what activities banks can engage in without regard to the limitations imposed by state branching law," *not* "what activities banks could engage in at all." *Id*. at 403. Nevertheless, OCC relies on *Clarke* to define the "business of banking" as used in the NBA chartering provisions, first, by equating that term with a national bank's "general business" that is subject to the locational restrictions of Section 81 and, second, by concluding that the "general business" conducted by a national bank's main office should be defined to include any one of the three core banking functions. *Clarke* actually prohibits drawing either conclusion.

First, the Court rejected plaintiff's argument, reiterated here by OCC, that the phrase "general business" in Section 81 should be read to be coterminous with the term "business of banking" as used in the NBA chartering provisions. *Id*. at 404-06. Relying on the *Lowry National Bank* Attorney General opinion, the Court reasoned that, since there is a "particular class of business incident to the banking business" that does not fall within a national bank's "general business" under Section 81, the phrase "general business" cannot be held to have the same meaning as the broader term "business of banking." *Id.* at 404-05. Accordingly, the Court held that the limitation on the locus of a national bank's "general business" covers only those activities that are part of the bank's core banking functions, not all activity within the "business of banking." *Id*. OCC cannot rely on *Clarke* as support for the notion that the "general business" and the "business of banking" can be equated; the Court expressly held otherwise.

48

Second, *Clarke* did not suggest, as OCC claims, that the exercise of at least one of the three core banking functions defines the "general business" conducted by the main office of a national bank. The Court did not reach this question because, having concluded that the "business of banking" cannot be equated with the "general business," the only question remaining was whether the extra-office discount brokerage services activity at issue qualified as a core banking function necessitating the establishment of a branch. *Id*. at 409 (". . . it suffices, to decide this case, to hold that the operation of a discount brokerage service is not a core banking function."). Additionally, OCC did not consider or even mention Section 81 or the terms "general business" or "core banking functions" in the challenged application, but rather approved the application solely by concluding that the "non-chartered offices . . . will not constitute branches under the McFadden Act." *Id*. at 391.  In fact, the interpretation advanced in the briefs filed by OCC in *Clarke* refer to deposit-taking, if not all three activities, as necessary functions. Thus, even if the Court were to ignore the holding in *Clarke* that the meaning of the terms "business of banking" and "general business" cannot be equated, the plain language of the NBA and prior OCC interpretations indicate that the "general business" of a national bank's main office includes *all three core banking functions*, including deposit-taking.

The OCC's argument in the *Clarke* briefs finds support in the language of the NBA and related OCC interpretations. Section 81 commands that the "general business of each national banking association shall be transacted in the place specified in its organization certificate."  That place – the national bank's main office – is described in 12 U.S.C. § 22 as the "place where its operations of discount *and deposit* are to be carried on" (emphasis added).  Additionally, OCC itself has defined the term "banking business" for purposes of Section 36 as necessarily including the exercise of all three core banking functions. In the very interpretive letter that coined the term "core banking functions", OCC interpreted the term "banking business" in the definition of "state bank" as follows: ". . . the National Bank Act essentially reduces the business of banking, in perhaps its simplest form,

to accepting deposits, making loans, *and* paying checks," *see* 1985 OCC QJ LEXIS 812, at \*21-22 (emphasis added), an interpretation affirmed by the Fifth Circuit, *see Dep't of Banking & Consumer Fin. v. Clarke*, 809 F.2d 266, 268 (5th Cir. 1987). Thus, to the extent that the phrase "general business" has any bearing on the meaning of the "business of banking," the NBA's plain language and longstanding OCC interpretations jointly establish that the "general business" that a national bank "shall" transact at its main office under Section 81 must encompass *all three core banking functions*, including deposit-taking.

## IX.   OCC HAS NOT DEMONSTRATED A "CLEAR INDICATION" THAT IT HAS AUTHORITY TO PREEMPT STATE LAW BY ISSUING NATIONAL BANK CHARTERS TO NON-DEPOSITORY INSTITUTIONS, AND CSBS'S TENTH AMENDMENT CLAIM THEREFORE SHOULD NOT BE DISMISSED.

OCC seeks to dismiss CSBS's Tenth Amendment claim, asserting that the NBA displaces conflicting state law. This argument misses the point. CSBS does not challenge *Congress's* authority to regulate national bank operations; CSBS challenges *OCC's* authority to infringe upon traditional areas of state regulation without clear authorization from Congress. "Where, as here, we are confronted with state consumer protection laws, 'a field traditionally regulated by the states, compelling evidence of an intention to preempt is required.'" *Lusnak v. Bank of Am.*, N.A., 883 F.3d 1185, 1191 (9th Cir. 2018) (citing *Aguayo v. U.S. Bank*, 653 F.3d 912, 917 (9th Cir. 2011), quoting *General Motors Corp. v. Abrams*, 897 F.2d 34, 41-42 (2d Cir. 1990)). Moreover, even where Congress has granted OCC power to preempt inconsistent state law, this authority cannot be used to "run afoul of federal laws governing the activities of national banks." *CSBS v. Conover*, 710 F.2d 878, 885 (D.C. Cir. 1983). Yet OCC has done exactly that.

The Supreme Court has "never assumed lightly that Congress has derogated state regulation." *New York State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 654 (1995)(citations omitted). There are three requirements. First, if the agency pushes the limits of its authority against the rights of states, there must be a *clear indication* that Congress intended to allow

50

it to do so.  *See Solid Waste Agency v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 172 (2001).  In analyzing this requirement, the court "must interpret the statute to determine whether Congress has given [the agency] the power to act as it has, and . . . do so without any presumption one way or the other." *New York v. FERC*, 535 U.S. 1, 18 (2002)("*FERC*") (quotations omitted); *see also Garrelts v. Smithkline Beecham Corp.*, 943 F. Supp. 1023, 1042 (N.D. Iowa 1996) (explaining lack of deference).  Second, the agency's preemption determination must be under "proper circumstances." *New York v. FCC*, 486 U.S. 57, 64 (1988). These proper circumstances arise only where the agency has a "broad grant of authority to reconcile conflicting policies" and adopted "a reasonable accommodation of [those] conflicting policies." *United States v. Shimer,* 367 U.S. 374, 383 (1961). Third, the accommodation will not stand if "it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned." *Id*.

OCC fails each part of this test.  As explained *supra*, the Nonbank Charter Program triggers significant risks to traditional areas of state concern; namely, licensing and oversight of nonbank financial services providers. *See, e.g.*, *Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 756 (1985)(citations omitted).  OCC is entitled to no deference in its regulation of nonbank financial services providers (*FERC*, 535 U.S. at 18), and there must be a "clear indication" that Congress intended to allow OCC to act as it has. *Solid Waste Agency*, 531 U.S. at 172. Yet, far from approving, Congress has rejected OCC's efforts to expand its chartering authority to nonbanks. *See* Section VII(C). Congress has taken significant steps to preserve States' traditional role in chartering, regulating and supervising State banks, *see*, *e.g.*, Section VIII(B) (branching limits), and in licensing, regulating and supervising nondepository financial services providers, *see*, *e.g*., S.A.F.E. Mortgage Licensing Act, Pub. L. 110–289, §1501 *et. seq.*, 122 Stat. 2810 (2008)(12 U.S.C. § 5101 *et. seq.*).

Further, OCC does not argue it has accommodated (much less reasonably so) any state interests. It merely catalogs the ways a purportedly *valid* federal regulation preempts conflicting state

law. OCC's silence on this balancing confirms that it has given no thought to state interests and has provided no accommodation. OCC's actions only underscore why the accommodation requirement exists—to prevent an agency from "confer[ring] power upon itself." *See Louisiana Pub. Serv. Comm'n.*, 476 U.S. 355, 374-75 (1986) ("To permit an agency to expand its power in the face of a congressional limitation on its jurisdiction would be to grant to the agency power to override Congress. This we are both unwilling and unable to do.").[17]

To the extent that the creation of a federal charter for nonbanks is viewed as enabling a *de facto* conversion, see *infra* n. 12, of state-chartered nonbank institutions to a federal charter, the NBA runs afoul the Tenth Amendment because it enables a conversion in contravention of state law. *See Hopkins Fed. Sav. & Loan Asso. v. Cleary*, 296 U.S. 315, 335 (1935) ("to the extent that [Section 5(i) of the Home Owners' Loan Act] permits the conversion of state associations into federal ones in contravention of the laws of the place of their creation, is an unconstitutional encroachment upon the reserved powers of the states."). In *Hopkins*, the Supreme Court found Section 5(i) to be unconstitutional not only because it allowed state savings institutions to convert to federal charters without state permission, but also because it permitted them to escape the supervisory control of the chartering state. *Id.* at 337. The Nonbank Charter Program triggers the same outcome that concerned the *Hopkins* Court.

The Supreme Court's holdings in other cases that regulation of national bank operations is a prerogative of Congress does not alter this analysis. See *Watters v. Wachovia Bank, N.A.*, 550 U.S. 1 (2007). Unlike the rulemaking extending NBA preemption to nondepository operating subsidiaries

---

[17] *CSBS v. Conover* does not support OCC. The ruling acknowledged that the Comptroller's "power to preempt inconsistent state law" is limited, and does not "authorize activities that run afoul of federal laws governing the activities of national banks." 710 F.2d 878, 885 (D.C. Cir. 1983). OCC has done exactly that by promulgating a regulation and adopting a chartering program that improperly expands OCC's chartering authority in a manner that conflicts with provisions of the NBA and other statutes that govern national banks. *See* Sections VI(A) and VI(B).

of national banks (the issue in *Watters*), Section 5.20(e)(1) changes the charter type and corporate status of state-chartered nonbank entities licensed by the states.  In the words of *Hopkins*, OCC has "put an end to corporations created by the states and turn[ed] them into different corporations created by the nation."  *Hopkins*, 296 U.S. at 336.  The Tenth Amendment bars the federal government from destroying states' sovereign authority to determine the nature, scope, and duration of powers that may be exercised by state-chartered corporations, and, therefore, prohibits the OCC's actions.

**X.    THE NONBANK CHARTER PROGRAM IS AN UNLAWFUL PREEMPTION DETERMINATION (AND OCC'S ASSERTIONS TO THE CONTRARY ARE ENTITLED TO *SKIDMORE* DEFERENCE AT BEST).**

Because the NBA "does not occupy the field in any area of state law" (12 U.S.C. § 25b(b)(4)), Congress requires the OCC to make an official preemption determination regarding state laws. *See* 12 USC 25b(b)(1) (state laws preempted "only if" one of three preemption standards met).[18]  To comply with this mandate, OCC's preemption determinations are subject to formal notice and comment. *Id.*; 12 U.S.C. § 43.  These requirements were adopted as part of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 (Pub. L. 111-203, H.R. 4173) which, among other things, invalidated certain rules previously promulgated by OCC that prevented states from exercising visitorial authority over national bank operating subsidiaries.  In adopting Section 25b and other reforms, Congress sought to reverse OCC's actions that "created an environment where abusive mortgage lending could flourish without State controls" in an effort "to attract additional charters." S. Rep. No. 111-176, at 16-17 (2010).

Here, OCC has already made a preemption determination through the very establishment of the Nonbank Charter Program, without following the procedures imposed by Congress and flagrantly

---

[18] OCC's attempt to interpret Section 25b to render preemption determinations merely permissible, not mandatory, is flawed.  The statute's use of the term "may" clearly indicates that this required interpretation "may" be issued *either* by the court or OCC and does not turn this essential requirement into an option. *See* 12 U.S.C. 25b(b)(1)(B).

disregarding the very purpose of those procedures--to prevent the inappropriate preemption of state regulatory oversight.  When OCC established the Nonbank Charter Program, it necessarily decided that the same broad preemption applicable to "full-service national bank[s]" will also apply to nonbanks chartered under Section 5.20(e)(1).  OCC Br. at 17, n. 7.  In deciding that the Nonbank Charter Program will preempt each state's laws to the same extent as the NBA preempts state law for national banks, OCC conclusively determined that it would displace numerous state laws.  *Id.* at 44 ("a fintech chartered as a national bank under Section 5.20(e)(1) would be entitled to the protections of the [NBA] against state interference.").  In fact, OCC markets the nonbank charter as an "option" for entities who want a "regulatory structure" *other than* state licensing laws and regulatory oversight. (Compl. Ex. A). There can be no dispute that OCC's decision to displace state laws governing nonbanks is an unprecedented and, therefore, *new* determination triggering its statutory obligations. Until the establishment of the Nonbank Charter Program, OCC has never asserted that the broad preemption afforded insured national banks applies to nonbank charters issued by OCC because no such charters have ever been issued.

OCC mischaracterizes CSBS's preemption determination argument.  OCC Br. at 16.  OCC need not make a preemption determination "every time" a charter issues because OCC has *already made* the preemption determination, and because the Comptroller's authority to make preemption determinations is not delegable to its licensing staff. 12 U.S.C. § 25b(b)(6).  OCC also claims it has *not yet* made a preemption determination because it has not specifically addressed a "particular state law."  OCC Br. at 17. This is disingenuous. OCC itself has eschewed any notion that preemption determinations must be state-law specific; indeed, in implementing 12 U.S.C. §25b, OCC made "categorical determinations" that certain types of state laws are preempted. *See* 76 Fed. Reg. 43549, 433556-43557 (2011) ("case-by-case procedural requirement applicable to [preemption determinations] allows categorical determinations where multiple state laws are identified.")  In

deciding to apply the same preemption standards to nonbanks, OCC decided that it would displace *all* of the same state laws that national bank preemption displaces, including those laws listed in OCC's regulations that have been categorically determined to be preempted. See 12 CFR 7.4007(a), 7.4008(d), 34.4(a).[19]

Finally, OCC's interpretation of Section 25b is entitled to *Skidmore* deference, at best.  The statute itself makes clear that a court "shall assess the validity of [the OCC's preemption] determinations, depending upon the thoroughness evident in the consideration of the agency, the validity of the reasoning of the agency, the consistency with other valid determinations made by the agency, and other facts which the court finds persuasive." 12 U.S.C. § 25b(b)(5)(A).  Accordingly, OCC's view is entitled to respect only to the extent it has the "power to persuade." *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944); *see also Lusnak*, 883 F.3d 1185 (applying *Skidmore* deference to OCC Section 25b interpretation).  Because OCC made a preemption determination and does not dispute that it did not follow notice and comment procedures, the determination must be set aside.[20]

## CONCLUSION

For all of the foregoing reasons, Defendants' Motion to Dismiss should be denied.

---

[19] Because OCC has listed state consumer financial and consumer protection laws in these regulations, its assertion that the laws covered by Sections 25b and/or Section 43 are not implicated by the Nonbank Charter Program and its Section 25b obligation is baseless.

[20] To the extent OCC alternatively argues that a preemption determination "is not relevant to the chartering process" (OCC Br. 18), that is also incorrect. The Licensing Manual Supplement, consistent with the OCC's Licensing Manual, states that the review of a charter application and decision to grant a charter depends upon compliance with applicable laws and regulations. Ex. 5 at 1. Accordingly, during the review process OCC must determine whether a charter complies with non-preempted state law--which necessarily requires OCC to first determine which state laws are and are not preempted.

Date:  February 5, 2019

Respectfully submitted,

*/s/ Jennifer Ancona Semko*
Jennifer Ancona Semko (Bar No. 481119)
Steven M. Chasin (Bar No. 495853)
Graham Cronogue (Bar No. 104436)
BAKER & McKENZIE LLP
815 Connecticut Avenue NW
Washington, DC 20006
Tel: +1 202 835-4250
Fax: +1 202 416-7055
jennifer.semko@bakermckenzie.com
steven.chasin@bakermckenzie.com
graham.cronogue@bakermckenzie.com

John Gorman
Margaret Liu
Michael Townsley
CONFERENCE OF STATE BANK
SUPERVISORS
1129 20th Street, NW
Washington, DC 20036
Tel: +1 202 296-2840
bgorman@csbs.org
mliu@csbs.org
mtownsley@csbs.org

## CERTIFICATE OF SERVICE

In accordance with LCvR 5.3, I hereby certify that on February 5, 2019, a true and correct

copy of the foregoing P was served on all counsel of record through the Court's CM/ECF system.

*/s/ Jennifer Ancona Semko*
Jennifer Ancona Semko
BAKER & McKENZIE LLP
815 Connecticut Avenue, N.W.
Washington, D.C, 20006
Tel: +1 202 835-4250
Fax: +1 202 416-7055
jennifer.semko@bakermckenzie.com

*Attorney for Plaintiff*

56