# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

CONFERENCE OF STATE BANK
SUPERVISORS,

    *Plaintiff*,

v.

OFFICE OF THE COMPTROLLER OF
THE CURRENCY, *et al.*,

    *Defendants*.

No. 18-cv-2449 (DLF)

## MEMORANDUM OPINION

For the second time in this district, the plaintiff, Conference of State Bank Supervisors (CSBS), challenges the purported Nonbank Charter Decision of the defendants, the Comptroller of the Currency and the Comptroller's Office (collectively, the OCC). *See* Compl. at 40–45, Dkt. 1. This Court dismissed CSBS's first challenge because CSBS lacked standing and its claims were unripe. *See Conference of State Bank Supervisors v. Office of the Comptroller of the Currency* (*CSBS I*), 313 F. Supp. 3d 285, 299 (D.D.C. 2018). Two motions are before the Court: the defendants' Motion to Dismiss, Dkt. 12, and CSBS's Alternative Motion for Leave to Conduct Jurisdictional Discovery, Dkt. 16. The Court will grant the defendants' motion to dismiss because CSBS continues to lack standing and its claims remain unripe. And the Court will deny CSBS's motion for discovery because the OCC has agreed to provide the information necessary to establish standing and because that information is publicly available.

Not much has happened since *CSBS I* that affects the jurisdiction analysis.[1] In its most recent complaint, CSBS does not allege that any financial technology company (a so-called "Fintech") has applied for a charter, let alone that the OCC has chartered a Fintech. Compl. ¶ 119. It highlights two arguably relevant events: the Senate confirming Joseph Otting as Comptroller of the Currency, *id.* ¶ 22, and on July 31, 2019 the OCC finalizing its once-draft policy to charter Fintechs, *id.* ¶¶ 7–9. Yet because neither event "cure[s] the original jurisdictional deficiency" identified in *CSBS I* "[i]ssue preclusion bars [the Court] from reconsidering whether [CSBS] suffered Article III injury." *Nat'l Ass'n of Home Builders v. Envtl. Prot. Agency*, 786 F.3d 34, 41–42 (D.C. Cir. 2015).[2]

To start, CSBS still "fails to plead an injury in fact" that is either actual or imminent. *CSBS I*, 313 F. Supp. 3d at 299. In *CSBS I*, the Court reasoned that each of the alleged "harms [was] contingent on whether the OCC charters a Fintech." *Id.* at 296. That reasoning still applies because CSBS's alleged harms remain the same, and the OCC still has not chartered a Fintech. The Court also said:

> Several contingent and speculative events must occur before the OCC charters a Fintech: (1) the OCC must decide to finalize a procedure for handling those applications; (2) a Fintech company must choose to apply for a charter; (3) the particular Fintech must substantively satisfy regulatory requirements; and (4) the OCC must decide to grant the charter to the particular Fintech.

---

[1] CSBS's latest complaint is nearly identical to its first. The Court discussed at length the background and applicable legal standards in *CSBS I*, 313 F. Supp. 3d at 291–94, and does not restate them here.

[2] The Court acknowledges that Judge Marrero in the Southern District of New York concluded in a similar case that the plaintiff had established standing. *See* Pl.'s Notice at 1, Dkt. 22 (citing *Vullo v. Office of the Comptroller of the Currency, et. al.*, No. 18-cv-08377 (S.D.N.Y. May 2, 2019)). The Court respectfully disagrees with *Vullo*, to the extent that its reasoning conflicts with either this opinion or *CSBS I*.

*Id.* At the time, none of these four events had occurred. *Id.* Since then, the OCC has finalized its procedure for handling Fintech applications. But what was true then remains true today:

> [T]he second step—a Fintech's electing to apply—ha[s] not occurred, let alone the third or fourth. In fact, an aspiring Fintech that does not accept deposits plausibly could have attempted to apply for a charter anytime since the 2003 regulations took effect. And yet in the [now over] fifteen years between those regulations and the complaint, the OCC posits—and CSBS does not plead otherwise—that not one Fintech of the type described by the complaint has attempted to apply for a national charter.

*Id.* at 297. In addition, "CSBS [still] does not allege in more than a conclusory fashion that its members suffer an injury from a 'substantial risk' of harm, and CSBS certainly does not allege that any such risk 'may prompt its members to reasonably incur costs to mitigate or avoid that harm.'" *Id.* (original alterations omitted) (quoting *Clapper v. Amnesty Int'l*, 568 U.S. 398, 414 n.5 (2013)). This case also remains distinguishable from those other cases in which "CSBS seeks refuge . . . to show regulatory injuries" because "not a single Fintech has ever applied for a charter." *Id.*; *see id.* at 297–98.

On top of this, CSBS's second complaint "remain[s] inadequate" because it "fails to identify in its complaint which particular member of the organization" faces imminent injury. *Id.* at 298–99. Though the latest complaint generally identifies laws from each state that cover mortgage lending, consumer lending, and money transmission, *see* Compl. Ex. 4, Dkt. 1-4, it does not connect those general laws to any particular actual or imminent harm. And it stays silent about which state bank supervisors—CSBS's members—face imminent injury. *See id.* That silence alone warrants dismissal. *See CSBS I*, 313 F.3d at 298–99 (explaining that associational standing requires "plead[ing] an imminent injury to some particular member"). CSBS's omission is unsurprising given that no Fintech—in any state—has applied for a charter.

3

Until then, CSBS can only guess which states and which members face imminent injury. As the Court said in *CSBS I*:

> [T]he identification requirement serves an important gatekeeping role. It highlights the challenge of determining whether any particular state will be injured before a particular Fintech, if any, receives a charter. A national charter could injure Indiana without injuring Alaska, or vice versa. As it stands, the complaint does not equip the Court to decide which state to consider when evaluating standing, what role the CSBS member has in that state's regulatory system, or whether there are any Fintech companies within that state that are likely to receive a national charter. And the identification requirement ensures that the Court considers the likelihood of injury to individual members of the organization, thus preventing the organization from gaining standing by combining several alleged injuries that are inadequate separately.

*Id.* at 299. This reasoning still applies. The bottom line is that despite the now-final policy and the Comptroller's confirmation, CSBS still fails to "carry its burden" of "demonstrat[ing] that it has standing to survive a Rule 12(b)(1) motion" for nearly all the same reasons as before. *Id.*

This dispute also remains neither "constitutionally [n]or prudentially ripe for determination." *Id.* For one thing, "[t]his dispute [still] would benefit from a more concrete setting and additional percolation." *Id.* at 300. As in *CSBS I*, "this dispute will be sharpened if the OCC charters a particular Fintech—or decides to do so imminently." *Id.* Though the "procedures that may lead to issuing a Fintech charter" are now final and the OCC's leadership is settled, "there are [still] many other procedural hurdles to overcome before a charter could be granted." *Id.* As such, "[a]ny procedural review at this point would be piecemeal, potentially involving a new legal challenge every time the OCC takes a step towards a result disfavored by a trade organization." *Id.* at 300–01. In addition, this dispute presents the same "legal issues that are unfit for review" absent "a more concrete setting" to resolve them. *Id.* at 301.

For another, CSBS also makes no new attempt to explain how "withholding a decision will cause hardship to the parties" that "would be immediate and significant." *Id.* (quotation

4

omitted). CSBS alleges hardship to "charter applicants," Pl.'s Opp. at 19, but charter applicants are not parties. And the other hardships that CSBS alleges—"confusion" and "budgetary and resource allocation complications" among the states, *id.* at 13—are not "immediate and significant" hardships that outweigh the "institutional interests in the deferral of review," *CSBS I*, 313 F. Supp. at 301.

As before, "the prudential ripeness doctrine counsels in favor of allowing time to sharpen this dispute before deciding it. Indeed, there may ultimately be no case to decide at all if the OCC does not charter a Fintech." *Id.* Thus, "even if CSBS had successfully alleged an injury in fact, this case is prudentially unripe." *Id.*

Finally, CSBS's request for jurisdictional discovery covering pre-application activity is unwarranted. *See* Pl.'s Disc. Br., Dkt. 16-1. As the Court has explained, it will lack jurisdiction over CSBS's claims at least until a Fintech applies for a charter. And CSBS can learn whether and when a Fintech has applied for a charter without discovery because that information is public. A charter applicant must "publish a notice of its filing in a newspaper of general circulation in the community in which the applicant proposes to engage in business." 12 C.F.R. § 5.8(a). In addition, the OCC notices new charter applications in a "Weekly Bulletin" published on its website. Lybarger Decl. ¶ 8; *see* Pl.'s Disc. Reply Ex. D at 6, Dkt. 21-6. And recognizing the importance of this information, the OCC has agreed to "notify the Court and CSBS when an applicant makes [the] public notice required under 12 C.F.R. § 5.8." Defs.' Disc. Opp'n at 3, Dkt. 18.

CSBS critiques the OCC's offer as "tellingly narrow and insufficient." Pl.'s Disc. Reply at 13 n.6, Dkt. 21. CSBS argues that the OCC has "broad discretion to waive the Section 5.8 notice requirement," meaning that its offer might not cover certain applicants if the OCC waives

§ 5.8(a)'s public notice requirements for those applicants.  *Id*.  But this argument is misplaced.  Most importantly, § 5.8(a) unequivocally requires an applicant to make public notice.  12 C.F.R. § 5.8 (providing that "an applicant *shall* publish a public notice of its filing") (emphasis added).  And 12 C.F.R. § 5.8(f), which provides that "the OCC may require or give public notice and request comment on any filing and in any manner the OCC determines appropriate for the particular filing," does not affect that requirement.  Section 5.8(f) concerns public notice by the OCC only, not public notice by the applicant.  And it explicitly applies "[i]n addition to"—i.e., not in lieu of—"the foregoing" provisions of § 5.8, which include § 5.8(a).  Moreover, the Court presumes the OCC's offer to be in good faith and expects the OCC to notify CSBS when any Fintech applies for a charter.  And based on CSBS's own contention, the median processing time between the OCC receiving and finally approving a charter application is 162 days; the average is even higher at 215 days.  Townsley Decl. ¶ 6, Dkt. 15-7.  In short, CSBS will know when a Fintech applies for a charter and will have time to challenge that application.

## CONCLUSION

For the foregoing reasons, the Court denies CSBS's Alternative Motion for Leave to Conduct Jurisdictional Discovery, Dkt. 16, and grants the defendants' Motion to Dismiss, Dkt. 12.  A separate order accompanies this memorandum opinion.

_____
DABNEY L. FRIEDRICH
United States District Judge

September 3, 2019